TIMOTHY W. SNIDER, OSB No. 034577
timothy.snider@stoel.com
JAMES A. KILCUP, OSB No. 173891
james.kilcup@stoel.com
KATE S. SHEPHERD, OSB No. 224891
kate.shepherd@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380

KEVIN S. SCHWARTZ, appearing *pro hac vice*
kschwartz@wlrk.com
NOAH B. YAVITZ, appearing *pro hac vice*
nbyavitz@wlrk.com
ADAM M. GOGOLAK, appearing *pro hac vice*
amgogolak@wlrk.com
SIJIN CHOI, appearing *pro hac vice*
schoi@wlrk.com
JULIA M. BRUCE, appearing *pro hac vice*
jmbruce@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: 212.403.1000

*Attorneys for Defendants Coinbase, Inc. and
Coinbase Global, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| THE STATE OF OREGON, ex rel., DAN RAYFIELD, Attorney General for the STATE OF OREGON,<br><br>  Plaintiff,<br><br>  v.<br><br>COINBASE, INC. and COINBASE GLOBAL, INC.,<br><br>  Defendants. | Case No.: 3:25-CV-0952-jr<br><br><br>**OPPOSITION TO PLAINTIFF'S MOTION TO REMAND** |

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

ARGUMENT ......................................................................................................................12

I.    REMAND SHOULD BE DENIED BECAUSE THIS ACTION
      NECESSARILY RAISES A FEDERAL ISSUE THAT IS DISPUTED
      AND SUBSTANTIAL....................................................................................................12

      A.    Oregon's action necessarily raises a question of federal law. ..............................12

      B.    The disputed issue of federal law in this action implicates a
            substantial federal interest.....................................................................................15

      C.    Removal did not affect the federal-state balance. .................................................18

II.   REMAND SHOULD ALSO BE DENIED BASED ON THE
      FEDERAL-OFFICER REMOVAL STATUTE. .............................................................20

      A.    There is sufficient causal nexus between Oregon's claims and
            Coinbase's federal conduct to deny remand to state court. ...................................22

            1.    Coinbase "acts under" the USMS by operating its
                  trading platform nationwide...........................................................................23

            2.    The Attorney General's claims are connected to and
                  associated with Coinbase's operation of its nationwide
                  trading platform. ...........................................................................................27

      B.    Coinbase has identified colorable federal defenses that warrant
            denial of remand. ...................................................................................................28

III.  THERE IS NO JUSTIFICATION FOR AN AWARD OF FEES. ...................................32

CONCLUSION....................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amerivest Fin., LLC* v. *Malouf*,
    263 Or. App. 327 (Or. App. 2014)........................................................................14

*Bennett* v. *MIS Corp.*,
    607 F.3d 1076 (6th Cir. 2010) ..............................................................................24

*Butcher* v. *Knudsen*,
    38 F.4th 1163 (9th Cir. 2022) ...............................................................................30

*California* v. *CaremarkPCS Health LLC*,
    2024 WL 3770326 (9th Cir. Aug. 13, 2024)........................................................22

*California ex rel. Lockyer* v. *Dynegy, Inc.*,
    375 F.3d 831 (9th Cir. 2004) ................................................................................17

*Casablanca Prods., Inc.* v. *Pace Int'l Rsch., Inc.*,
    697 F. Supp. 1563 (D. Or. 1988) ..........................................................................14

*City & Cnty. of Honolulu* v. *Sunoco LP*,
    39 F.4th 1101 (9th Cir. 2022) ...............................................................................25

*Cnty. of San Mateo* v. *Chevron Corp.*,
    32 F.4th 733 (9th Cir. 2022) ...........................................................................23, 26

*Coinbase, Inc.* v. *SEC*,
    126 F.4th 175 (3d Cir. 2025) .......................................................................7, 8, 30

*Computer Concepts* v. *Brandt*,
    310 Or. 706 (1990)................................................................................................14

*Cousin* v. *Healthcare*,
    2024 WL 1184702 (S.D. Cal. Mar. 19, 2024) ......................................................24

*DeFiore* v. *SOC LLC*,
    85 F.4th 546 (9th Cir. 2023) ........................................................................ *passim*

*FCC* v. *Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)...............................................................................................30

*Geo Grp., Inc.* v. *Newsom*,
    50 F.4th 745 (9th Cir. 2022) (*en banc*) ...............................................................29

*Goncalves By & Through Goncalves* v. *Rady Children's Hosp. San Diego*,
    865 F.3d 1237 (9th Cir. 2017) ...........................................................26

*Gov't of Puerto Rico* v. *Express Scripts, Inc.*,
    119 F.4th 174 (1st Cir. 2024) ...........................................................22

*Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*,
    545 U.S. 308 (2005) .......................................................... *passim*

*Gunn* v. *Minton*,
    568 U.S. 251 (2013) ...................................................................12, 15

*Herbal Brands, Inc.* v. *Photoplaza, Inc.*,
    72 F.4th 1085 (9th Cir. 2023) ...........................................................31

*Jefferson Cnty., Ala* v. *Acker*,
    527 U.S. 423 (1999) ...................................................................23, 27

*Jost* v. *Locke*,
    65 Or. App. 704 (Or. App. 1983) .......................................................14

*Lacano Invs., LLC v. Balash*,
    765 F.3d 1068 (9th Cir. 2014) .......................................................4 n.3

*Leite* v. *Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ...........................................................28

*Los Angeles Police Protective League* v. *City of Los Angeles*,
    2008 WL 11454760 (C.D. Cal. June 20, 2008),
    *aff'd*, 314 F. App'x 72 (9th Cir. 2009) .........................................2, 17

*Martin* v. *Franklin Corp.*,
    546 U.S. 132 (2005) ......................................................................32

*Morris* v. *Blue Shield of California*,
    2017 WL 1653938 (C.D. Cal. May 1, 2017),
    *aff'd*, 918 F.3d 1011 (9th Cir. 2019) ...............................................16

*NASDAQ OMX Grp., Inc.* v. *UBS Secs., LLC*,
    770 F.3d 1010 (2d Cir. 2014) ....................................................16, 17, 19

*Nevada* v. *Bank of America Corporation*,
    672 F.3d 661 (9th Cir. 2012) ...........................................................19

*New York* v. *Arm or Ally, LLC*,
    644 F. Supp. 3d 70 (S.D.N.Y. 2022) ............................................3, 14, 20

*Oregon* v. *United States Dist. Ct. for Dist. of Oregon, Eugene*,
2024 WL 2270514 (9th Cir. May 20, 2024) .........................................................30

*Oregon* v. *Gen. Nutrition Corp.*,
2016 WL 3382137 (D. Or. Mar. 30, 2016),
*adopted by* 2016 WL 3381247 (D. Or. June 14, 2016)...........................................15

*People of State of Cal.* v. *H & H Ship Serv. Co.*,
68 F.3d 481 (9th Cir. 1995) ...............................................................................32

*Pratt* v. *Kross*,
276 Or. 483 (1976)................................................................................13, 14, 15

*Pro 49 Dev., LLC* v. *Ness Express 1, LLC*,
2024 WL 4542306 (E.D. Cal. Oct. 22, 2024) ..................................................5 n.3

*Ranck* v. *Mt. Hood Cable Regul. Comm'n*,
2017 WL 1752954 (D. Or. May 2, 2017) ........................................................12, 17

*Sauk-Suiattle Indian Tribe* v. *City of Seattle*,
56 F.4th 1179 (9th Cir. 2022) .........................................................................18, 20

*Sec. Indus. Ass'n* v. *Bd. of Governors of Fed. Rsrv. Sys.*,
468 U.S. 207 (1984)............................................................................................24

*SEC* v. *Binance Holdings Ltd.*,
738 F. Supp. 3d 20 (D.D.C. 2024) ......................................................................31

*SEC* v. *Coinbase, Inc.*,
761 F. Supp. 3d 702 (S.D.N.Y. 2025)............................................................16, 31

*SEC* v. *Glenn W. Turner Enters.*,
474 F.2d 476 (9th Cir. 1973) ...............................................................................14

*SEC* v. *Murphy*,
50 F.4th 832 (9th Cir. 2022) ...............................................................................24

*SEC* v. *Ripple Labs, Inc.*,
682 F. Supp. 3d 308 (S.D.N.Y. 2023)...................................................................31

*SEC* v. *W.J. Howey Co.*,
328 U.S. 293 (1946).......................................................................3, 13, 14, 15, 31

*Stirling* v. *Minasian*,
955 F.3d 795 (9th Cir. 2020) ...............................................................................32

*United Hous. Found., Inc.* v. *Forman*,
421 U.S. 837 (1975)............................................................................................14

*United States* v. *California*,
    921 F.3d 865 (9th Cir. 2019) ...................................................................................29

*Watson* v. *Phillip Morris Cos., Inc.*,
    551 U.S. 142 (2007) ...............................................................................................23

*West Virginia* v. *Caremark*,
    140 F.4th 188 (4th Cir. 2025) ...............................................................................22

*Willingham* v. *Morgan*,
    395 U.S. 402 (1969) ...............................................................................................28

## Statutes and Rules

28 C.F.R. § 0.111(i) ......................................................................................................23

7 U.S.C. § 13a-2 .............................................................................................19, 19 n.18

7 U.S.C. § 25(c) .......................................................................................................19 n.18

15 U.S.C. § 77h(a) ...........................................................................................................1

15 U.S.C. § 78aa(a) ........................................................................................................19

15 U.S.C. § 78c(a)(1) ................................................................................................16 n.16

15 U.S.C. § 78e ........................................................................................................16 n.16

15 U.S.C. § 78f .........................................................................................................16 n.16

21 U.S.C. § 853 ...............................................................................................................23

28 U.S.C. § 524 .........................................................................................................23, 25

28 U.S.C. § 1331 .............................................................................................................12

28 U.S.C. § 1441(a) ........................................................................................................12

28 U.S.C. § 1442(a)(1) ............................................................................................3, 20, 28

28 U.S.C. § 1447(c) ........................................................................................................32

28 U.S.C. § 1653 .........................................................................................................5 n.3

ORS § 59.035(1) .......................................................................................................21 n.19

**Other Authorities**

HB 2244, Minutes & Exhibits, H. Comm. on Consumer & Bus. Affs.,
    Reg. Sess. (Or. 1985) .........................................................................................21 n.19

Restatement (Third) of Agency § 1.01 (2006)..............................................................24

Restatement (Third) of Agency § 8.06 (2006)......................................................25 n.21

# <u>INTRODUCTION</u>

This case is about regulatory overreach, an attempt by Oregon's Attorney General to override recent federal decisions about the future of digital assets and the nationwide platforms on which they trade. This power-grab invades the province of federal law and belongs in federal court.

1.      Coinbase is the nation's largest digital-asset market, providing a highly liquid platform for customers across the country to trade digital assets since 2012. Over the past decade, as federal policymakers and regulators grappled with how to apply longstanding federal statutes and regulations to novel digital-asset technologies, Coinbase invested heavily in efforts to comply with the evolving regulatory landscape. Following extensive review of Coinbase's trading platform, the SEC, fulfilling its federal statutory mandate to consider "the public interest and the protection of investors," 15 U.S.C. § 77h(a), permitted Coinbase to list as a public U.S. company in 2021. And within the year, other federal agencies — including the Department of Justice — followed in step, with the U.S. Marshals Service ("USMS") retaining Coinbase as its platform for sales of digital assets seized by or forfeited to federal law enforcement.

Throughout this period, Oregon never said a word claiming authority to regulate trades on Coinbase's platform as securities transactions. Just the opposite: Oregon acknowledged publicly that digital assets were "not regulated" by the State of Oregon — "similar to . . . gold," not shares of Nike stock.[1]

Then, in 2023, the SEC abruptly changed course: As part of an ad hoc enforcement sweep against the crypto industry, the SEC sued Coinbase, alleging that it operated an unregistered securities exchange. This new regulation-by-enforcement campaign was resoundingly criticized

---

[1]      *E.g.*, Oregon Div. of Fin. Reg., *Cryptocurrency* (Oct. 12, 2018), https://tinyurl.com/chx49csm.

both within and outside of the SEC. And earlier this year, the SEC dismissed that suit with prejudice, pivoting to a more constructive approach to crypto — including by establishing a Crypto Task Force to develop informed, sensible rules as to when a digital-asset transaction does, and does not, implicate securities laws. This aligns with the work of other federal regulators, such as the CFTC, as well as bipartisan legislation advancing in Congress.

2.      Dissatisfied with the federal government's more recent approach to crypto policymaking and regulation, Oregon's new Attorney General decided that *he* wanted to dictate the future of crypto. So he sued Coinbase in state court, contending for the first time in the decade-plus history since Coinbase's trading platform has been available to Oregonians that the company participates in the sale of unregistered securities in the state by operating that platform, which is relied upon by customers across the country — and also the federal government.

The Attorney General's decision to defy ongoing federal policymaking and regulatory efforts, with the express purpose of attempting to "fill the enforcement vacuum [] left by federal regulators,"[2] plainly implicates "issues of potential national importance [that] are the kinds of issues most properly resolved in a federal forum." *Los Angeles Police Protective League* v. *City of Los Angeles*, 2008 WL 11454760, at *10 (C.D. Cal. June 20, 2008), *aff'd*, 314 F. App'x 72 (9th Cir. 2009). Coinbase therefore removed the action to this Court.

3.      Oregon's motion to remand should be denied, for two independent reasons:

*First*, this Court has jurisdiction because Oregon asserts a claim arising under federal law. The lawsuit hinges on whether certain digital-asset transactions are "investment contracts" and therefore securities under state law. But to answer that question, Oregon looks to *federal* law —

---

[2]      Or. Dep't of Just., *Oregon Attorney General Rayfield Sues Coinbase for Promoting and Selling High-Risk Investments* (Apr. 18, 2025), https://tinyurl.com/5fmerby4.

the standard set by the U.S. Supreme Court's decision in *SEC* v. *W.J. Howey Company*, 328 U.S. 293 (1946) and applied by its progeny. Whether digital-asset transactions on nationwide platforms involve securities is a novel and important legal issue, one that urgently calls for "the experience, solicitude, and hope of uniformity that a federal forum offers." *Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Adjudicating the lawsuit in this Court would be consonant with the "congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. Transactions on nationwide exchanges implicate uniquely federal issues, properly heard in federal court. And "although the State brings only state-law claims, the State itself made the decision to incorporate a federal definition into the relevant state law and, thus, took the risk that suits to enforce the law would be removed to federal court." *New York* v. *Arm or Ally, LLC*, 644 F. Supp. 3d 70, 82 (S.D.N.Y. 2022). Having looked to federal law for decades to determine what is, and what is not, an investment contract, Oregon should not now be permitted to escape a federal court deciding that issue in this case.

*Second*, this action is also subject to removal under 28 U.S.C. § 1442(a)(1), which permits parties acting on behalf of the federal government to remove suits relating to that work. The USMS has engaged Coinbase as its chosen platform for sales of digital assets seized by or forfeited to the federal government — including more than half of the digital assets targeted in this action. Oregon seeks to avoid the removal commanded by statute by amending its complaint to disclaim any alleged violations based on the USMS's sales to Oregonians. But the Attorney General's hollow amendment fails to insulate his claims from this Court's jurisdiction over USMS federal interests.

The post-amendment suit still implicates core federal interests in two ways: it would impair the USMS's interest in Coinbase's performance under its agreements, and as a practical matter it would imperil the market for USMS sales to Oregonians. The USMS retained Coinbase to attain

the "maximum value" and efficiency for its asset sales — performance achieved with the liquidity and scale of Coinbase's nationwide platform. And so Coinbase has operated its trading platform on a nationwide basis, without restriction of Oregonians, as part of its performance on behalf of the USMS. Moreover, the post-amendment suit still seeks to drive Oregonians away from Coinbase, prohibiting them from buying scores of popular digital assets from anyone other than USMS, and prohibiting them from reselling even those USMS assets. In practice, without anyone to sell to, Oregonians would no longer buy those assets using Coinbase's platform (and thus no longer transact with the federal government). This unmistakably impairs the very liquidity and scale on which the USMS relies and that is key to Coinbase's performance. Indeed, if every state followed Oregon's lead, there would be *no* buyers on Coinbase's platform with whom the USMS could transact. The direct nexus between the Attorney General's claims and Coinbase's activities on behalf of the USMS warrants denial of the motion to remand.

*    *    *

For each of these reasons, the Attorney General ought not be permitted to shield his attack on federal interests from review in federal court.

## BACKGROUND

A.    **Coinbase's business.**

Founded in 2012, Coinbase offers the nation's largest platform for trading digital assets. First Amended Complaint ("Am. Compl."), Dkt. No. 18-1 at ¶ 5. Every second of every day, a fully automated matching engine brings together and executes transactions for users around the country from a central order book. *Id.* ¶¶ 61, 62; Decl. ¶ 3.[3] Coinbase's platform thus supports an

---

[3]    "Decl. ¶ __" refers to the Declaration of Brian Foster submitted herewith, which is directed to developments following the filing of Coinbase's Notice of Removal, as relevant to the Court's jurisdiction over this case. "Ex. __" refers to the exhibits to that declaration. These materials are properly before the Court. *See Lacano Invs., LLC* v. *Balash*, 765 F.3d 1068, 1071 (9th Cir. 2014)

integrated and highly liquid national market. Decl. ¶¶ 3, 9.

In tandem with its trading platform, Coinbase also operates Coinbase Prime, a full-service prime brokerage for institutional clients that provides tools for the execution of trades and custody of assets at scale on the Coinbase platform and other connected trading venues. Am. Compl. ¶ 6. Among the features of Coinbase Prime is Coinbase Execution Services, a 24/7 high-touch "agency" trading desk that assists clients in obtaining the best available price and liquidity in the execution of their trades. Am. Compl. ¶ 64.

From inception, Coinbase has invested heavily in efforts to comply with applicable regulatory guidance, including by developing procedures to identify and exclude from listing on its platform any digital assets that might be deemed securities. Notice of Removal ("NOR"), Dkt. No. 1 ¶ 3. Coinbase's investment in compliance was validated in April 2021, when the SEC allowed Coinbase's parent to become a publicly traded company — a determination that followed a thorough review of the company's business, including its trading platform. *Id.*

Not once during this period did the SEC, the CFTC, or any other regulator suggest that Coinbase's core business — its trading platform — runs afoul of laws that regulate the offer and sale of unregistered securities. *Id.* Nor did Oregon. To the contrary, Oregon expressly declared that digital assets were "*not* regulated" by the State, and were "similar to . . . gold." NOR ¶ 4.

### B. The federal government taps Coinbase's trading platform to sell seized and forfeited assets on its behalf.

Under federal law, the USMS has primary responsibility for managing and selling assets

---

(courts "may look beyond the complaint and consider extrinsic evidence" when assessing federal subject matter jurisdiction) (citation omitted). In all events, the Court also has discretion to construe "the supporting documentation submitted along with" this memorandum as an amendment to the Notice of Removal. *Pro 49 Dev., LLC* v. *Ness Express 1, LLC*, 2024 WL 4542306, at *1 (E.D. Cal. Oct. 22, 2024) (citations omitted). In the alternative, Coinbase requests leave to amend its Notice of Removal pursuant to 28 U.S.C. § 1653.

seized by and forfeited to the federal government. For years, the USMS itself managed the custody and sale of the billions in digital assets seized by federal law enforcement. NOR ¶ 24. As this market grew in complexity, however, the USMS decided to retain an outside specialist to perform this work. In December 2022, the agency hired Coinbase to act as its agent in future sales on terms set out in a pair of agreements: the Prime Broker Agreement ("PBA") and the accompanying Master Trade Agreement ("MTA"). NOR ¶ 23.

Coinbase's obligation under these agreements was to sell the seized and forfeited assets for the federal government at the best price then available, per the USMS's direction. NOR ¶ 24. Specifically, Coinbase was required to "provide Client [*i.e.*, the USMS] with access to trade execution and automated trade routing services and Coinbase Execution Services . . . to enable Client[] to submit orders . . . to purchase and sell specified Digital Assets . . . ." Ex. 1 (MTA) at 16. The MTA further provided that "[n]either Coinbase nor any Coinbase Entity [would] sell, transfer, loan, rehypothecate or otherwise alienate Client's Assets credited to Client's Trading Balance *unless instructed by Client* pursuant to an agreement between Client and a Coinbase Entity." *Id.* § 2.7 (emphasis added).

At the USMS's direction, Coinbase performed under the agreements by providing the federal government with access to its nationwide trading platform and services. NOR ¶¶ 23-24; Decl. ¶¶ 7, 15. The central purpose of the agreements was to allow the federal government to tap into the liquidity and price performance of the nationwide private market that Coinbase built — the largest in the country. Decl. ¶¶ 3, 5, 9. Integral to Coinbase's performance under the USMS agreements, therefore, was the continuous operation of its platform, broadly accessible to the national market of buyers and sellers of digital assets within and outside of Oregon, in order to maintain a highly liquid national clearinghouse for sales of federal assets. NOR ¶ 24; Decl. ¶ 15.

To date, Coinbase has sold more than half a million digital assets for the USMS, including transactions in more than half of the specific digital assets targeted by the Attorney General in this action. NOR ¶ 24. Each of these transactions was performed at the specific direction of the USMS, with Coinbase operating as its agent. In each instance, the USMS directed Coinbase to sell specific quantities of specific digital assets at the highest price then-achievable, implementing execution strategies authorized by federal officials. *Id.* ¶¶ 23, 24; Decl. ¶¶ 7, 16-18. Throughout the life of the agreements, the USMS has applied pervasive oversight to Coinbase's operations — including by regular security audits and demands for detailed reporting. Decl. ¶ 20.

## C.    The SEC reverses course and brings an enforcement action against Coinbase.

In 2023, the SEC abruptly pivoted its regulatory stance, launching an enforcement sweep against the digital-asset industry. This included an action in June 2023 accusing Coinbase of failing to register as a national securities exchange under the Securities Exchange Act of 1934 ("Exchange Act"). NOR ¶ 5.

The SEC's ad hoc crypto enforcement campaign was widely criticized, even among federal regulators. As one SEC commissioner observed in dissent, "[u]sing enforcement actions to tell people what the law is in an emerging industry is not an efficient or fair way of regulating."[4] And the U.S. Court of Appeals for the Third Circuit held that the SEC's perfunctory refusal to engage in notice-and-comment rulemaking on the regulation of digital assets was arbitrary and capricious, in violation of federal statute. *Coinbase, Inc.* v. *SEC*, 126 F.4th 175, 202-03 (3d Cir. 2025). As Judge Bibas noted in an extensive concurring opinion, the SEC's "old regulations fit poorly with this new technology, and its enforcement strategy raises constitutional notice concerns." *Id.* at 204.

---

[4]    NOR ¶ 5 (quoting SEC Comm'r Hester M. Peirce, *Kraken Down*: *Statement on SEC* v. *Payward Ventures, Inc., et al.* (Feb. 9, 2023), https://tinyurl.com/2mwnuppr).

The "SEC repeatedly sues crypto companies for not complying with the law," he observed, "yet it will not tell them how to comply." *Id.* at 213.

**D.    Coinbase enters into a new agreement with the USMS.**

While the SEC was suing Coinbase's platform, the USMS continued to rely on the same platform to sell hundreds of millions of dollars in government assets. In March 2024, seeking to expand its use of private companies for the management and disposition of seized digital assets, the USMS posted a "Request for Proposal" that sought bids to fulfill its requirement for managing and disposing of large quantities of popular cryptocurrency assets. Decl. ¶ 8. The goal of this outsourcing effort was to streamline the custody, management, and disposal processes for digital assets while also permitting a diversification of the types of assets the federal government can manage and properly sell upon seizure or forfeiture. *Id.*

Following an open solicitation process, on June 28, 2024 the USMS entered into a multi-year services contract with Coinbase, Inc., pursuant to which the company would custody, manage, and dispose of cryptoassets seized by and forfeited to U.S. federal government agencies with law-enforcement missions, including many of the digital assets targeted by the Attorney General in this action. *Id.* ¶ 9. Under the terms of the new agreement, Coinbase agreed to "remain capable of taking custody of *all* types and quantities of virtual currency *without limitation*" and to "dispose of forfeited virtual currency" upon the request of a designated USMS officer with responsibility for "overall project management and oversight" and "coordinat[ing] the technical aspects" of Coinbase's services. Ex. 2A § 2; Ex. 2B § 9(b)(a) (emphasis added). As with its prior USMS agreements, Coinbase's ability to provide a highly liquid, efficient national market on which to trade USMS assets remained critical. To discharge its responsibilities, Coinbase was obligated to supply the USMS with "a platform that allows for the quick and efficient disposal of cryptocurrency assets," permitting "[d]irect exchange from cryptocurrency into fiat currency

where markets exist." Ex. 2C § 2.4. The contract further provided that "[o]nce a Government cryptocurrency asset has been approved for disposal, the USMS will notify [Coinbase] and indicate which asset(s) under custody will be disposed, via exchange or return, through written documentation (e.g., subtask orders, email, etc.)," with "the ultimate decision regarding the disposal method rest[ing] solely with the USMS." *Id*. §§ 2.4, 2.4.1.

In connection with its performance under the contract, Coinbase expressly agreed that it would serve as an agent of the USMS and a bailee of the federal government. Ex. 2C §§ 1.3, 2.3.5. At all times, Coinbase must operate at the USMS's direction and subject to its guidance, supervision, and control. Decl. ¶ 13. And significantly, Coinbase would be duty-bound to "ensure all services in the contract provide *maximum value* while minimizing expenses to the USMS." Ex. 2C § 1.3 (emphasis added).

Although the new agreement was executed in June 2024, it did not take immediate effect due to a series of bid protests filed by one of Coinbase's competitors, which prompted the USMS to issue a stop-work order. Decl. ¶ 10. Pending the final resolution of those protests, Coinbase continued to perform under its existing agreements with the USMS, including by and through the operation of its trading platform nationwide. *Id*. ¶¶ 10, 15.

### E.   The SEC drops its enforcement action and the federal government pursues comprehensive, uniform policymaking.

In early 2025, the SEC dismissed its action against Coinbase, with prejudice. Acknowledging that its enforcement dragnet had created "confusion about what is legal"[5] and had

---

[5]   NOR ¶ 7 (quoting SEC, *SEC Crypto 2.0: Acting Chairman Uyeda Announces Formation of New Crypto Task Force* (Jan. 21, 2025), https://tinyurl.com/e5fekk55, and citing SEC Comm'r Hester M. Peirce, *The Journey Begins* (Feb. 4, 2025) ("[T]he Commission's handling of crypto has been marked by legal imprecision and commercial impracticality."), https://tinyurl.com/36vd3ykx).

"evaded sound regulatory practice,"[6] the agency launched a Crypto Task Force charged with developing a comprehensive and clear federal regulatory framework for digital assets. The SEC Chair has since "directed Commission staff across [its] policy Divisions to begin drafting rule proposals related to crypto,"[7] and staff have already issued a series of guidance statements addressing questions about digital assets under federal law.[8] The CFTC has partnered in this initiative, agreeing that "lawfare from multiple federal agencies against innovators in the digital asset space has created unfairness and uncertainty that [] undermined trust in the regulatory process and impeded American competitiveness."[9]

Congress, too, has redoubled its efforts to develop a tailored framework to govern digital assets. In 2024, the U.S. House of Representatives adopted legislation proposing functional federal requirements for digital-asset markets. In May 2025, the House released an updated, bipartisan draft digital-asset market structure bill.[10] The draft legislation reaffirms that digital assets trading on secondary markets like Coinbase's are not securities, and that digital-asset platforms like Coinbase's are to be principally regulated by the CFTC. And the Senate Banking Committee has already published a guiding set of principles for similar legislation.[11]

---

[6]    NOR ¶ 7 (quoting SEC Comm'r Hester M. Peirce, *New Paradigm: Remarks at SEC Speaks* (May 19, 2025), https://tinyurl.com/yj8nkm3v).

[7]    NOR ¶ 7 (quoting SEC Chair Paul S. Atkins, *Prepared Remarks Before SEC Speaks* (May 19, 2025), https://tinyurl.com/ywrkctnv).

[8]    NOR ¶ 7 (citing SEC, Division of Corporation Finance, *Statement on Stablecoins* (Apr. 4, 2025), https://tinyurl.com/bdh3uskt; SEC, Division of Corporation Finance, *Statement on Certain Protocol Staking Activities* (May 29, 2025), https://tinyurl.com/33jj4t5n).

[9]    NOR ¶ 7 (quoting CFTC, *Acting Chairman Pham Lauds DOJ Policy Ending Regulation by Prosecution of Digital Assets Industry and Directs CFTC Staff to Comply with Executive Orders*, Release No. 9063-25 (Apr. 8, 2025), https://tinyurl.com/bdcmcsjf).

[10]   NOR ¶ 8 (citing Digital Asset Market Clarity Act of 2025, H.R. 3633, 119th Cong. (2025)).

[11]   *Scott, Lummis, Tillis, Hagerty Release Principles for Market Structure Legislation* (June 24, 2025), https://tinyurl.com/359pcazz.

### F.    Oregon brings a copycat action against Coinbase, purporting to "fill" an "enforcement vacuum being left by federal regulators."

Dissatisfied with the federal developments, the Attorney General commenced this action on April 18, 2025, naming Coinbase, Inc. and its corporate parent Coinbase Global, Inc. as defendants. NOR ¶ 10. The Complaint alleges that transactions in 31 digital assets (the "Digital Assets") are "investment contracts" and that Coinbase offers and sells, or aids and abets the offer and sale of, unregistered securities by operating a market where these assets can trade — largely parroting the allegations made in now-dismissed SEC complaints. It seeks a $20,000 fine per violation, disgorgement of profits, and an injunction against any future sales of the targeted assets in Oregon. Am. Compl. at 162. In announcing this action, the Attorney General touted it as a bid to "fill" a supposed "enforcement vacuum being left by federal regulators who are giving up under the new administration and abandoning [] important cases."[12]

### G.    Coinbase removes the Attorney General's action and the USMS withdraws its stop-work order on the 2024 contract.

On June 2, 2025, Coinbase timely removed the action to this Court. Dkt. No. 1. Seeking to avoid federal jurisdiction, the Attorney General amended his complaint on July 2, 2025 and moved to remand. Dkt. Nos. 18, 19 ("Mot."). The amended complaint seeks to exclude claims and relief for "any sale of [digital assets], or any successful solicitation of, or any participation in or material aid of, any sale of [digital assets] by or on behalf of the [USMS]." Am. Compl. ¶ 503.

On June 24, 2025, after final resolution of the protest to Coinbase's federal contract, the USMS lifted the stop-work order and informed Coinbase that it was prepared to proceed under the new agreement. With this challenge cleared, Coinbase ceased performance under the PBA and MTA and commenced performance under that new agreement. Decl. ¶ 10.

---

[12]    NOR ¶ 11 (quoting Or. Dep't of Just., *Oregon Attorney General Rayfield Sues Coinbase for Promoting and Selling High-Risk Investments* (Apr. 18, 2025), https://tinyurl.com/5fmerby4).

## ARGUMENT

### I.    REMAND SHOULD BE DENIED BECAUSE THIS ACTION NECESSARILY RAISES A FEDERAL ISSUE THAT IS DISPUTED AND SUBSTANTIAL.

An action brought in state court may be removed to federal court if it "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see* 28 U.S.C. § 1441(a). Federal-question removal applies not only where a plaintiff expressly brings federal claims, but also where asserted state-law claims raise substantial federal issues such that "there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013) (quoting *Grable*, 545 U.S. at 313-14). As the Supreme Court explained in *Grable*, this doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. at 312.

Under *Grable*, an action asserting a state-law claim is removable where the "claim contains a federal issue that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance." *Ranck* v. *Mt. Hood Cable Regul. Comm'n*, 2017 WL 1752954, at *2 (D. Or. May 2, 2017). Because Oregon's action here directly implicates a disputed issue[13] of federal law that can and should be resolved in federal court, remand should be denied.

### A.    Oregon's action necessarily raises a question of federal law.

The alleged violations of Oregon Securities Law are all predicated on transactions in the Digital Assets being "investment contracts," and thus securities, under Oregon law. Am. Compl.

---

[13]    Oregon does not contest that the relevant issue here is actually disputed; it contends that *Grable*'s first, third, and fourth prongs are not met. *See* Mot. 6.

¶ 71. To determine whether a transaction gives rise to an "investment contract," however, Oregon courts for over half a century have applied *federal* law — specifically, the federal standard for "investment contract" announced by the U.S. Supreme Court in *SEC* v. *W.J. Howey Company*, 328 U.S. 293 (1946), and applied in subsequent federal cases. *See, e.g.*, *Pratt* v. *Kross*, 276 Or. 483 (1976). The Attorney General's action thus necessarily raises an issue of federal law: whether the transactions in the Digital Assets are investment contracts under the federal standard.

The Attorney General does not dispute that Oregon's courts look to federal precedent to determine whether a transaction involves an investment contract. *See* Mot. 6-7. He nonetheless contends that his claims do not raise a federal question, because Oregon courts supposedly do not apply the holding in *Howey* "strictly," "adopting instead a 'modified' test that differs significantly from *Howey*." Mot. 6 (citing *Pratt*). But no court — state or federal — applies the ruling in *Howey* "strictly," because federal law has evolved since 1946. That Oregon has adopted a "modified" form of the *Howey* decision provides no basis to remand — because Oregon's so-called "modified" test is, inescapably, the federal standard.

In *Howey*, the Supreme Court held that an investment contract "means a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298-99. Thirty years later, in *Pratt*, the Oregon Supreme Court adopted *Howey* as the proper test for determining an "investment contract" under Oregon law, and modified the final *Howey* element to focus on the "management and control of others." 276 Or. at 497. But the Oregon Supreme Court did not invent this change in the wording of the standard articulated in *Howey*, nor did this mark any departure from federal law. Rather, Oregon's "modification" was based on how the standard articulated in *Howey* had been applied over time by the federal courts, including by the Supreme Court in *United*

*Housing Foundation* v. *Forman*, 421 U.S. 837, 852 (1975), and the Ninth Circuit in *SEC* v. *Glenn W. Turner Enterprises*, 474 F.2d 476, 482 (9th Cir. 1973). *See Pratt*, 276 Or. at 496-97 (discussing standard's articulation in *Forman* and *Glenn W. Turner*). Oregon courts have expressly acknowledged that *Pratt*'s adoption of a "modified" *Howey* test ran "parallel" — adhered — to the *federal* courts' own modification of the *Howey* standard. *Amerivest Fin., LLC* v. *Malouf*, 263 Or. App. 327, 336-37 & n.8 (Or. App. 2014) (citing *Computer Concepts, Inc.* v. *Brandt*, 310 Or. 706, 714 & n.7 (1990)); *see also Jost* v. *Locke*, 65 Or. App. 704, 716 (Or. App. 1983) ("The Oregon Supreme Court, in *Pratt* v. *Kross*, recognized that *Howey* is unduly restrictive and therefore *adopted* Forman*'s restatement of the* Howey *test*." (emphasis added; internal citation omitted)). In other words, the "modified" form of *Howey* that *Pratt* adopted *was* federal law.

To this day, there is no daylight between Oregon and federal law in determining whether a transaction forms an investment contract, much less does Oregon law "differ[] significantly from *Howey*," Mot. 6. *See Casablanca Prods., Inc.* v. *Pace Int'l Rsch., Inc.*, 697 F. Supp. 1563, 1566 & n.2 (D. Or. 1988) (applying *Glenn W. Turner* to resolve whether general partnership was a "security" under both federal and Oregon law, and noting it was unnecessary to conduct a separate analysis under *Pratt* because both cases would furnish the same outcome). Accordingly, to determine here whether transactions in the Digital Assets are "investment contracts" under Oregon law, a court will need to interpret federal law.

This case is thus similar to *New York* v. *Arm or Ally, LLC*, 644 F. Supp. 70 (S.D.N.Y. 2022). In *Arm or Ally*, the New York Attorney General sued certain gun manufacturers and sellers for the sale of "ghost guns," alleging violations of state law. *Id.* at 73. The Attorney General's claims included an alleged violation of New York General Business Law § 898-b, which applied to "gun industry member[s]" who sell a "qualified product." *Id.* at 78. The statute in turn gave

"qualified product" the same meaning as under federal law. *Id.* The court thus found that the action "necessarily raised" a federal question, because "to prevail on its claim that Defendants' conduct falls under General Business Law § 898-b(1), . . . the State must prove that the products at issue were 'firearms' or 'component parts' thereof within the meaning of federal law." *Id.* at 78-79.

So too here. The Oregon statutes on which the Attorney General bases his claim apply only to securities, relevant here specifically to "investment contracts." Under *Pratt*, Oregon gives the term "investment contract" the same meaning as under federal law, *i.e.*, in accordance with *Howey* and its progeny. To prevail on his claim that Coinbase's conduct falls within the Oregon securities law statutes, the Attorney General must therefore establish that the Digital Asset transactions involve investment contracts "within the meaning of federal law." Thus, the action necessarily raises a federal issue, satisfying *Grable*'s first prong. *See Oregon* v. *Gen. Nutrition Corp.*, 2016 WL 3382137, at *5 (D. Or. Mar. 30, 2016) (finding federal issue necessarily raised where Oregon "relies on the federal definition to establish the 'unlawfulness' element of its UTPA claims"), *adopted by*, 2016 WL 3381247 (D. Or. June 14, 2016).

**B.    The disputed issue of federal law in this action implicates a substantial federal interest.**

Under *Grable*, the disputed federal issue must also be "substantial." 545 U.S. at 312. This requires assessment of the "importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260 (cleaned up).

The importance of the federal interest here cannot seriously be questioned. Digital assets are a transformative technology held by more than one in five Americans.[14] In bringing this action, the Attorney General seeks to regulate the trading of 31 such assets on Coinbase's nationwide

---

[14]    *See* CFTC Chair Rostin Behnam, *Keynote Address of Chairman Rostin Behnam at the Brookings Institution Webcast on The Future of Crypto Regulation* (July 25, 2022), https://tinyurl.com/n2fv2bj8.

platform, involving hundreds of millions of dollars in transactions across the country on a daily

basis. Whether and to what extent transactions in digital assets involve investment contracts has

been expressly recognized as a "novel, important legal issue," *SEC* v. *Coinbase, Inc.*, 761 F. Supp.

3d 702, 707 (S.D.N.Y. 2025), as the Attorney General concedes.[15]

Moreover, the premise of the Attorney General's complaint is that Coinbase participates

or materially aids in securities transactions by offering a marketplace and facility for the trading

of the Digital Assets, which he alleges are securities. *See, e.g.,* Am. Compl. ¶¶ 55-64, 71. By the

Attorney General's account, therefore, Coinbase is a national securities exchange under the

Exchange Act.[16] This would have wide-ranging consequences for the regulation of Coinbase and

other nationwide digital-asset platforms — issues which directly implicate national interests. *See*

*NASDAQ OMX Grp., Inc.* v. *UBS Secs., LLC*, 770 F.3d 1010, 1023-25 (2d Cir. 2014) (discussing

national importance of regulation of securities exchanges); *see also Morris* v. *Blue Shield of*

*California*, 2017 WL 1653938, at *3 (C.D. Cal. May 1, 2017) (applying *NASDAQ* to find that the

"central issue" in the case had a "national reach"), *aff'd sub nom. Morris* v. *California Physicians'*

*Serv.*, 918 F.3d 1011 (9th Cir. 2019).

And in any event, ensuring that nationwide transaction platforms like Coinbase's are

subject to a uniform set of rules is critical to the efficient operations of those markets. "Allowing

disparate state courts to establish different standards" for digital-asset transactions under federal

---

[15]    Mot. 10 (acknowledging that "the federal cryptocurrency regulatory scheme" is "an important policy question").

[16]    *See* 15 U.S.C. § 78c(a)(1) ("The term 'exchange' means any organization, association, or group of persons . . . which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities . . . ."); 15 U.S.C. § 78f (registration of national securities exchanges); 15 U.S.C. § 78e (making it unlawful to operate an unregistered securities exchange). Oregon's pleadings repeatedly refer to Coinbase's platform as an "exchange." *See, e.g.*, Am. Compl. ¶¶ 2, 5, 8. Coinbase denies that Digital Asset transactions are securities, that it is a securities exchange, or that it is otherwise regulated under the Exchange Act.

law would hobble such markets by subjecting digital-asset platforms to a patchwork of state-based rules and regulations. *See Ranck*, 2017 WL 1752954, at *5 (noting that Congress explicitly intended the Cable Communications Policy Act to establish uniform national standards for cable companies and franchises and that allowing state courts to establish different fee standards could undermine that uniformity); *NASDAQ*, 770 F.3d at 1031 (removal warranted where "party's efforts to have that federal law duty assessed by reference to state law principles . . . could undermine Congress's expectations for uniformity in an exchange's performance of specified Exchange Act duties"). This need for uniformity "justif[ies] resort to the experience, solicitude, and hope of uniformity that a federal forum offers." *Id.* at 1019.

Reflecting that substantial federal interest, Congress, the SEC, and the CFTC are actively working to develop uniform rules for crypto transactions, including whether and when such transactions involve securities. *See supra* pp. 9-11. These efforts are particularly "noteworthy" because they were "made, not generally, but in the specific context of assessing the very federal issue disputed in this case." *NASDAQ*, 770 F.3d at 1025. The Attorney General's decision to act in contravention of these efforts — with the unabashed objective to "fill the enforcement vacuum [] left by federal regulators"[17] — plainly implicates "issues of potential national importance," "the kinds of issues most properly resolved in a federal forum." *Los Angeles Police Protective League* v. *City of Los Angeles*, 2008 WL 11454760, at *10 (C.D. Cal. June 20, 2008), *aff'd*, 314 F. App'x 72 (9th Cir. 2009); *see also California ex rel. Lockyer* v. *Dynegy, Inc.*, 375 F.3d 831, 843 (9th Cir. 2004) (finding removal jurisdiction where "California's state claim represented a naked attempt to enforce . . . federal obligations").

---

[17]    Or. Dep't of Just., *Oregon Attorney General Rayfield Sues Coinbase for Promoting and Selling High-Risk Investments* (Apr. 18, 2025), https://tinyurl.com/5fmerby4.

The Attorney General tries to brush aside the important federal interests at stake, saying that its action involves only "sales exclusively to its own residents." Mot. 9. This blinks reality. There are two sides to every crypto transaction, and Coinbase brings together buyers and sellers from across the nation. *Every* transaction that the Attorney General seeks to regulate involves not just an Oregonian buyer but also a seller, who could be resident in any number of other U.S. jurisdictions. If the Attorney General's position is adopted, for example, a seller in Seattle would no longer have the benefit of reaching a purchaser in Portland — and the superior pricing and liquidity that comes from Oregonians having access to the platform. The interests implicated by the action thus go far beyond Oregon's borders.

The Attorney General also points to the "dual enforcement scheme of state and federal securities regulation" as a basis to remand. Mot. 9. But nothing in *Grable* or its progeny suggests that an issue is "substantial," and therefore properly adjudicated in federal court, only where a state-law claim is explicitly preempted by federal law. The Attorney General's claims implicate important issues of federal securities law — issues that will have nationwide effects on digital-asset transaction platforms — and thus belong in federal court.

### C.    Removal did not affect the federal-state balance.

Denying remand here would not disrupt the "congressionally approved balance of federal and state judicial responsibilities." *Sauk-Suiattle Indian Tribe* v. *City of Seattle*, 56 F.4th 1179, 1185 (9th Cir. 2022) (quoting *Grable*, 545 U.S. at 314) (cleaned up). While the Attorney General strains to paint his claim as simply reflecting "*Oregon's* state-specific regulatory scheme and protecting *Oregon* residents," Mot. 10, that framing ignores the true nature of the action. This is not a run-of-the-mill Oregon securities case where the State seeks to remedy, for example, a fraudulent scheme targeting its residents. Rather, he seeks to regulate — as securities, on a strict-liability basis — transactions on Coinbase's *nationwide* digital asset market. Regulation of

interstate transactions on national exchanges implicates inherently *federal* interests, appropriately resolved by federal courts. *See supra* pp. 16-17.

Indeed, as noted above, the implication of the Attorney General's suit is that Coinbase operates a national securities exchange, regulable under the federal Exchange Act. Actions arising under the Exchange Act are subject to the *exclusive* jurisdiction of the federal courts, *see* 15 U.S.C. § 78aa(a). And as to commodities, federal courts have jurisdiction over suits brought by states to enforce the Commodities Exchange Act. 7 U.S.C. § 13a-2.[18] Congress thus contemplated — and even mandated — that legal disputes just like this one be adjudicated in a federal forum. Removal therefore respected the Congressionally approved allocation of federal and state judicial responsibilities regarding the regulation of transactions on national exchanges. *See NASDAQ*, 770 F.3d at 1030 ("Far from threatening the federal-state balance envisioned by Congress in this area, the exercise of federal jurisdiction here comports with Congress's expressed preference for alleged violations of the Exchange Act, and of rules and regulations promulgated thereunder, to be litigated in a federal forum.").

The Attorney General's resort to *Nevada* v. *Bank of America Corporation*, 672 F.3d 661 (9th Cir. 2012), is unavailing. *See* Mot. 10. *Bank of America* concerned a state-law action arising out of alleged misrepresentations about mortgage modifications involving *only* Nevada residents and consumer protection laws that were routinely adjudicated in state court and that did not look solely to federal law for their scope. *Id.* at 674-76. In that narrow context, the "claim of sovereign protection from removal arises in its most powerful form." *Id.* at 676. But here, by contrast, the Attorney General seeks to regulate *nationwide* transactions, on a *nationwide* digital-asset

---

[18]    States can sue to enforce the anti-fraud provisions of the Commodities Exchange Act in state court, but those actions are expressly removable to federal court. 7 U.S.C. § 13a-2(8)(A)-(B). Federal courts have *exclusive* jurisdiction over private suits under the statute. 7 U.S.C. § 25(c).

exchange, pursuant to a standard *adhering directly to federal law*. No principle of federalism would be violated by having that claim adjudicated in federal court — especially where Congress has determined that equivalent claims relating to national securities and commodities exchanges are properly the province of federal court. And "although the State brings only state-law claims, the State itself made the decision to incorporate a federal definition into the relevant state law and, thus, took the risk that suits to enforce the law would be removed to federal court." *Arm or Ally*, 644 F. Supp. 3d at 82. Nor has Oregon shown here "any special responsibility in determining" whether transactions in the Digital Assets involve securities under federal law or why such national issues should be adjudicated before an Oregon state court. *Sauk-Suiattle*, 56 F.4th at 1185.

For these reasons, this action belongs in federal court and was properly removed under *Grable*.

## II.    REMAND SHOULD ALSO BE DENIED BASED ON THE FEDERAL-OFFICER REMOVAL STATUTE.

The Court should also retain jurisdiction under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), which permits removal of civil actions brought against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." *Id.* The statute's protection extends to companies, like Coinbase, that act on behalf of the federal government. *See DeFiore* v. *SOC LLC*, 85 F.4th 546, 553, 555 (9th Cir. 2023). Courts must "afford § 1442 a generous and liberal construction" and interpret it "broadly in favor of removal" because "the statute vindicates the interests of government itself in preserving its own existence." *Id.* at 553 (cleaned up). Under this "generous" standard, removal is proper upon a showing that (1) "there is a causal nexus between [the defendant's] actions, taken pursuant to a federal officer's directions, and plaintiff's claims" and (2) the defendant "can assert a colorable federal defense." *Id.* (internal quotations omitted).

Critically, no part of this analysis is affected by the Attorney General's last-ditch effort to evade the federal forum by amending his pleadings. That amendment withdraws only claims concerning executed sales of the USMS's Digital Assets to Oregon residents. But Coinbase's performance under its agreements was and is grounded in its ability to provide a continuously operating and highly liquid nationwide trading platform that "maximizes value" for the USMS. Put simply, Coinbase runs an integrated interstate platform, and all users, including those in Oregon, generate the liquidity of the platform that the USMS demands as part of its agreements with Coinbase — and which drives the best-price execution that undergirds Coinbase's trading obligations in its agreements. Accordingly, Coinbase has operated its trading platform on a nationwide basis, without restriction of Oregonians, as part of its performance on behalf of the USMS.[19]

Moreover, precluding Oregon residents from buying Digital Assets from anyone but the USMS will dry up Oregon-based liquidity on the platform, as the post-amendment lawsuit would still prohibit Oregon residents from selling *any* Digital Assets, including those purchased from the USMS. *See* Decl. ¶¶ 15, 19. In practice, without anyone to sell to, Oregonians would not buy those assets on Coinbase's platform — and thus not transact with the USMS. The USMS would not have the same access to the nationwide platform of trading activity that it sought by hiring Coinbase. The Attorney General's post-amendment claims thus continue to target Coinbase's work on behalf of the federal government.

---

[19]    For the same reason, it is irrelevant that ORS § 59.035(1) exempts transactions by a "marshal" from regulation. *See* Mot. 18, 23, 24-25. And, in any event, that exemption is narrower than the Attorney General asserts, reaching only transactions by a marshal in the "judicial context," and thus not the many digital assets that the USMS obtains through nonjudicial forfeiture. HB 2244, Minutes & Exhibits, H. Comm. on Consumer & Bus. Affs., Reg. Sess. (Or. 1985), at 63.

Just as Judge Ikuta recently recognized in analogous circumstances in *California* v. *CaremarkPCS Health LLC*, 2024 WL 3770326 (9th Cir. Aug. 13, 2024), "because [Coinbase's] work for private clients cannot be disaggregated from its work for the federal government," the Attorney General's disclaimer cannot defeat removal. *Id.* at *2 (Ikuta, J., concurring); *see also id.* at *1 (reversing denial of remand where company's government work "remained causally connected to the dispute," notwithstanding broad disclaimer). *Accord Gov't of Puerto Rico* v. *Express Scripts, Inc.*, 119 F.4th 174, 189 (1st Cir. 2024) (disclaimer could not defeat removal where "[c]oncluding that [the defendant's] actions . . . can be so divided [between private and federal conduct] contradicted [the defendant's] theory of the case and resolved whether the challenged acts were outside the scope of its official duties"); *West Virginia* v. *Caremark*, 140 F.4th 188, 196 (4th Cir. 2025) (agreeing with *Puerto Rico* and Judge Ikuta's concurrence in *Caremark* and rejecting disclaimer).[20]

As set forth below, notwithstanding Oregon's hollow amendment, the requirements for federal-officer removal are plainly met here and remand should be denied.

### A.    There is sufficient causal nexus between Oregon's claims and Coinbase's federal conduct to deny remand to state court.

Courts in this Circuit evaluate causal nexus through a two-step test. First, a removing party must demonstrate that it was "acting under a federal officer in performing some act under color of federal office." *DeFiore*, 85 F.4th at 554 (internal quotation omitted). Next, the removing party must show that its activities on behalf of the federal government are "causally connected with the claims against it." *Id.* Not only is the "hurdle erected" by this analysis "quite low," *id.* at 557

---

[20]    Coinbase notes that the scope of disclaimers under the federal-officer statute is currently being briefed before the Ninth Circuit. *See Hawaii* v. *CaremarkPCS, et al.*, Case No. 25-3102 (9th Cir.) (appeal filed May 14, 2025). Accordingly, Coinbase reserves its right to further brief the disclaimer issue upon resolution of that appeal.

(internal quotation omitted), but "[i]n assessing whether a causal nexus exists" the Court must "credit defendants' theory of the case." *Id.* (citing *Jefferson Cnty.* v. *Acker*, 527 U.S. 409, 423 (1999)). Coinbase satisfies both prongs.

### 1.    Coinbase "acts under" the USMS by operating its trading platform nationwide.

To establish that it is "acting under" a federal officer, Coinbase need only show that it has been involved in "an effort to assist, or to help carry out, the duties or tasks of the federal" officer. *Watson* v. *Phillip Morris Cos., Inc.*, 551 U.S. 142, 152 (2007) (emphasis omitted). A party operating under an agreement with the federal government has met this standard when *either* (a) its "assistance . . . goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks," *id.* at 153, *or* (b) it served as an "agent" of the federal government "under common-law agency principles," *DeFiore*, 85 F.4th at 556. Coinbase's work on behalf of the USMS meets both conditions, with each independently sufficient.

Coinbase's work on behalf of the USMS fulfills a "basic governmental task," because its role is one "that the Government itself would have had to perform if it had not contracted with a private firm." *Cnty. of San Mateo* v. *Chevron Corp.*, 32 F.4th 733, 756-57 (9th Cir. 2022) (quoting *Watson*, 551 U.S. at 153-54). There is no dispute that prior to retaining Coinbase, the USMS sold — and supplied a market for — the digital assets seized by and forfeited to the federal government. *See supra* pp. 5-6. Nor can it plausibly be denied that such disposal of seized and forfeited assets is one of the USMS's core regulatory responsibilities. *See* 28 C.F.R. § 0.111(i); Justice Manual § 9-115.100. In fact, a bevy of federal statutes *compel* the DOJ (acting through the USMS) to ensure the prompt and efficient sale of seized or forfeited assets. *See, e.g.*, 21 U.S.C. § 853(h)-(i); 28 U.S.C. § 524(c)(1)(A).

Unable to dispute this, Oregon instead attempts to cabin the "tasks" that satisfy the "acting under" prong as limited to, "for example, manufacturing weapons of war and administering health benefits to federal employees." Mot. 16 (citing *Cousin* v. *Healthcare*, 2024 WL 1184702, at *6 (S.D. Cal. Mar. 19, 2024)). But no court has adopted that limitation, because it would defy the broad aims of the removal statute. To the contrary, courts routinely deny remand for defendants that perform everyday tasks for the federal government. In *Bennett* v. *MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010), for example, a private mold-remediation company that had been hired by a government agency removed state-law claims alleging deficiencies in the treatment of mold at Detroit's airport. *Id.* at 1084. The Sixth Circuit affirmed the denial of remand, finding sufficient that the defendant had been hired to do "a job that, in the absence of a contract . . . the [agency] itself would have had to perform." *Id.* at 1088 (quoting *Watson*, 551 U.S. at 154).

In any event, Coinbase also serves as an "agent" of USMS, because it "acts on the [USMS's] behalf and subject to the [USMS's] control" in connection with its performance under its agreements. *DeFiore*, 85 F.4th at 556 (quoting Restatement (Third) of Agency § 1.01). The record clearly demonstrates that Coinbase operates under the close direction, guidance, and control of the USMS. *See supra* pp. 5-7, 8-9. Most prominently, as the Attorney General concedes, the USMS determines "whether and when to submit orders to sell its crypto assets, including which assets to sell and how many." Mot. 15. This type of brokerage activity is a classic example of agency. *See Sec. Indus. Ass'n* v. *Bd. of Governors of Fed. Rsrv. Sys.*, 468 U.S. 207, 218 (1984) ("[A] broker executes orders for the purchase or sale of securities solely as agent."); *SEC* v. *Murphy*, 50 F.4th 832, 844 (9th Cir. 2022) ("[B]rokers are typically equated with agents.").

The Attorney General's only response is that Coinbase cannot be an agent of the USMS because the PBA provides that Coinbase "is not acting as a *fiduciary*" to the USMS. Mot. 15. Even

if this disclaimer were sufficient to negate the principal-agent relationship — and it is not[21] — it would make no difference. Coinbase is now operating under a different government agreement that lacks any such disclaimer, and that otherwise eliminates any possible doubt as to Coinbase's status as an agent. Under this new agreement, the USMS expressly requires Coinbase "*as its agent*, to take prudent action and good faith on the USMS's behalf" in order to "ensure all services in the contract provide maximum value while minimizing expenses." Ex. 2C § 1.3 (emphasis added). And this is consistent with the statutory framework that Congress established for the management of the seized and forfeited assets, which expressly authorizes the federal government to employ "outside contractors" to provide "specialized services necessary to dispose of . . . [such] properties in an effort to maximize the return." 21 U.S.C. § 524(c)(1).

None of the State's remaining arguments in favor of remand have merit. The Attorney General argues that Coinbase cannot possibly be "acting under" the USMS because it has a "normal business relationship . . . under which Coinbase supplies USMS with widely available products or services." Mot. 14. This is a red herring. While a simple commercial relationship with the federal government by itself would not be "enough" for removal, *City & Cnty. of Honolulu* v. *Sunoco LP*, 39 F.4th 1101, 1107 (9th Cir. 2022), it is by no means disqualifying so long as a defendant — like Coinbase here — can show that it is charged to perform a "basic governmental task" or acts as a common-law agent of a federal officer. *DeFiore*, 85 F.4th at 556. And in any case, Coinbase's current contract is a bespoke agreement calibrated to the federal government's unique specifications, replete with detailed auditing and reporting requirements, through which Coinbase offers services that are *not* available to the general public. *See supra* pp. 7, 8-9.

---

[21]    *See* Restatement (Third) of Agency § 8.06 (2006) ("[A]n agreement that contains general or broad language purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is not likely to be enforceable.")

The Attorney General also points to a four-factor analysis in *County of San Mateo* v. *Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022), suggesting the Ninth Circuit mandated application of those factors as the new controlling test. It did nothing of the sort. In fact, when the Ninth Circuit later endorsed common-law agency in *DeFiore* as sufficient in itself under the statute, the court did not find it necessary even to mention the *San Mateo* factors. *See generally* 85 F.4th 546 (9th Cir. 2023). And even if *San Mateo* had established a balancing test, remand would still be error, because Coinbase has clearly satisfied each factor, as discussed above. *See supra* pp. 23-25.

Finally, pointing to a grab-bag of provisions in the now-superseded PBA, the Attorney General argues that Coinbase retains some measure of theoretical discretion over trade execution that is irreconcilable with "acting under" the USMS. Mot. 12-13, 15. But the Attorney General misreads the agreements, conflating "discretion" over certain aspects of a trading platform's operation, with unfettered "control" over the execution of the USMS's sales.[22] And in all events, the exercise of discretion does *not* defeat removal. The Ninth Circuit in *Goncalves By & Through Goncalves* v. *Rady Children's Hosp. San Diego*, 865 F.3d 1237 (9th Cir. 2017), rejected the same argument now sponsored by the Attorney General, holding that "just because [a company is] vested with discretion does not mean that [it is] not involved in an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 1248 (cleaned up). As in *Goncalves*, "[t]he task here is the [sale of seized and forfeited digital assets], and [operating a nationwide trading platform] assists in that effort regardless of whether [Coinbase] has discretion." *Id.*

---

[22]    For example, the Attorney General notes that Coinbase reserves the right to cancel or modify "clearly erroneous" trades. Mot. 13 (quoting Ex. 1 (MTA) § 6.2). "Clearly erroneous" is a term of art that refers to trades "involv[ing] an error with respect to price, quantity, or other parameters." Coinbase Trading Rules § 2.12. It does not afford Coinbase roving discretion in the execution of trades.

2.    **The Attorney General's claims are connected to and associated with Coinbase's operation of its nationwide trading platform.**

Coinbase has also established that its conduct on behalf of the federal government bears the requisite link to the Attorney General's claims. In evaluating this nexus, a court must look "not just [to] the specific challenged acts" of the removing party, but more broadly to "the circumstances that gave rise to the claim against" it. *DeFiore*, 85 F.4th at 557 (quoting *Jefferson Cnty.*, 527 U.S. at 433).

Oregon seeks to hold Coinbase liable for "creat[ing] and operat[ing] an exchange for the purchase and sale of crypto assets" and thus allegedly "solicit[ing], participat[ing] in, and materially aid[ing] the sale of unregistered securities to Oregonians." Am. Compl. ¶ 2. As discussed above, Coinbase's performance of its agreements with the USMS is tied to the operation of this same nationwide platform, available to users in Oregon and elsewhere, to supply what the government hired Coinbase to deliver — a national, liquid market, with sufficient scale to attain the best price available, in the sale of the federal government's digital assets. The Attorney General's claims thus bear a direct and unavoidable relationship to Coinbase's activity on behalf of the USMS.

Urging remand, the Attorney General argues that the challenged acts could not have occurred "because of" Coinbase's work on behalf of the USMS, as the USMS did not specifically "ask[] Coinbase to sell" digital assets in Oregon and "Coinbase has no obligation . . . to make the crypto assets at issue in the State's complaint available for trading at all." Mot. 17. The nexus determination, however, does not turn on whether a defendant was requested or required to perform the challenged act — the question, instead, is whether the challenged acts were in some manner "*connected* or *associated*" with its official conduct. *DeFiore*, 85 F.4th at 557 n.6 (internal quotation omitted, emphasis in original). Coinbase has pleaded that the operation of its trading

platform on a nationwide basis, without restriction of Oregonians, is a key component of its performance under its agreements with the federal government. NOR ¶ 24; Decl. ¶¶ 15, 19. On a motion to remand, the Court must credit this theory of the case. *See Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014); *see also DeFiore*, 85 F.4th at 558 n.7 (the question "whether the challenged act was . . . specifically directed by the federal Government, is one for the federal — not state — courts to answer" following denial of remand); *Willingham* v. *Morgan*, 395 U.S. 402, 400 (1969) ("If the question raised is whether [the defendants] were engaged in some kind of 'frolic of their own' in relation to [the plaintiff], then they should have the opportunity to present their version of the facts to a federal, not a state court.").[23]

## B. Coinbase has identified colorable federal defenses that warrant denial of remand.

Coinbase also satisfied its burden of identifying at least one colorable federal defense that "flows from" the performance of its "official duties." "[A] defendant invoking § 1442(a)(1) need not win his case before he can have it removed." *Leite*, 749 F.3d at 1124 (quoting *Willingham*, 394 U.S. at 407). Instead, a federal defense is colorable so long as it is not "immaterial and made solely for the purpose of obtaining jurisdiction or . . . wholly insubstantial and frivolous." *DeFiore*, 85 F.4th at 560 (citation omitted). That bar is easily cleared here. In its Notice of Removal, Coinbase pleaded four federal defenses, NOR ¶ 26, all arising out of its work on behalf of the federal government and each more than sufficiently colorable for removal:

---

[23]     Oregon repeatedly asserts that because the PBA requires Coinbase to comply with "any applicable state and federal laws" in its performance, its sales of digital assets in Oregon "could in fact breach the terms of" that agreement. *E.g.*, Mot. 17 n.13. But as noted *infra*, the Attorney General's claims are barred by among other things the intergovernmental immunity doctrine. And in any event, this is just another reason why removal was warranted — the Attorney General is seeking to litigate "whether the challenged act was outside the scope of [Coinbase's] duties," and that is a question that Coinbase is entitled to have resolved by a federal court. *DeFiore*, 85 F.4th at 558 n.7.

1.    *Preemption and intergovernmental immunity*. The Attorney General's action violates the federal Supremacy Clause, because it is both preempted and otherwise unsustainable under the intergovernmental immunity doctrine. "Under the doctrine of obstacle preemption [] a state law is preempted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Geo Grp., Inc.* v. *Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) (*en banc*). By seeking to obstruct the USMS and DOJ's execution of their regulatory mandate to administer the Asset Forfeiture Program, the Attorney General's "interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption." *Id.* at 762. The intergovernmental immunity doctrine, meanwhile, "prohibits state laws that *either* regulate the United States directly or discriminate against the Federal Government or those with whom it deals (*e.g.*, contractors)." *Id.* at 758 (emphasis in original). And Oregon also violates this constitutional limit because it seeks to "control" the federal government's law enforcement operations by prohibiting Coinbase from maintaining a nationwide market in connection with its performance under the USMS agreements.

Conceding that Coinbase's Supremacy Clause defenses arise out of its federal conduct, the Attorney General disputes that the defenses are colorable. Mot. 22-25. He invokes *United States* v. *California*, 921 F.3d 865 (9th Cir. 2019), for the proposition that intergovernmental immunity "attaches only to state laws that discriminate against the federal government and burden it in some way." Mot. 23. But the Ninth Circuit, sitting *en banc*, has since recognized that a "neutral state law[] imposed on the private conduct of federal contractors violate[s] the Supremacy Clause" under the doctrine of intergovernmental immunity where it would serve to "control [the] operations" of the federal government. *Geo Group*, 50 F.4th at 755, 760. There is thus no need to demonstrate "discrimination." It is enough to show that Oregon is applying its laws so as to directly

burden the federal government. It plainly is. *See Oregon* v. *United States Dist. Ct. for Dist. of Oregon, Eugene*, 2024 WL 2270514, at *1 (9th Cir. May 20, 2024) (rejecting Oregon mandamus request to remand because Supremacy Clause defense was colorable).

Oregon also posits that the federal government lacks a strong interest in "selling all the assets that it recovers." Mot. 25. This attempt to redefine the federal government's interests only proves Coinbase's point. If Oregon has its way, it will secure a court order constraining the administration of the federal Asset Forfeiture Program. The federal-officer removal statute was designed to ensure that such issues are adjudicated in the federal courts.

2.    *Due process*. The Attorney General's enforcement action also violates fair notice principles under the federal Due Process Clause. *See FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). The federal Constitution's fair notice requirement is based on the bedrock principle that "regulated parties should know what is required of them so they may act accordingly" and that "those enforcing the law do not act in an arbitrary or discriminatory way." *Butcher* v. *Knudsen*, 38 F.4th 1163, 1168-69 (9th Cir. 2022) (cleaned up). Oregon's action fails by either measure. The Attorney General sprang this lawsuit on Coinbase after Oregon had publicly declared that cryptoassets were "not regulated . . . by the State of Oregon," "similar . . . to gold," Oregon Div. of Fin. Reg., *Cryptocurrency* (Oct. 12, 2018). "That caginess creates a serious constitutional problem; due process guarantees fair notice." *Coinbase, Inc.* v. *SEC*, 126 F.4th 175, 213 (3d Cir. 2025) (Bibas, J., concurring) (criticizing the SEC's action against Coinbase). And this defense directly "flows from" the USMS agreements: Coinbase will rely on the existence of those federal agreements as one reason it lacked fair notice that it might be involved in the sale of unregistered securities.

3.      *Classification of digital assets as "investment contracts."* None of the digital-asset

transactions identified in the Complaint qualify as "investment contracts" under the federal

standard at issue in Oregon's claims. As the Southern District of New York acknowledged when

it granted interlocutory appellate review of the SEC's since-dismissed action against Coinbase,

there exists "substantial ground for difference of opinion" on this point, due in part to "conflicting

authority [] regarding *Howey*'s application to crypto-assets." *SEC* v. *Coinbase, Inc.*, 761 F. Supp.

3d 702, 716 (S.D.N.Y. 2025); *see also SEC* v. *Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 328-30

(S.D.N.Y. 2023) (holding that sales of XRP on secondary market platforms were not investment

contracts); *SEC* v. *Binance Holdings Limited*, 738 F. Supp. 3d 20, 57 (D.D.C. 2024) (dismissing

claim that secondary-market transactions of the BNB token were investment contracts). The

defense is thus, at minimum, colorable. And again, the challenged conduct "flows from"

Coinbase's operation of its digital-asset trading platform, which is integral to the performance of

its obligations to the USMS.

4.      *Personal jurisdiction*. The Attorney General has failed to plead that Coinbase has

"minimum contacts" with Oregon sufficient to establish personal jurisdiction consistent with the

federal Constitution. Personal jurisdiction does not lie in Oregon because Oregon does not allege

that Coinbase has specifically directed any of its activities toward the state. *Herbal Brands, Inc.* v.

*Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023) ("[O]peration of an interactive website does

not, by itself, establish express aiming."). In fact, Coinbase Global, Inc., as a holding company,

has conducted no activity whatsoever in the state.

Oregon says this defense, along with Coinbase's Exchange Act and Due Process defenses,

do not "flow from" its federal conduct, because they would "exist regardless of Coinbase's

contractual relationship with USMS" and lack "relevance to the question of whether Coinbase was

performing its duty under the direction of a federal officer." Mot. 20, 21. But even were those assertions true, neither is disqualifying. The Ninth Circuit has repeatedly found that removal was justified even where both were absent. *See, e.g.*, *Stirling* v. *Minasian*, 955 F.3d 795, 801 (9th Cir. 2020) (colorable federal defense based on implied preemption by federal regulatory scheme); *People of State of Cal.* v. *H & H Ship Serv. Co.*, 68 F.3d 481 (9th Cir. 1995) (colorable federal defense based on federal regulation's general preemption provision). As these decisions establish, Coinbase need only show that its defenses generally "flow from" its conduct taken under color of federal authority — including its nationwide operation of the trading platform, as set out above.[24]

## III.    THERE IS NO JUSTIFICATION FOR AN AWARD OF FEES.

As Oregon concedes, the award of fees under 28 U.S.C. § 1447(c) is justified "only where the removing party lacked an objectively reasonable basis for seeking removal." Mot. 26 (quoting *Martin* v. *Franklin Corp.*, 546 U.S. 132, 141 (2005)). As set forth above, Oregon's arguments against removal are premised on its basic misunderstanding of the record, Coinbase's theory of removal, and Ninth Circuit law. An award of fees should be denied on that basis alone.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Oregon's Motion to Remand and retain jurisdiction.

---

[24]    The requirement that a federal defense "arise from" a defendant's federal conduct is neither consistent with Section 1442 nor compelled by the federal Constitution. Coinbase acknowledges that binding authority requires that showing (which is furnished in this submission), but preserves this issue for appeal. *See Chevron USA Inc.* v. *Plaquemines Par.*, 2025 WL 1678985 (U.S. June 16, 2025) (granting *certiorari* to consider whether a causal nexus test applies to the federal-officer removal statute).

DATED: July 16, 2025        STOEL RIVES LLP

*s/ Timothy W. Snider*

TIMOTHY W. SNIDER, OSB No. 034577
timothy.snider@stoel.com
JAMES A. KILCUP, OSB No. 173891
james.kilcup@stoel.com
KATE S. SHEPHERD, OSB No. 224891
kate.shepherd@stoel.com

AND

KEVIN S. SCHWARTZ, appearing *pro hac vice*
kschwartz@wlrk.com
NOAH B. YAVITZ, appearing *pro hac vice*
nbyavitz@wlrk.com
ADAM M. GOGOLAK, appearing *pro hac vice*
amgogolak@wlrk.com
SIJIN CHOI, appearing *pro hac vice*
schoi@wlrk.com
JULIA M. BRUCE, appearing *pro hac vice*
jmbruce@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: 212.403.1000

*Attorneys for Defendants Coinbase, Inc. and
Coinbase Global, Inc.*