Keil M. Mueller, OSB No. 085535
Jennifer S. Wagner, OSB No. 024470
Yoona Park, OSB No. 077095
Norjmoo Battulga, OSB No. 242037
KELLER ROHRBACK L.L.P.
601 S.W. Second Avenue, Suite 1900
Portland, OR 97204
Tel. (971) 253-4600 Fax (206) 623-3384
kmueller@kellerrohrback.com
jwagner@kellerrohrback.com
ypark@kellerrohrback.com
nbattulga@kellerrohrback.com

*Special Assistant Attorneys General for Plaintiff*
[Additional Counsel listed on Signature Page]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DIVISION PORTLAND

| | |
|---|---|
| THE STATE OF OREGON, EX REL. DAN RAYFIELD, ATTORNEY GENERAL FOR THE STATE OF OREGON, | No. 3:25-cv-00952-JR |
| Plaintiff, | **PLAINTIFF THE STATE OF OREGON'S REPLY IN SUPPORT OF MOTION TO REMAND** |
| v. | |
| COINBASE, INC. AND COINBASE GLOBAL, INC., | |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ..........................................................................................1

II.   ARGUMENT ...............................................................................................2

    A.    Coinbase Fails to Establish Federal Question Jurisdiction. ..................................2

        1.    Oregon's State Law Action Does Not Necessarily Raise a
            Question of Federal Law.............................................................................2

        2.    This Action Does Not Implicate a Substantial Federal
            Interest, and Remanding Would Preserve the Federal-State
            Balance....................................................................................6

    B.    Coinbase Fails to Establish Jurisdiction under the Federal Officer
       Removal Statute..........................................................................10

        1.    Coinbase Fails to Demonstrate a Causal Nexus between the
            State's Claims and the Services Coinbase Provides to
            USMS. ..................................................................................11

            a.    The State's Waiver of Claims Arising from Sales on
                behalf of USMS Eviscerates Any Grounds for
                Removal under the Federal Officer Removal
                Statute............................................................................13

            b.    There is No Causal Connection Between the State's
                Claims and the Services Coinbase Provides to
                USMS............................................................................15

            c.    Coinbase Does Not "Act Under" USMS in
                Operating Its Trading Platform.....................................................18

        2.    Coinbase Does Not Assert a Colorable Federal Defense
            Arising Out of the Services It Provides Pursuant to USMS. ...................21

            a.    If the Service Coinbase Provides USMS Is the
                Operation of a Trading Platform, Coinbase Has No
                "Official Duties" From Which a Colorable Defense
                Can Arise. .....................................................................22

            b.    Coinbase's Due Process, Exchange Act, and
                Personal Jurisdiction Defenses Do Not "Arise" Out
                of Coinbase's Services for USMS and Are Not
                Colorable. .....................................................................23

       c.     Coinbase Cannot Allege a Colorable Supremacy
Clause Defense. .........................................................................27

III.    CONCLUSION ............................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Badger v. Paulson Inv. Co.*,
    311 Or. 14 (1991)....................................................................................................3

*Bennett v. MIS Corp.*,
    607 F.3d 1076 (6th Cir. 2010) ..................................................................... 12, 20

*Black v. Corp. Div.*,
    54 Or. App. 432 (1981) ..........................................................................................4

*Bonta v. Exxon Mobil Corp.*,
    No. 3:24-CV-07288-RS, 2025 WL 595267 (N.D. Cal. Feb. 24, 2025) ................26

*Briskin v. Shopify, Inc.*,
    135 F.4th 739 (9th Cir. 2025) ..............................................................................25

*California by & through Harrison v. Express Scripts, Inc.*,
    No. 2:23-CV-08570-SPG-PD, 2024 WL 841197 (C.D. Cal. Feb. 28, 2024),
    *aff'd in part*, 139 F.4th 763 (9th Cir. 2025)............................................................13

*California v. CaremarkPCS Health LLC*,
    No. 23-55597, 2024 WL 3770326 (9th Cir. Aug. 13, 2024) ..................................14

*California v. H & H Ship Serv. Co.*,
    68 F.3d 481, 1995 WL 619293 (9th Cir. 1995) (unpublished)........................23, 24

*City & Cnty. of Honolulu v. Sunoco LP*,
    39 F.4th 1101 (9th Cir. 2022) ...............................................................21, 23, 29

*Cnty. of San Mateo v. Chevron Corp.*,
    32 F.4th 733 (9th Cir. 2022) ........................................................... 11, 13, 19, 21

*Computer Concepts, Inc. Profit Sharing Plan v. Brandt*,
    98 Or. App. 618 (1989), *aff'd sub nom. Computer Concepts, Inc. v. Brandt*,
    310 Or. 706 (1990)...........................................................................................4, 5

*Danner v. Himmelfarb*,
    858 F.2d 515 (9th Cir. 1988) .................................................................................4

*DeFiore v. SOC LLC*,
    85 F.4th 546 (9th Cir. 2023) .......................................................................*passim*

*Foelker v. Kwake*,
    279 Or. 379 (1977)................................................................................................5

*FTC v. Amazon.com, Inc.*,
    735 F. Supp. 3d 1297 (W.D. Wash. 2024) ........................................................27

*Geo Group, Inc. v. Newsom*,
    50 F.4th 745 (9th Cir. 2022) ...................................................... 27, 28, 29

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*,
    865 F.3d 1237 (9th Cir. 2017) ................................................... 20, 21

*Good George LLC v. Cincinnati Ins. Co.*,
    No. 3:20-CV-01705-AC, 2021 WL 5305854 (D. Or. Nov. 15, 2021) ...................................8

*Gov't of Puerto Rico v. Express Scripts, Inc.*,
    119 F.4th 174 (1st Cir. 2024)..................................................... 13, 14

*Gunn v. Minton*,
    568 U.S. 251 (2013) ..............................................................5, 8

*Hornish v. King Cnty.*,
    899 F.3d 680 (9th Cir. 2018) .......................................................6

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ....................................................25

*Hukkanen v. Air and Liquid Sys. Corp.*,
    No. CV 17-2227-JFW, 2017 WL 1217075 (C.D. Cal. Mar. 31, 2017)................................10

*W. Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*,
    140 F.4th 188 (4th Cir. 2025) .....................................................14

*Jefferson County v. Acker*,
    527 U.S. 423 (1999) ..............................................................12

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ..............................................................25

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ....................................................12

*Marshall v. Harris*,
    276 Or. 447 (1976) ...............................................................4

*MCI Telecomms. Corp. v. GTE Nw., Inc.*,
    41 F. Supp. 2d 1157 (D. Or. 1999)..................................................9

*Mesa v. California*,
    489 U.S. 121 (1989) ..............................................................21

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC,*
 770 F.3d 1010 (2d Cir. 2014) ............................................................. 10

*Nevada v. Bank of Am. Corp.,*
 672 F.3d 661 (9th Cir. 2012) ........................................................ 1, 5, 7

*New York v. Arm or Ally, LLC,*
 644 F. Supp. 3d 70 (S.D.N.Y. 2022) ..................................................... 3

*Or. Clinic, PC v. Fireman's Fund Ins. Co.,*
 75 F.4th 1064 (9th Cir. 2023) ............................................................ 15

*Plaquemines Par. v. BP Am. Prod. Co.,*
 103 F.4th 324 (5th Cir. 2024) ...................................................... 12, 16

*Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.,*
 352 Or. 697 (2012) ............................................................................. 3

*Pratt v. Kross,*
 276 Or. 483 (1976) ................................................................... 3, 4, 5

*Preble v. Centennial Sch. Dist. No. 287,*
 298 Or. App. 357 (2019) .................................................................. 16

*Ranck v. Mt. Hood Cable Regul. Comm'n,*
 No. 3:16–cv–02409–AA, 2017 WL 1752954 (D. Or. May 2, 2017) ...................... 8

*Reves v. Ernst & Young,*
 494 U.S. 56 (1990) ............................................................................ 4

*Sauk-Suiattle Indian Tribe v. City of Seattle,*
 56 F.4th 1179 (9th Cir. 2022) ............................................................. 7

*Smith v. Lenches,*
 263 F.3d 972 (9th Cir. 2001) .............................................................. 9

*In re Standard & Poor's Rating Agency Litig.,*
 23 F. Supp. 3d 378 (S.D.N.Y. 2014) ..................................................... 7

*State v. Gaines,*
 346 Or. 160 (2009) .......................................................................... 15

*Stirling v. Minasian,*
 955 F.3d 795 (9th Cir. 2020) ........................................................ 23, 24

*Television Events & Mktg, Inc. v. Amcon Distrib. Co.,*
 416 F. Supp. 2d 948 (D. Hawaii 2006) ................................................. 25

*United States v. King Cnty., Wash.*,
    122 F.4th 740 (9th Cir. 2024) ...........................................................................................23

*Valladolid v. Mem'l Health Servs.*,
    No. CV 23-3007-MWF (ASX), 2023 WL 4236179 (C.D. Cal. June 27, 2023),
    *appeal dismissed,* No. 23-55668, 2024 WL 5356266 (9th Cir. Aug. 22, 2024)....................18

*Watson v. Philip Morris Cos., Inc.*,
    551 U.S. 142 (2007) ...........................................................................................................18

*Willingham v. Morgan*,
    395 U.S. 402 (1969) ...........................................................................................................12

**Statutes**

21 U.S.C. § 881(e)(1)(B)..........................................................................................................20

National Securities Markets Improvement Act of 1996,
    15 U.S.C. §77r.................................................................................................................9, 10

Or. Rev. Stat. § 59.015 ...............................................................................................................3

Or. Rev. Stat. § 59.035 ..............................................................................................15, 16, 17, 29

Or. Rev. Stat. § 59.055 ..........................................................................................................3, 26

Or. Rev. Stat. § 59.115 ..........................................................................................................3, 26

**Other Authorities**

39 C.F.R. § 233.7(q).............................................................................................................17, 20

Restatement (Third) of Agency § 1.02 (2006)......................................................................18, 19

# I.     INTRODUCTION

A "claim of sovereign protection from removal arises in its most powerful form" when a state seeks to enforce its own consumer protection laws. *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012) (quoting *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011)). Plaintiff the State of Oregon's ("the State" or "Oregon") *parens patriae* action alleges, as a single cause of action, that Defendants Coinbase, Inc. and Coinbase Global, Inc. (collectively, "Coinbase") have sold and facilitated the sale of crypto assets to Oregon residents in violation of the Oregon Securities Law ("OSL"). Under long-established principles of federalism, it is difficult to imagine an action more properly adjudicated in state court.

In opposing the State's Motion for Remand, Coinbase offers conclusory arguments, imprecise and misleading citations to irrelevant caselaw, and even a new articulation of the services it provides the federal government. But the fact remains that Coinbase improperly removed this action. Because Coinbase cannot establish that the state law claims Oregon alleges in its Amended Complaint to protect Oregonians from violations of the OSL are subject to federal jurisdiction, the Court should grant the State's motion and remand this case to Multnomah County Circuit Court.

First, Coinbase fails to establish that this local action to enforce local rights arises under federal law. As contemplated by Congress's express recognition of the states' prerogative to independently regulate the registration of securities, the OSL uses its own test to define a security. Among other problems with Coinbase's argument, the Oregon Supreme Court has made clear that it is not bound by federal law in determining what constitutes an "investment contract" under the OSL. While Coinbase relies on cases reflecting that the Oregon courts have *discretion* to look to

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**

1

federal law in interpreting the OSL, such discretion does not "necessarily raise" an issue of federal law as required to justify removal on the grounds of federal question jurisdiction.

Second, Coinbase fails to show that it properly removed this case under the federal officer removal statute. The new "RFP Contract" on which Coinbase relies is irrelevant given that the State has waived its claims to the extent they arise from any sale of the crypto assets at issue ("the Crypto Securities") by or on behalf of the U.S. Marshals Service ("USMS"). Further, despite its new characterization of the service it provides to USMS, there still is no causal nexus between that service and the State's claims that Coinbase violated the OSL by selling unregistered Crypto Securities. Even if Coinbase could demonstrate the necessary causal nexus, it fails to establish that any of the federal defenses it asserts arise out of the services it provides to USMS and are colorable.

The State respectfully requests that this action be remanded.

## II.     ARGUMENT

### A.     Coinbase Fails to Establish Federal Question Jurisdiction.

#### 1.     Oregon's State Law Action Does Not Necessarily Raise a Question of Federal Law.

Coinbase narrowly insists that, because the Oregon Supreme Court has taken guidance from certain federal law decisions in defining an investment contract under the OSL, the State's claims necessarily raise a federal question. But this misses the big-picture point confirmed by the governing Oregon Supreme Court decisions: that the test for an investment contract under the OSL does not "turn on" federal law, because, as the Oregon Supreme Court has confirmed, the OSL is not bound by the federal test developed by *Howey* or its progeny.

To start, it is patently incorrect that the question here is whether the Crypto Securities "are investment contracts under the federal standard." Opp'n to Pl.'s Mot. to Remand ("Opp.") at 13,

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**

ECF No. 25. Rather, the lynchpin question in this case is whether the transactions are investment contracts under the OSL. Importantly, unlike the statute in *New York v. Arm or Ally, LLC*, 644 F. Supp. 3d 70 (S.D.N.Y. 2022), to which Coinbase tries to analogize this case, the OSL's definition of "investment contract" neither refers to nor incorporates federal law.[1] *Contra* Opp. at 3, 14–15. Logically, then, the interpreting court "need not establish a [federal securities law] violation to claim that [a defendant] violated" the corollary state law provision. Mot. to Remand ("Mot.") at 7, ECF No. 19 (quoting *St. Mary's Reg'l Med. Ctr. v. Renown Health*, 35 F. Supp. 3d 1275, 1282–84 (D. Nev. 2014)).

Coinbase's assertion to the contrary conveniently ignores that even "[i]n situations involving Oregon [securities] laws in large measure drawn from a federal counterpart," those decisions "*do not bind*" a court when applying the Oregon law. *Badger v. Paulson Inv. Co.*, 311 Or. 14, 21 (1991) (emphasis added); *Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 710 (2012) ("[F]ederal precedent interpreting an analogous federal provision, or interpreting an Oregon provision for that matter, is not binding on this court when it interprets the law of this state[.]"); *see also* Mot. at 8 n.3 (distinguishing the state and federal statutes). Coinbase's argument thus overlooks that, when the Oregon Supreme Court adopted a modified *Howey* test in *Pratt* that drew (in part) from subsequent federal securities law

---

[1] In *Arm or Ally*, the state statute in question applied only to "gun industry member[s]" who, among other things, sell a "qualified product," which was, in turn, "defined in" federal law by the statute itself. 644 F. Supp. 3d at 78 (quoting N.Y. Gen. Bus. Law § 898-b(1), § 898-a(6)). Here, in contrast, what constitutes an "investment contract" under the OSL is not "defined in" federal law. *See* Or. Rev. Stat. ("ORS") §§ 59.015(19), 59.055, 59.115(1)(a), and 59.115(3). Rather, as the ultimate arbiter of issues of state law, the Oregon Supreme Court determines the test for what an "investment contract" is under the OSL and has made clear it has considerable interpretive discretion over that definition, guided by the overall structure and purpose of the OSL. *Pratt v. Kross*, 276 Or. 483, 487, 497 (1976).

decisions, it was not bound to follow those federal law decisions, but merely opted to take guidance from them (as well as other authorities, such as scholarship). *See* 276 Or. at 495–97.

Indeed, Oregon Supreme Court and Court of Appeals decisions including *Pratt* demonstrate that Oregon courts have at times also used a different test than the test under *Howey* and its progeny, called the "risk capital" test, for determining what constitutes an investment contract under the OSL. *Computer Concepts, Inc. Profit Sharing Plan v. Brandt*, 98 Or. App. 618, 624 n.7 (1989), *aff'd sub nom. Computer Concepts, Inc. v. Brandt*, 310 Or. 706 (1990), (noting that in a prior decision, the Court of Appeals "adopt[ed] an alternative test for an investment contract, the 'risk capital test,' precisely in order to avoid the limitations of the *Howey* test"); *Black v. Corp. Div.*, 54 Or. App. 432, 443 (1981) (stating that "[t]he Oregon Supreme Court did not limit 'investment contracts' only to those satisfying [the *Howey-Forman*] test, but has expressly provided that new situations may require modification of the rule," and finding that transactions were investment contracts under "either the *Howey-Forman* or risk-capital test"); *Pratt*, 276 Or. at 490–91 (noting Court of Appeals use of risk capital test); *Marshall v. Harris*, 276 Or. 447, 452 (1976) (declining to rule out that "the 'risk-capital' test . . . m[ight] also be applied under appropriate circumstances").

Although a few federal circuit courts have at times used a "risk capital" test in deciding what constitutes a security, *e.g.*, *Danner v. Himmelfarb*, 858 F.2d 515, 518 (9th Cir. 1988), and the U.S. Supreme Court has noted similarity between the risk capital test and the *Howey* test, *see Reves v. Ernst & Young*, 494 U.S. 56, 64 (1990), the U.S. Supreme Court does not appear to have ever adopted the test, further confirming that the OSL's definition of an investment contract does not "turn on" federal law.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**

Accordingly, it matters not whether Oregon's test for an investment contract under the OSL might "furnish the same outcome" as the federal courts' test for the same under the federal securities law, *see* Opp. at 14[2]; what matters is that Oregon has its own statutory scheme, and authority to interpret its own statute as it sees fit, *see Nevada*, 672 F.3d at 676 (finding no necessary federal issue where a violation of federal law also violated the state law); *see Gunn v. Minton*, 568 U.S. 251, 264 (2013) (remanding for state court adjudication of a state law issue that would involve only a "hypothetical" assessment of how the issue would be resolved in a federal proceeding). In exercising that authority, the Oregon Supreme Court has expressly reserved discretion to deviate from federal law[3] and to further refine its test for what constitutes an "investment contract" "in situations in which reason seems to so direct when the purpose of [Oregon's] statutory scheme is considered." *Pratt*, 276 Or. at 497; *see also id.* ("Neither do we mean to indicate that this will be the only rule used in all circumstances."); *Computer Concepts*, 310 Or. at 714 n.7–8 (explaining that "[the court] may look to federal cases for guidance" as they may be "instructive"). One such purpose is "to afford the 'greatest possible protection' to the public," *Foelker v. Kwake*, 279 Or. 379, 385 (1977), which the State seeks to effectuate with this action.

Because Oregon's Supreme Court reserves the right to determine what constitutes an investment contract under the OSL without deference to or presumption of primacy of the *Howey* test, the State's claims do not raise a federal question at all, much less necessarily implicate one.

---

[2] And, given that the OSL test is broader than *Howey*, it does not follow that a token found to be a security under the OSL would also be found to be a security under the federal corollary. Nor would such a finding be tantamount to requiring Coinbase to register federally as a national securities exchange. *Contra* Opp. at 18–19. Rather, it would simply require that Coinbase stop selling the unregistered securities in Oregon.

[3] As the State's opening brief noted, the OSL more broadly diverges from the 1933 Act in significant ways relevant to State's claims here. Mot. at 6–8, 8 n.3.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**

2.     **This Action Does Not Implicate a Substantial Federal Interest, and Remanding Would Preserve the Federal-State Balance.**

Even if the Court were to find a federal issue exists, Coinbase vastly overstates the relevance of, and the impact of the case on, the federal securities regulation landscape. Oregon seeks only to vindicate *its* citizens' interests by challenging sales exclusively to *its own* residents under Oregon's decades-long statutory scheme—not sales to residents of the other 49 states. Mot. at 9; Am. Compl. ¶¶ 505–06, ECF No. 18.

Coinbase argues that this case is properly before a federal court in part because "more than one in five Americans" hold cryptocurrency tokens, and that Coinbase operates a "nationwide platform, involving hundreds of millions of dollars in transactions across the country on a daily basis." Opp. at 15–16. That may be. But that is irrelevant to the State's targeted challenge of sales to only Oregon residents of only 31 out of the millions of cryptocurrencies—not including Bitcoin, which comprises the majority of the crypto market's value. Mot. at 9 n.6, 10 n.7.

Regardless, the substantiality inquiry for purposes of removal is not about the breadth of the defendant's business ventures; it is about the overriding interests at stake. *See Hornish v. King Cnty.*, 899 F.3d 680, 690 (9th Cir. 2018) (analyzing the "strong" and "direct" interests (quoting *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 315 (2005))). Here, the interest at stake is the Oregon Attorney General's interest in enforcing Oregon's state-specific regulatory scheme and in protecting Oregon residents—an interest duly protected by remanding this case to the Oregon courts. *See* Mot. at 10–11.

Coinbase nonetheless contends that prioritizing this significant regulatory interest would impair its platform's "liquidity," *see* Opp. at 18—an argument that, at bottom, asserts that Coinbase's interest in maximizing its cash flow, or the ability of sellers to dump their unregistered

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**                    6

Crypto Securities on Oregonians, trumps Oregon's sovereign interest in protecting its residents from the sale of these high-risk, illicit investments. Effectively, Coinbase's position seems to be that virtually any state-law claim against a corporation like Coinbase that operates a "nationwide platform" implicates substantial federal interests because it could have some impact on the platform's markets or network effects. *See* Opp. at 16–17, 18–19. Accepting Coinbase's logic would significantly undermine the ability of state courts to hear actions under their own laws seeking to protect their residents from unlawful conduct by behemoth corporations such as Amazon, Facebook, or eBay operating such platforms. Foundational principles of federalism reject this logic. *In re Standard & Poor's Rating Agency Litig.*, 23 F. Supp. 3d 378, 413 (S.D.N.Y. 2014) ("With few exceptions, the doors to federal court [do] not swing open merely because a party has a national presence[.]" (citation modified) (citation omitted)); *see Nevada*, 672 F.3d at 676 (remanding a state law question against nationwide defendant because "[r]emoving a state's action from its own courts must 'serve[ ] an overriding federal interest'" which was absent there (quoting *McGraw*, 646 F.3d at 178).[4]

That Congress is considering cryptocurrency legislation is immaterial. Congress could, in many industries, intervene at any point, and Congress contemplates a vast array of legislative proposals that, if passed, could alter the federal-state regulatory balance. But this prospect alone does not "disturb[] any congressionally approved balance of federal and state judicial responsibilities." *Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179, 1185 (9th Cir. 2022) (quoting *Grable*, 545 U.S. at 314). Indeed, Congress has been considering comprehensive crypto

---

[4] Coinbase's attempt to distinguish the present case from *Nevada* rests on the faulty premise that Oregon's investment contract standard "adher[es] directly to federal law." Opp. at 19–20. As set forth above, this argument is incorrect. *See infra* § II.B.1.a; *See* Mot. at 6–8.

**PLAINTIFF'S REPLY IN**              7
**SUPPORT OF MOTION**
**TO REMAND**

regulatory reform since before crypto exchange FTX notoriously collapsed (along with the broader

crypto market) in November 2022,[5] yet Oregonians have continued to suffer millions of dollars of

losses on the Crypto Securities without effective avenues for redress.

      While both Coinbase and the Blockchain Association want the Court to believe that state

securities enforcement is a bug of the system rather than a feature, the "federal-state balance

approved by Congress" is, and has long been, that Oregon retains a "special responsibility" in

determining whether its citizens are subject to the sale of unregistered securities under its own

longstanding blue sky law.[6] *Gunn*, 568 U.S. at 258, 264; *see* Mot. at 9–11; Br. of Amicus Curiae

Blockchain Association in Support of Defs,' Response in Opp'n to Remand ("Amicus Br."), ECF

No. 28-1; *see also Ranck v. Mt. Hood Cable Regul. Comm'n*, No. 3:16–cv–02409–AA, 2017 WL

1752954, at *5 (D. Or. May 2, 2017) (acknowledging that allowing a federal court to resolve a

question about the role that "state and local authorities should play in regulating cable services"—

---

[5] *See* Jason Brett, *In 2021, Congress Has Introduced 35 Bills Focused On U.S. Crypto Policy*, Forbes (Dec. 27, 2021), https://web.archive.org/web/20220812043025/http://www.forbes.com/sites/jasonbrett/2021/12/27/in-2021-congress-has-introduced-35-bills-focused-on-us-crypto-policy/?sh=401f3743c9e8.

[6] The Blockchain Association's proposed amicus brief is primarily notable for laying bare the arrogance behind its and its member Coinbase's concerted effort to keep this case out of state court. Ignoring the Oregon Supreme Court's clear holdings that it is not bound by federal securities law, and the 1933 Securities Act's preservation of state regulation of non-"covered" securities (*see* Mot. at 2, 9) such as those at issue here, the Association nakedly argues for usurping state sovereignty, purely on the basis that state regulation could inconvenience aspects of the crypto industry. *See, e.g.*, Amicus Br. at 9 ("Oregon cannot decouple its definition of an investment contract from decades of federal law through a rogue enforcement action."). In general, the Association simply regurgitates Coinbase's federal question arguments. Because a recitation of a party's argument, without more, neither "supplement[s] the efforts of counsel" nor "draw[s] the court's attention to law that escaped consideration," the Association's motion to appear amicus curiae (ECF No. 28) should be denied. *See Good George LLC v. Cincinnati Ins. Co.*, No. 3:20-CV-01705-AC, 2021 WL 5305854, at *1 (D. Or. Nov. 15, 2021) (quoting *Miller-Wohl Co. v. Comm'r of Labor & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982)).

**PLAINTIFF'S REPLY IN**
**SUPPORT OF MOTION**
**TO REMAND**

        8

similar to the question here—may "disrupt the federal-state balance" in a manner that favors state court adjudication, but finding federal jurisdiction because the claims were explicitly based on violations of federal statute).

Coinbase's related concern about the supposed impact of "'[a]llowing disparate state courts to establish different standards' for digital-asset transactions *under federal law*," Opp. at 16–17 (emphasis added), also rings hollow for two distinct reasons. First, states have necessarily "established different standards" under the long-standing dual enforcement regime for securities regulation. *See* Mot. at 9. While the carveout for "covered securities" under the 1933 Act is an exception, *see* Mot. at 2, 9; 15 USC § 77r(a), Coinbase concedes the Crypto Securities are not "covered securities," Opp. at 16 n.16. So while Coinbase might prefer "a uniform set of rules," that desire runs contrary to the decades-long regulatory scheme and is insufficient to justify wresting this case from the Oregon courts.[7] Second, as discussed at length *supra* and in the State's Motion, the State brings no claims under federal law and seeks only a determination that the Crypto Securities are securities under the OSL.

Coinbase's argument that the federal 1934 Exchange Act demands a federal forum here also fails. The State's claims do not arise under the Exchange Act, so its exclusive federal jurisdiction provision does not apply (nor does Coinbase seriously contend otherwise). Moreover,

---

[7] The same goes for the Blockchain Association's attempt to frame this action as "fractur[ing] the federal framework" by creating a "patchwork of varying definitions" under the various state laws. *See* Amicus Br. at 3, 5; *see also Smith v. Lenches*, 263 F.3d 972, 977–78 (9th Cir. 2001) ("Because [state] law governs, the determination whether [state] securities laws were violated will . . . be decided by [] state courts.").

For similar reasons, Coinbase's repeated assertions about the "novel" nature of this question are mystifying, as it is long settled that "it is preferable to let the Oregon courts decide important or novel questions of state law.*" MCI Telecomms. Corp. v. GTE Nw., Inc.*, 41 F. Supp. 2d 1157, 1169 (D. Or. 1999).

the Exchange Act's provisions are not triggered by a finding that an investment is a security under *state* law, which is all that the State's claims here allege. Finally, because Coinbase is not registered as a national securities exchange and the Crypto Securities at issue have not been designated by the SEC as "qualified for trading in the national market system," *see* 15 U.S.C. § 77r(b)(1), these securities are not "covered securities" under the National Securities Markets Improvement Act of 1996, so state authority to regulate them is undisturbed, *see* 15 U.S.C. § 77r.[8] In other words, the federal securities laws actually evince Congress's intent to preserve states' prerogative to regulate the registration of securities such as these.[9]

* * *

For these reasons, this *parens patriae* action, which seeks a ruling under state law and implicates only a substantial *state* issue, should be remanded to, and adjudicated in, the Oregon state courts.

## B. Coinbase Fails to Establish Jurisdiction under the Federal Officer Removal Statute.

Coinbase's argument that it properly removed this case to federal court under the federal officer removal statute also fails. For one, the State's waiver of claims arising from the sale of Crypto Securities to Oregon residents by or on behalf of USMS eviscerates any grounds for removal under the statute. *See Hukkanen v. Air and Liquid Sys. Corp.*, No. CV 17-2227-JFW, 2017

---

[8] The Blockchain Association's invocation of the National Securities Markets Improvement Act and its "broad[] preempt[ion]" provision conveniently overlooks this crucial distinction that undercuts its argument. Amicus Br. at 7.

[9] *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC* is not to the contrary. There the court found a substantial federal issue to be necessarily raised because the claims alleged that NASDAQ—an actual federally registered securities exchange—breached a federally imposed "duty to provide a fair and orderly market." 770 F.3d 1010, 1022 (2d Cir. 2014). Here the source of the State's claims against Coinbase, which is not a registered national exchange, is Oregon law, not federal law.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**          10

WL 1217075, at *2 (C.D. Cal. Mar. 31, 2017). Even if that were not the case, Coinbase still has

proved neither (1) a causal nexus between the services it provides to USMS and the State's claims,

nor (2) that it can assert a colorable federal defense to those claims. *See Cnty. of San Mateo v.*

*Chevron Corp.*, 32 F.4th 733, 746 (9th Cir. 2022) ("The defendant has the burden of proving by a

preponderance of the evidence that the requirements for removal jurisdiction have been met."

(citing *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014)). Thus, there is no basis for removal

under this ground.

>    **1.    Coinbase Fails to Demonstrate a Causal Nexus between the State's Claims
>          and the Services Coinbase Provides to USMS.**

As discussed in the State's Motion and further discussed below, the express claim waiver

in the State's operative amended complaint (the "Complaint") eliminates any possible grounds for

removal under the federal officer removal statute. Mot. at 18–19. But even if the State's waiver

did not defeat removal, Coinbase still could not establish a causal nexus between the State's claims

and the services Coinbase provides to USMS, because Coinbase's contractual obligations to

USMS *do not require* it to execute sales of the Crypto Securities at issue to Oregon residents in

violation of the OSL. Mot. at 12–14. While Coinbase now attempts to rely on a new contract that

took effect weeks after Coinbase removed this case to federal court, Coinbase fails to cite a single

provision of either the original Prime Broker Agreement or the new RFP Contract that

demonstrates a causal nexus between those agreements and the conduct at issue—selling or

materially aiding the sale of unregistered Crypto Securities to Oregon residents. *See* Opp. at 22–

28.

Coinbase's contention that it has met both the "acting under" and causal connection prongs

of the Ninth Circuit's causal nexus test rests largely on its misapplication of the principle that a

court assessing the existence of a causal nexus must credit the defendant's theory of the case. Opp. at 23 (quoting *DeFiore v. SOC LLC*, 85 F.4th 546, 557 (9th Cir. 2023)). Specifically, Coinbase argues that this principle means that this Court must accept Coinbase's characterization of its agreements with USMS, but the cases on which it relies do not support this proposition. *See* Opp. at 28 (citing *Leite*, 749 F.3d at 1124). For example, while the *Leite* court found that affidavits submitted by defendant from two retired admirals "stat[ing] that the Navy issued detailed specifications governing the form and content of all warnings that equipment manufacturers were required to provide" were sufficient to satisfy defendant's burden of establishing a colorable federal defense, it did not suggest that courts must credit a defendant's *characterization of evidence* offered in support of removal, which is exactly what Coinbase contends this Court must do. *See* 749 F.3d at 1123–24.[10]

Instead, the Court should conduct an independent analysis of and reach its own conclusions about the federal contractor agreements between Coinbase and USMS. *See, e.g.*, *Plaquemines Par. v. BP Am. Prod. Co.*, 103 F.4th 324, 339 (5th Cir. 2024), ("[I]n cases involving private federal contractors, courts look to the contents of the relevant federal contracts in determining whether the challenged conduct was 'connected or associated with' acts taken under color of federal office."); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1087–88 (6th Cir. 2010) (closely analyzing terms of relevant

---

[10] Nor did the Supreme Court credit a removing defendant's characterization of its federal contractor agreement, or other evidence, in either *Willingham v. Morgan*, 395 U.S. 402 (1969), or *Jefferson County v. Acker*, 527 U.S. 423 (1999). In *Willingham*, the Court held that the warden and chief medical officer of a federal penitentiary demonstrated causal connection by "show[ing] that their only contact with respondent occurred inside the penitentiary." 395 U.S. at 409. In *Jefferson County*, the Court "accept[ed] . . . for purposes of th[e] jurisdictional inquiry" two federal judges' contention that a county occupational tax "required the judges to pay a license fee before 'engag[ing] in [their] occupation,'" and held that this was sufficient to show "the essential nexus between their activity 'under color of office' and the county's demand, in the collection suits, for payment of the local tax." 527 U.S. at 432–33.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**

12

federal contractor agreements). When it does, the Court will agree that Coinbase fails to carry its burden as to either prong of the causal nexus test, thereby precluding removal. *See San Mateo*, 32 F.4th at 55.

        a.    **The State's Waiver of Claims Arising from Sales on behalf of USMS Eviscerates Any Grounds for Removal under the Federal Officer Removal Statute.**

The State's disclaimer and express waiver of claims related to or arising from the sale of Crypto Securities by or on behalf of USMS is unambiguous and makes clear that the claims set forth in the Complaint do not arise from any sale of Crypto Securities by or on behalf of USMS. Am. Compl. ¶ 503. Coinbase does not dispute that a post-removal waiver may effectively eliminate grounds of federal jurisdiction, nor does it suggest that the State's waiver is insufficiently comprehensive to cover all sales by or on behalf of USMS. Courts have routinely held that express claim waivers, like the State's waiver here, defeat removal. *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 187 (1st Cir. 2024) (Waivers "that clearly carve out certain factual bases, whether by time span or location, such that any alleged injury could not have happened under the direction of a federal officer will prevent removal." (citation and internal quotation marks omitted)); *California by & through Harrison v. Express Scripts, Inc.*, No. 2:23-CV-08570-SPG-PD, 2024 WL 841197, at *5 (C.D. Cal. Feb. 28, 2024), *aff'd in part*, 139 F.4th 763 (9th Cir. 2025) ("[C]ourts in the Ninth Circuit have recognized that when the federal officer removal statute is at issue, a plaintiff may expressly waive claims that would give rise to potential federal defenses . . . [and] this is the case even if the waiver is submitted post-removal.").

Unable to show that Coinbase might somehow be held liable for sales by or on behalf of USMS, Coinbase contends that federal officer removal jurisdiction extends to the Complaint in spite of the waiver on the theory that *any* restriction on its ability to sell or facilitate the sale of

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**

13

Crypto Securities to Oregonians would impact its ability to perform the services it agreed to provide to USMS. Opp. at 21. But this case is readily distinguishable from the pharmacy benefit manager ("PBM") cases on which Coinbase relies. *See Gov't of Puerto Rico*, 119 F.4th 174; *California v. CaremarkPCS Health LLC*, No. 23-55597, 2024 WL 3770326 (9th Cir. Aug. 13, 2024); *W. Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188 (4th Cir. 2025). In those cases, involving defendants' allegedly improper negotiation of drug rebate agreements with pharmaceutical companies, the courts held that defendants' efforts to negotiate drug prices on behalf of the federal government were indivisible from their negotiations on behalf of their private clients. In other words, defendants' actions at the direction of the federal government could not be separated from their actions on behalf of other clients. *Gov't of Puerto Rico*, 119 F.4th at 190–94; *see also California*, 2024 WL 3770326 at *2; and *W. Virgina ex rel. Hunt*, 140 F.4th at 195–96.

Coinbase's actions here are not indivisible like collective drug rebate negotiations; they are distinct *transactions* of distinct assets, executed for individual clients like USMS. The conduct at issue in the Complaint—namely, the sale of Crypto Securities to Oregon residents through Coinbase's platform by or on behalf of Coinbase customers other than USMS—is indisputably separate from the sale of Crypto Securities by or on behalf of USMS (and Coinbase does not contend otherwise). Each sale is a single transaction and, as such, any sale of Crypto Securities to an Oregon resident by or on behalf of USMS is distinct and divisible from other sales of Crypto Securities to Oregon residents. Notably, Defendants have not pointed to even a single instance of Coinbase selling Crypto Securities to an Oregon customer on behalf of USMS. But, to the extent any Crypto Securities have been sold to Oregon residents on USMS's behalf, those transactions are in no way "indivisible" from the other sales of the Crypto Securities to Oregon residents, which are the subject of the State's Complaint.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**                    14

Coinbase's attempt to avoid the impact of the State's waiver by reframing its obligation to USMS as "provid[ing] a continuously operating and highly liquid nationwide trading platform" is unavailing. *See* Opp. at 21. There is not a single mention of an obligation to provide a certain level of liquidity in either the Prime Broker Agreement or the RFP Contract. Nor does Coinbase suggest that it could not continue to perform its obligation to dispose of crypto assets at the direction of USMS without making the Crypto Securities available for sale to Oregon residents by other Coinbase customers. Instead, Coinbase effectively asks the Court to find that *every* transaction it executes on its platform is at the direction of the federal government. This position is not credible.

Because the State expressly waives claims arising from sales by or on behalf of USMS, and because Coinbase cannot plausibly claim that it executes sales of Crypto Securities to Oregon residents by or on behalf of its other customers at the direction of USMS, the State's waiver is effective and defeats removal. Accordingly, the Court should remand this case to State court.

> **b.    There is No Causal Connection Between the State's Claims and the Services Coinbase Provides to USMS.**

Even if the State's waiver did not defeat removal, Coinbase fails to establish the required causal connection between the State's claims and Coinbase's actions on behalf of USMS. Coinbase does not credibly contest that the OSL explicitly exempts from the registration requirement transactions by marshals such as USMS. *See* ORS § 59.035(1).[11] Nor does Coinbase dispute that

---

[11] Coinbase cites the legislative history of ORS § 59.035(1) in an effort to overcome the plain language of the statute. Opp. at 21 n.19. The Oregon Supreme Court, however, has held that, "[w]hen the text of a statute is truly capable of only having one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different." *State v. Gaines*, 346 Or. 160, 173 (2009); *see also Or. Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1069 (9th Cir. 2023) (Courts in the Ninth Circuit are "bound to follow the decisions of the state's highest court" when interpreting state law, "and when the state supreme court has not spoken on an issue, [the court] must determine what result the court would

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**

its agreements with USMS do not require it to sell Crypto Securities held by USMS to Oregon residents to the extent that would violate the OSL if the statutory exemption did not apply. These concessions are fatal to Coinbase's argument that a sufficient causal connection exists between the State's claims and Coinbase's activities on behalf of USMS.

Coinbase nevertheless contends that its attenuated nationwide liquidity argument creates a causal connection. Specifically, Coinbase claims that facilitating the sale of Crypto Securities *by sellers other than USMS* to Oregon residents in violation of the OSL is a "key component" of its obligations to USMS. Opp. at 27–28. On this theory, Coinbase could remove any state court action asserting claims that touch in virtually any way upon the manner in which Coinbase elects to operate its platform. But, as discussed above, the Court need not credit Coinbase's untethered, self-serving characterization of its agreements with USMS. *See, e.g.*, *Plaquemines Par.*, 103 F.4th at 339 ("[C]ourts look to the contents of the relevant federal contracts in determining whether the challenged conduct was 'connected or associated with' acts taken under color of federal office.").[12]

_____

reach based on state appellate court opinions, statutes and treatises." (quoting *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021))).

Coinbase's argument that ORS § 59.035(1) is limited to transactions by a marshal in the "judicial context" contravenes the plain meaning of the word "any" and is contrary to the typical usage of the word as Oregon "courts assume that the legislature's use of the word 'any' indicates [a] deliberately comprehensive application." *Preble v. Centennial Sch. Dist. No. 287*, 298 Or. App. 357, 367 (2019) (citing *State v. Hamilton*, 348 Or. 371, 378 (2010), *Crocker and Crocker*, 332 Or. 42, 51 (2001), and *Dickinson v. Leer*, 255 Or. 274, 276 (1970)).

[12] Coinbase makes much of the supposed difference between acts that occurred "because of" Coinbase's work on behalf of USMS and acts that were "connected or associated" with that work. Opp. at 27–28. *DeFiore* uses both terms and states that the Ninth Circuit's causal connection analysis is consistent with both concepts. *DeFiore*, 85 F.4th at 557. More importantly, however, "connected or associated" does not expand the analysis beyond the contents of Coinbase's contracts with USMS to its unsupported characterization of those agreements.

**PLAINTIFF'S REPLY IN**                    16
**SUPPORT OF MOTION**
**TO REMAND**

Coinbase cites nothing in its agreements with USMS or otherwise to support its claim that the sale of the Crypto Securities to Oregon residents is a "key component of its performance under its agreements with the federal government." Opp. at 27–28.[13] In fact, to the extent those sales by USMS would even violate the OSL notwithstanding ORS § 59.035(1), Coinbase's agreements with USMS indicate such sales would be *prohibited* by those agreements' provisions requiring compliance with securities laws and state laws. *See* Mot. at 13 (discussing relevant provisions of Prime Broker Agreement); RFA Contract, ECF No. 26-2, at 10 ("Contractor shall comply with all applicable . . . State and local laws . . . applicable to its performance under this contract."); *id.* at 71 ("The Contractor shall perform required functions in accordance with all Federal, State, and local laws and regulations applicable to the services being provided[.]").

As the Complaint makes clear, the State does not challenge Coinbase's broader operation of its trading platform as such; it challenges Coinbase's specific decision *to make the Crypto Securities available* for purchase by Oregon residents, even though those securities are not registered as required by the OSL. There is no dispute that Coinbase, and Coinbase alone, decides which crypto assets are available to trade on its platform. And there is no dispute that Coinbase alone decided to make those assets available to Oregon residents. As a result, the sales of Crypto Securities to Oregon residents simply did not occur because of the services Coinbase provides to USMS, and there is no causal connection between the State's claims and Coinbase's actions on behalf of USMS. *See DeFiore*, 85 F.4th at 557 ("To satisfy the causal connection requirement,"

---

[13] Indeed, federal regulations permit USMS to sell "forfeited property" in another district "[i]f the laws of a state in which an article of forfeited property is located prohibit the sale . . . of such property," 39 C.F.R. § 233.7(q).

contractors must show "that the challenged acts occurred because of what they were asked to do by the Government." (citation and internal quotation marks omitted)).

### c.    Coinbase Does Not "Act Under" USMS in Operating Its Trading Platform.

Coinbase contends that, to demonstrate that it is "acting under" USMS, it need only show either that (1) Coinbase is helping USMS fulfill a basic governmental task, or (2) it serves as USMS's agent under common-law agency principles. This misstates controlling precedent.

In *Watson v. Philip Morris Cos., Inc.*, the Supreme Court held that a contractor acts under a federal officer for the purposes of the federal officer removal statute when it is in an unusually close relationship with the government, involving detailed regulation, monitoring or supervision, *and* is assisting the government with the fulfillment of a basic governmental task. 551 U.S. 142, 153–54 (2007); *see also Valladolid v. Mem'l Health Servs.*, No. CV 23-3007-MWF (ASX), 2023 WL 4236179 (C.D. Cal. June 27, 2023), *appeal dismissed,* No. 23-55668, 2024 WL 5356266 (9th Cir. Aug. 22, 2024) (a removing party "generally . . . must demonstrate **both** that [it is] operating as a subordinate and pursuant to the Government's directions **and** that [its] conduct is in furtherance of a traditional or statutory governmental duty or task" (emphasis in original)).

While the Ninth Circuit held in *DeFiore* that the "acting under" requirement is satisfied where a government contractor is "an agent under common-law agency principles as reflected in the *Restatement (Third) of Agency*," *see* 85 F.4th at 556, no court has held that simply helping to

fulfill a basic governmental task is sufficient on its own. And absent a showing of common law agency, the *San Mateo* "acting under" factors control.[14] Coinbase's argument fails on both fronts.

In an attempt to show that it was an agent of USMS under the Prime Broker Agreement, Coinbase disavows the express language of its own form agreement, which disclaims any fiduciary duty to USMS, and suggests that this provision is unenforceable. Opp. at 25 n.21. Coinbase then pivots to the new RFP Contract, which refers to Coinbase as USMS's "agent." *Id.* at 25. But "[w]hether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling," Restatement (Third) of Agency § 1.02 (2006), so this does not make Coinbase's case. Nor do Coinbase's conclusory arguments in response to the State's application of the *San Mateo* factors, which demonstrates that Coinbase does not "act under" USMS. Mot. at 14–17.

First, Coinbase argues that it helps to fulfill a basic governmental task because disposing of seized and forfeited assets is one of USMS's core responsibilities. Opp. at 23. But the responsibility to *dispose* of seized and forfeited assets is not the same as a responsibility to *sell* those assets. Indeed, federal law imposes no requirement on USMS to sell all seized and forfeited assets. Instead, it provides that "[t]he Attorney General *may* . . . sell . . . any forfeited property

---

[14] A removing party "acts under" a federal officer when it is:

> (1) working under an officer "in a manner akin to an agency relationship"; (2) being "subject to the officer's close direction, such as acting under the ... 'guidance, or control' of the officer" or having an "unusually close" relationship "involving detailed regulation, monitoring, or supervision"; (3) helping fulfill "basic governmental tasks"; and (4) conducting activities "so closely related to the government's implementation of its federal duties that the . . . person faces 'a significant risk of state-court prejudice.'"

Mot. at 14 (quoting *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1107 (9th Cir. 2022)).

**PLAINTIFF'S REPLY IN**
**SUPPORT OF MOTION**
**TO REMAND**

which is not required to be destroyed by law and which is not harmful to the public," 21 U.S.C.

§ 881(e)(1)(B) (emphasis added), and allows "forfeited property" to "be moved to and sold in such

other district" "[i]f the laws of a state in which an article of forfeited property is located prohibit

the sale . . . of such property," 39 C.F.R. § 233.7(q). Coinbase points to no statute or regulation

that permits, much less requires, USMS to *sell* Crypto Securities to Oregonians in violation of

Oregon law because no such statute or regulation exists.

Second, Coinbase argues that "everyday tasks" may constitute basic governmental tasks.

Opp. at 24 (citing *Bennett v. MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010)). The State does not dispute

this point, but *Bennett* does not stand for the proposition that anything the government may want

to accomplish is a basic governmental task. While the defendants in *Bennett* were assisting with

the removal of mold, which Coinbase characterizes as an "everyday task," the court only concluded

that the defendants acted under the FAA after closely analyzing the terms of defendants' contract

with the FAA and the amount of control and supervision exercised by the FAA. *Id.* at 1087–88.

Third, Coinbase argues that its complete discretion to determine which crypto assets are

available to trade on its platform, and its extensive discretion regarding other aspects of the

operation of its trading platform, is of no moment, as its exercise of discretion does not defeat

removal. Opp. at 26. In so doing, Coinbase simultaneously overstates and misapplies the authority

it relies on and mischaracterizes the State's argument.

In *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, the Ninth

Circuit held that private insurers were acting under the U.S. Office of Personnel Management

because they were effectively "acting as a claims processor" for the federal government by

asserting subrogation liens against federally insured patients. 865 F.3d 1237, 1246 (9th Cir. 2017).

Crucially, OPM informed the insurers "that it construes federal law to mean that FEHBA preempts

**PLAINTIFF'S REPLY IN**                         20
**SUPPORT OF MOTION**
**TO REMAND**

state laws prohibiting or limiting subrogation and reimbursement." *Id.* at 1247 (internal quotations omitted). The court stated that, by seeking subrogation, the insurers assisted with the basic governmental task of "the administration of a [federal] health insurance program . . . regardless of whether the [insurers] ha[d] *some discretion* in completing that task." *Id.* at 1248 (emphasis added).

Here, the issue is not whether Coinbase has "some discretion" as to how it executes trades on its platform, but rather whether the Prime Broker Agreement, and now the RFP Contract, demonstrate that Coinbase is either subject to USMS's "close direction" or acting under USMS's "guidance or control" in connection with the operation of Coinbase's trading platform. *See Honolulu*, 39 F.4th at 1107 (quoting *San Mateo*, 32 F.4th at 756–57). And Coinbase does not, and cannot, dispute that it has *no* obligation under either Prime Broker Agreement or the RFP Contract to execute trades of the Crypto Securities at issue on the Coinbase platform. *See* Mot. at 15 n.12. While the RFP Contract obligates Coinbase to "take custody of all types and quantities of virtual currency without limitation," RFP Contract at 37, § 2, nothing in the RFP Contract obligates Coinbase to dispose of all seized crypto securities on the Coinbase platform. Accordingly, Coinbase maintains complete discretion to determine which crypto assets are available to trade on its platform, and *Goncalves* does not support Coinbase's contention that it acts under USMS in connection with the operation of its trading platform.

### 2. Coinbase Does Not Assert a Colorable Federal Defense Arising Out of the Services It Provides Pursuant to USMS.

The federal officer removal statute only confers jurisdiction over cases where federal officers can raise a colorable defense that "aris[es] out of [their] official duties." *Honolulu*, 39 F.4th at 1110 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)); *see also Mesa v. California*, 489 U.S. 121, 131 (1989) (quoting *Gay v. Ruff*, 292 U.S. 25, 39 (1934)) (a defendant

must "rest his defense on his [federal] duty"). Before the Court assesses whether Coinbase's defenses are colorable, it must find that the defenses "arise out of" Coinbase's conduct at issue, and that underlying conduct must be an "official duty," or conduct that supports the government in fulfilling a duty that arises under federal law. Coinbase has added no new argument or facts to support its assertion that its four defenses "arise" out of the trade execution services it provides to USMS, which they argue constitute "official duties" because such services aid the federal government in fulfilling a job the federal government is duty-bound to do. But in changing horses midstream and arguing that the service it provides to USMS is the *operation of a crypto trading platform,* Coinbase has created a worse problem for itself, because under its new theory, there are no "official duties" from which a defense could even arise.

> **a.    If the Service Coinbase Provides USMS Is the Operation of a Trading Platform, Coinbase Has No "Official Duties" From Which a Colorable Defense Can Arise.**

Coinbase cites no cases in support of the proposition that a government contractor's "official duties" extend beyond the terms of its contract with the federal government. And there is no support in either the Prime Broker Agreement or the new RFP Contract to support Coinbase's theory that the services it was hired to provide are the "nationwide operation of [Coinbase's] trading platform." Opp. at 32. Coinbase's own response concedes that the work contemplated by the new RFP Contract is trade execution for USMS's seized crypto assets, Opp. at 8, and no text in the RFP Contract supports Coinbase's new contention that USMS hired Coinbase specifically to maintain a certain amount of nationwide liquidity on its platform, *see* Opp. at 28.[15]

---

[15] Coinbase likely resorts to this theory because the State has dropped all claims concerning sales of the Crypto Securities by USMS, clearly severing the connection between Coinbase's conduct still left at issue in the case and any conceivable federal defense. But as described in this section,

Despite this lack of evidence, Coinbase nonetheless asserts that its defenses arise from its "official dut[y]" to operate a liquid platform to serve USMS. *Id.* But the operation of a crypto platform is a far cry from the type of work the federal government is obligated to do, including the obligations identified in cases cited by Coinbase, *see id.* at 32, such as regulating immigration, *United States v. King Cnty., Wash.*, 122 F.4th 740, 757 (9th Cir. 2024); securing guard posts in war zones, *DeFiore*, 85 F.4th at 558–59; training and organizing the National Guard pursuant to federal law, *Stirling v. Minasian*, 955 F.3d 795, 798 (9th Cir. 2020); or cleaning up the environment to protect public health and welfare under CERCLA, *California v. H & H Ship Serv. Co.*, 68 F.3d 481, 1995 WL 619293, *3 (9th Cir. 1995) (unpublished).[16] Even assuming the USMS agreements supported Coinbase's contention that it was retained by USMS to operate such a platform—which they do not—Coinbase's actions do not constitute "official duties" sufficient to give rise to a colorable defense.

### b.    Coinbase's Due Process, Exchange Act, and Personal Jurisdiction Defenses Do Not "Arise" Out of Coinbase's Services for USMS and Are Not Colorable.

Nothing that Coinbase raises in its opposition establishes that its first three defenses—lack of personal jurisdiction, failure to state a claim on the grounds that the Crypto Securities allegedly are not "investment contracts" under the federal Exchange Act, and violation of the fair notice requirements of the federal Due Process Clause—arise from its official duties on behalf of the federal government. *See Honolulu*, 39 F.4th at 1110. And under Coinbase's new theory of the work it was hired to do for USMS, the Court should not even reach the question of whether Coinbase's

---

Coinbase's attempt to draw a vastly broadened picture of its responsibilities under its agreements with USMS is unmoored from reality and still fails to save its argument.

[16] *H & H Ship Service* is an unpublished case that is not binding on this Court.

**PLAINTIFF'S REPLY IN**          23
**SUPPORT OF MOTION**
**TO REMAND**

defenses "arise" out of its conduct, because the operation of a nationwide trading platform is not the type of conduct on behalf of the government that can even give rise to a colorable defense and Coinbase cites nothing in its agreements with USMS requiring it to maintain a certain level of nationwide liquidity.

Even if the operation of a crypto exchange somehow constitutes an "official duty," Coinbase's personal jurisdiction, Exchange Act, and Due Process defenses do not "arise from" or "flow from" either of Coinbase's characterizations of what it was hired to do. *DeFiore* is instructive, as there, when plaintiffs sued the defendant contractor for forcing plaintiffs to work excessive hours under a contract with the Department of Defense, the contractor asserted as a defense that the government contract required defendant's employees to work excessive hours. This defense clearly "arose" out of the services it was obligated to provide under the federal contract. *DeFiore*, 85 F.4th at 558–59.[17]

Here, Coinbase's purported lack of minimum contacts with Oregon does not "arise" from its operation of a trading platform or execution of trades on behalf of USMS, because the issue of whether Coinbase has sufficient contacts with Oregon has no connection to whether Coinbase has violated Oregon law in the performance of its services for USMS—as the defense is based on

---

[17] Coinbase argues that the Ninth Circuit has found that removal was justified even if the asserted federal defense would exist regardless of defendant's relationship with the federal government, Opp. at 31–32, but the cases it cites do not support this proposition. In *Stirling*, defendant—a Judge Advocate General ("JAG")—asserted a Supremacy Clause defense to a claim for unauthorized practice of law based on federal regulations permitting JAGs to practice law without being a member of the state bar in the state in which they are practicing, a defense which plainly arose from defendant's employment relationship with the federal government. *See* 955 F.3d at 801. Similarly, in *H & H Ship Service*, defendant asserted a CERCLA preemption defense against a claim arising from actions "taken during the course of a removal action that was under the direction and control of the Coast Guard, acting pursuant to its authority under CERCLA." *See* 1995 WL 619293 at *2.

Coinbase's contacts with Oregon, Coinbase could raise an identical defense even if it had absolutely no ties to the federal government. A contrary interpretation would allow any removing defendant to easily satisfy the federal defense prong merely by alleging that a complaint filed in state court does not establish personal jurisdiction under the federal standard, which would lead to absurd results.

The personal jurisdiction defense is also not colorable, because it is implausible that Oregon courts lack personal jurisdiction over Coinbase in this case. This Court has specific personal jurisdiction over Defendants[18] because (1) Coinbase sells crypto securities to Oregonians as part of its regular course of business, (2) Coinbase exercises full control over the "ultimate distribution" of those crypto securities, and (3) Oregon's claims arise out of Defendants' contacts with the state, *i.e.*, its sale of unregistered investment contracts in Oregon. *Briskin v. Shopify, Inc.*, 135 F.4th 739, 755 (9th Cir. 2025); *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779–80 (1984) (court has specific personal jurisdiction over a defendant who "is carrying on a part of its general business in [the state], and that is sufficient to support jurisdiction when the cause of action arises out of the very activity being conducted, in part, in [the state]"). Moreover, the State has alleged throughout the Complaint that Coinbase sells unregistered securities to Oregonians as

---

[18] The Court has jurisdiction over Coinbase Global, Inc. ("CGI") because CGI substantially controls its wholly-owned subsidiary, Coinbase, Inc.. CGI's principal asset is its equity interest in Coinbase, Inc., Am. Compl. ¶ 18, Coinbase, Inc.'s revenue and expenses flow up to CGI, *id.* ¶ 41, and the two entities share the same board of directors and website, *id.* ¶ 42; *see Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1069 (9th Cir. 2000) ("where the parent totally controls the actions of the subsidiary so that the subsidiary is the mere alter ego of the parent, jurisdiction is appropriate over the parent as well"). Defendants do not dispute that Coinbase, Inc. is the mere alter ego of CGI. And "the standard for personal jurisdiction under an alter ego theory is lower than the standard for liability under an alter ego theory." *Television Events & Mktg, Inc. v. Amcon Distrib. Co.*, 416 F. Supp. 2d 948, 962 (D. Hawaii 2006) (citing *San Mateo Cnty. Transit District v. Dearman, Fitzgerald and Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir.1992)).

**PLAINTIFF'S REPLY IN**          25
**SUPPORT OF MOTION**
**TO REMAND**

part of its regular course of business, and Coinbase does not deny that Oregon residents have bought the assets at issue on its platform. *See, e.g.*, Am. Compl., ¶ 2 ("Through this platform, Coinbase successfully solicits, participates in, and materially aids the sale of unregistered securities to Oregonians."); *id.* ¶ 11 ("The Attorney General seeks . . . disgorgement of profits Coinbase derived from the sale of unregistered Crypto Securities to Oregonians, and an award of restitution and/or damages on behalf of Oregonians harmed by Coinbase's violations of the Oregon Securities Law."); *id.* ¶ 14 ("[T]he violations of Oregon Securities Law complained of herein, occurred in Multnomah County, where Defendants have regularly sustained business activity").

Coinbase's appeal to the Exchange Act as a defense also remains unavailing. Although Coinbase no longer discusses this purported defense in terms of pleading standards, it continues to rely on the assertion that the definition of "investment contracts" under the federal Exchange Act is a legitimate defense to an action that alleges a single claim under the Oregon Securities Law. But the OSL uses an investment contract test that does not necessarily follow its federal counterpart. *See supra* § II.A.1. Consequently, the defense does not even "track the complaint's actual claims," *see Bonta v. Exxon Mobil Corp.*, No. 3:24-CV-07288-RS, 2025 WL 595267, at *5 (N.D. Cal. Feb. 24, 2025), much less "arise" out Coinbase's official duties on behalf of USMS.

Defendants' Exchange Act defense is not colorable for the same reason, as the definition of an investment contract under federal securities law is not binding on Oregon in interpreting the OSL. It is therefore implausible that the federal law is a legitimate defense to the State's sole claim that Coinbase sold unregistered securities in violation of ORS §§ 59.055 and 59.115. The cases Coinbase cites are solely federal district court cases that applied the federal investment contract test, not the OSL, and are accordingly irrelevant.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND**                    26

Coinbase's argument as to its Due Process defense explores the general concept of Due Process in more detail but fails to explain how the alleged lack of notice "arises from" Coinbase's official duties on behalf of USMS. In fact, Coinbase does not assert that the defense "arises" from any conduct at all, likely because the defense arises from the *State's* duties and conduct under the Fourteenth Amendment, not *Coinbase's* conduct. Instead, Defendants state that the defense "directly 'flows from' *the USMS agreements:* Coinbase will rely on the *existence of those federal* agreements" to support its Due Process defense. Opp. at 30 (emphasis added). As discussed throughout the State's remand briefing, a defense in this context must arise from the conduct at issue, not the mere "existence" of a contract.

Neither is the Due Process defense colorable. By Coinbase's own admission, it has long been aware that, for example, crypto assets "might be subject to regulation as securities." *See* Mot. at 22 n.16 (quoting Defs.' Notice of Removal ¶ 3). It is thus implausible that "Oregon sprang this lawsuit on Coinbase," Opp. at 30, not least of all because Coinbase is only entitled to "fair notice of what the *statute itself* requires," not to notice of Oregon's "*interpretation* of the statute," *FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1330 (W.D. Wash. 2024), (emphasis in *Wyndham*) (quoting FTC v. Wyndham Worldwide Corp., 799 F.3d 236, 255 (3d Cir. 2015)).

### c.    Coinbase Cannot Allege a Colorable Supremacy Clause Defense.

Coinbase's Supremacy Clause defense also remains implausible. Defendants cite *Geo Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022), for the proposition that a state law can violate the Supremacy Clause even if the law does not discriminate against the federal government, so long as the state law serves to "control the operations of the federal government." Opp. at 29 (citation modified). Coinbase then asserts in conclusory fashion that the OSL "controls" the operations of the federal government because the OSL "directly burden[s] the federal

**PLAINTIFF'S REPLY IN**                    27
**SUPPORT OF MOTION**
**TO REMAND**

government." *Id.* Tellingly, Defendants offer no specifics as to how the OSL "directly burdens" or "controls" the federal government.[19]

The state law at issue in *Geo Group* was a California statute that prohibited the federal Immigration and Customs Enforcement ("ICE") from hiring private contractors to operate ICE detention facilities in California. 50 F.4th 745, 757 (9th Cir. 2022). The Ninth Circuit held that state law violated the Supremacy Clause because it had the "same effect as direct enforcement against the Government" when it sought to control who ICE could and could not hire in the performance of its official government duties in regulating immigration. *Id.* at 760. To the extent Coinbase cites *Geo Group* to refute the State's argument that intergovernmental immunity only attaches to state laws that directly regulate or discriminate against the federal government, the case is unavailing.

But *Geo Group* is otherwise instructive here, for the contrast it presents with the facts of this case. Unlike the state law there, which sought to "override" the federal government's discretion to hire private contractors through a "direct ban" on private detention facilities, the OSL

---

[19] Coinbase alleges that Oregon's enforcement of the OSL will inhibit Coinbase's ability to maintain a nationwide market, which could then make it more difficult to "attain the best price available." Opp. at 34, 36. But Coinbase fails to cite a single actual provision of its agreements with USMS that would be breached by reducing liquidity from Oregon users, which is fatal to its argument. Moreover, by Coinbase's logic, any state law with the potential to indirectly "impair[] the . . . liquidity and scale . . . that is key to [Coinbase's] performance," Opp. at 11, would directly regulate USMS. But the Supremacy Clause cannot protect a company's own interest in maximizing the value of its services because the Supremacy Clause does not even invalidate state laws that indirectly increase the federal government's costs. *See Geo Grp.*, 50 F.4th at 760 ("[N]umerous cases distinguish for purposes of intergovernmental immunity between regulations of federal contractors that merely increase the federal government's costs, like taxes, and regulations that would control federal operations."). Relying only on a speculative chain of events relating to its own business operations, Coinbase fails to plausibly allege that Oregon controls federal operations in any way.

does not directly regulate or discriminate against the federal government, and in fact expressly carves out transactions by marshals such as USMS from its reach. *See* ORS § 59.035(1). The OSL is a facially neutral state law that, if anything, grants special solicitude to sales by marshals such as USMS, and that exists to protect Oregonians generally from the improper sale and solicitation of securities. It is not a state law that "interfer[es] with the federal government's . . . decisions," *Geo Grp.*, 50 F.4th at 757, and is otherwise not analogous to the state law at issue in *Geo Group*.

Coinbase does not respond to Oregon's arguments against its purported preemption defense and therefore concedes that it does not have a colorable preemption defense.[20] Coinbase ignores the fact that, even if the OSL didn't specifically exempt the relevant conduct, which it does, "nothing in the AFP-creating regime evinces an intent to override state laws regulating the sale of certain property seized by the federal government." *See* Mot. at 25. Coinbase claims that Oregon "attempt[s] to redefine the federal government's interests" by citing relevant federal regulations. Opp. at 30. But it cannot argue that the federal government has a strong interest in selling all forfeited digital assets to Oregonians, and this action doesn't in any way "constrain[] the administration of the [AFP]" under the doctrine of preemption. *Id.* Coinbase's Supremacy Clause defense is not colorable.

---

[20] Coinbase broadly states that, "[b]y seeking to obstruct the USMS and DOJ's execution of their regulatory mandate to administer the Asset Forfeiture Program, the Attorney General's 'interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption.'" Opp. at 36 (quoting *Geo Grp.*, 50 F.4th at 762). Its "conclusory statements and general propositions of law do not make [its] defense[] colorable." *Honolulu*, 39 F.4th at 1110.

## III.     CONCLUSION

For these reasons and those set forth in the State's Motion (ECF No. 19), this case should

be remanded to, and adjudicated in, Oregon state court.

RESPECTFULLY SUBMITTED this 30th day of July, 2025.

Dan Rayfield
Attorney General

BRIAN A. DE HAAN, OSB#155251
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel.: 971-673-1880
Fax: 971-673-1888
Email:  brian.a.dehaan@doj.oregon.gov

*Of Attorneys for Plaintiff*

*s/ Keil M. Mueller*
Keil M. Mueller, OSB No. 085535
Jennifer S. Wagner, OSB No. 024470
Yoona Park, OSB No. 077095
Norjmoo Battulga, OSB No. 242037
**KELLER ROHRBACK L.L.P.**
601 S.W. Second Avenue, Suite 1900
Portland, OR 97204
(971) 253-4600
Fax (206) 623-3384
Email:  kmueller@kellerrohrback.com
         jwagner@kellerrohrback.com
         ypark@kellerrohrback.com
         nbattulga@kellerrohrback.com

**PLAINTIFF'S REPLY IN
SUPPORT OF MOTION
TO REMAND**

30

Julie G. Reiser (Admitted *pro hac vice*)
Margaret (Emmy) Wydman (Admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS**
 **& TOLL PLLC**
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
Email:  jreiser@cohenmilstein.com
          ewydman@cohenmilstein.com

Christopher J. Bateman (Admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS**
 **& TOLL PLLC**
88 Pine St., 14th Floor
New York, NY 10005
Tel.: (212) 838-7797
Fax: (212) 838-7745
Email:  cbateman@cohenmilstein.com

*Special Assistant Attorneys*
*General for Plaintiff*

31