TIMOTHY W. SNIDER, OSB No. 034577
timothy.snider@stoel.com
JAMES A. KILCUP, OSB No. 173891
james.kilcup@stoel.com
KATE S. SHEPHERD, OSB No. 224891
kate.shepherd@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380

KEVIN S. SCHWARTZ, appearing *pro hac vice*
kschwartz@wlrk.com
NOAH B. YAVITZ, appearing *pro hac vice*
nbyavitz@wlrk.com
ADAM M. GOGOLAK, appearing *pro hac vice*
amgogolak@wlrk.com
SIJIN CHOI, appearing *pro hac vice*
schoi@wlrk.com
JULIA M. BRUCE, appearing *pro hac vice*
jmbruce@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: 212.403.1000

*Attorneys for Defendants Coinbase, Inc. and
Coinbase Global, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| THE STATE OF OREGON, ex rel, DAN RAYFIELD, Attorney General for the STATE OF OREGON,<br><br>Plaintiff,<br><br>v.<br><br>COINBASE, INC. and COINBASE GLOBAL, INC.,<br><br>Defendants. | Case No.: 3:25-cv-00952-JR<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND ACCOMPANYING MEMORANDUM OF LAW**<br><br>Request for Oral Argument |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................3

ARGUMENT ............................................................................................................5

I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE ATTORNEY
      GENERAL LACKS STATUTORY AUTHORITY TO PURSUE HIS CLAIMS
      ON BEHALF OF OREGON ...............................................................................5

II.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE COURT
      LACKS PERSONAL JURISDICTION OVER DEFENDANTS....................................12

      A.    The Complaint fails to allege sufficient contacts with Oregon to establish
            personal jurisdiction over Coinbase......................................................13

      B.    Even were personal jurisdiction adequately pleaded as to Coinbase, it has
            not been alleged as to CGI ...................................................................16

III.  IN THE ALTERNATIVE, THE COURT SHOULD DISMISS ANY CLAIMS
      THAT PRE-DATE JANUARY 3, 2022 BECAUSE THEY ARE TIME-BARRED........19

CONCLUSION........................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson* v. *Carden*,
  146 Or. App. 675 (1997) ...................................................................................19

*Asahi Metal Indus. Co.* v. *Superior Ct.*,
  480 U.S. 102 (1987) .........................................................................................13

*Briskin* v. *Shopify, Inc.*,
  135 F.4th 739 (9th Cir. 2025) .......................................................................13, 14

*Brown* v. *Serv. Grp. of Am., Inc.*,
  2022 WL 43880 (D. Or. Jan. 5, 2022),
  *aff'd*, 2022 WL 16958933 (9th Cir. Nov. 16, 2022) ...........................................19

*Ciuffitelli* v. *Deloitte & Touche LLP*,
  2018 WL 4568737 (D. Or. Aug. 1, 2018),
  *adopted*, 2018 WL 4568586 (D. Or. Sept. 21, 2018) ..........................................19

*CLF 007* v. *CooperSurgical, Inc.*,
  2025 WL 975175 (D. Or. Mar. 31, 2025) ..............................................16, 18 n.22

*Davis* v. *Cranfield Aerospace Sols., Ltd.*,
  71 F.4th 1154 (9th Cir. 2023) .......................................................................15, 16

*Domaine Serene Vineyards Winery, Inc.* v. *Jacob Rieger & Co., LLC*,
  2019 WL 1522881 (D. Or. Mar. 20, 2019),
  *adopted*, 2019 WL 1522877 (D. Or. Apr. 8, 2019) .............................................13

*Estate of Osborn-Vincent* v. *Ameriprise Financial, Inc.*,
  2018 WL 1724948 (D. Or. Feb. 13, 2018),
  *adopted as modified*, 2018 WL 1585763 (D. Or. Mar. 30, 2018) .........................16

*Herbal Brands, Inc.* v. *Photoplaza, Inc.*,
  72 F.4th 1085 (9th Cir. 2023) .......................................................................13, 14

*Iconlab, Inc.* v. *Bausch Health Cos., Inc.*,
  828 F. App'x 363 (9th Cir. 2020) .............................................17, 18, 18 n.23, 19

*Kruesi* v. *Oregon Dep't of Corr.*,
  2025 WL 1897872 (D. Or. July 9, 2025) ..............................................................19

*Lake Oswego Pres. Soc'y* v. *City of Lake Oswego Hanson*,
  360 Or. 115 (2016) ......................................................................................11, 12

*Mann* v. *St. Laurent*,
2002 WL 31972161 (D. Or. Dec. 16, 2002) ....................................................13

*Mavrix Photo, Inc.* v. *Brand Techs., Inc.*,
647 F.3d 1218 (9th Cir. 2011) ............................................................14 n.16

*Minden Pictures, Inc.* v. *John Wiley & Sons, Inc.*,
795 F.3d 997 (9th Cir. 2015) ..................................................................6

*Powell's Books, Inc.* v. *Kroger*,
622 F.3d 1202 (9th Cir. 2010) .................................................................6

*Ranza* v. *Nike, Inc.*,
793 F.3d 1059 (9th Cir. 2015) ........................................................... *passim*

*Rio Properties, Inc.* v. *Rio Int'l Interlink*,
284 F.3d 1007 (9th Cir. 2002) ...............................................................14

*Schwarzenegger* v. *Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) ................................................................13

*Shah* v. *Hilton Worldwide Holdings Inc.*,
2025 WL 1683577 (N.D. Cal. June 11, 2025) ...................................................14

*State* v. *Azar*,
372 Or. 163 (2024).........................................................................6, 7

*State* v. *Eggers*,
372 Or. 789 (2024).........................................................................7

*State* v. *Gaines*,
346 Or. 160 (2009).........................................................................6

*State* v. *Harrison*,
365 Or. 584 (2019).........................................................................8

*State* v. *Schriner*,
336 Or. App. 873 (2024), *review allowed*, 373 Or. 712 (2025)..............................7

*Sundberg* v. *Joint Apprenticeship Training Comm. of Nw. Line Constr. Indus.*,
2018 WL 7108064, (D. Or. Dec. 4, 2018),
*adopted*, 2019 WL 310117 (D. Or. Jan. 23, 2019) ..........................................17

*Swartz* v. *KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ...............................................................16

*Trama* v. *RELX PLC*,
2025 WL 657911 (C.D. Cal. Feb. 14, 2025)........................................16, 18, 18 n.23

*Unger* v. *Rosenblum*,
  362 Or. 210 (2017)...........................................................................................7, 11

*U.S.* v. *Bestfoods*,
  524 U.S. 51 (1998).......................................................................................18 n.23

*Von Saher* v. *Norton Simon Museum of Art at Pasadena*,
  592 F.3d 954 (9th Cir. 2010) ...............................................................................19

*Yamashita* v. *LG Chem, Ltd.*,
  62 F.4th 496 (9th Cir. 2023) ................................................................................15

**Statutes and Rules**

15 U.S.C. § 77r ...............................................................................................8 n.11

O.R.S. § 59.015(5) ..........................................................................................8 n.11

O.R.S. § 59.055........................................................................................5, 9, 19

O.R.S. § 59.115.....................................................................................5, 9, 19, 20

O.R.S. § 59.235..............................................................................................5, 7

O.R.S. § 59.255(1) ..................................................................................................12

O.R.S. § 59.331 .............................................................................................*passim*

Fed. R. Civ. P. 12(b)(2)...........................................................................................12

Fed. R. Civ. P. 12(b)(6)........................................................................................6, 19

Or. R. Civ. P. 4J ....................................................................................................13

**Other Authorities**

Nasdaq Rulebook § 5600 ...................................................................................10 n.15

NYSE American Company Guide § 101 ................................................................10 n.15

NYSE Listed Company Manual § 303A ................................................................10 n.15

Or. Dep't of Just., *Oregon Attorney General Rayfield Sues Coinbase for
  Promoting and Selling High-Risk Investments* (Apr. 18, 2025) ..........................5 n.3

Or. Dep't of Consumer & Bus. Svcs., Div. of Fin. Reg.,
  *Cryptocurrency* (Oct. 12, 2018)................................................................1 n.1, 4 n.2

Webster's Third New Int'l Dictionary (unabridged ed. 2002) .......................................7

## **LR 7-1 CERTIFICATION**

Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc. conferred in good faith with counsel for the Attorney General on July 31, 2025 regarding the arguments in this Motion. The parties were unable to resolve the dispute.

## **MOTION**

Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), Defendants move this Court to dismiss the claim asserted in the Attorney General's Amended Complaint ("Complaint" or "Compl."), Dkt. No. 18, for failure to state a claim and lack of personal jurisdiction. This motion is supported by the following memorandum of law, the Declaration of Timothy W. Snider, and the exhibits attached to that declaration (referred to herein as "Ex. __").

## PRELIMINARY STATEMENT

This is a case of regulatory overreach, in which Oregon's Attorney General seeks to install himself as regulator of digital assets and the nationwide platforms on which they trade. The Attorney General readily touted this suit as his bid to "fill" a supposed "enforcement vacuum being left by federal regulators." The action not only constitutes a flagrant intrusion on the province of federal law, it is also wrong on the merits — among other core deficiencies, transactions on Coinbase's platform are not "investment contracts," and Oregon's new position, attacking conduct stretching back over a decade, is the antithesis of fair notice and due process. But the Court need not reach the merits, because this lawsuit suffers from an even more basic, pleadings-stage infirmity: the Attorney General does not have authority to bring it.

The Attorney General seeks to achieve his regulatory dominion over crypto through an enforcement action that at once exceeds his statutory authority and tramples on the power of Oregon's actual securities regulator, the Department of Consumer and Business Services ("DCBS"). That is the only agency empowered by statute to interpret and enforce the state securities-registration regime at issue, and that agency declared years ago that "*cryptocurrency is not regulated . . . by the State of Oregon*."[1] Dissatisfied with that judgment and with recent federal regulatory developments, Oregon's Attorney General has taken matters into his own hands — without the power to do so. And in any event, he has failed to establish this Court's personal jurisdiction over Defendants. As detailed below, dismissal of this action is due.

1.      By statute, the DCBS has unlimited authority to enforce Oregon's blue sky laws. The Attorney General historically had no such authority. That was the prevailing order until the

---

[1]      Or. Dep't of Consumer & Bus. Svcs., Div. of Fin. Reg., *Cryptocurrency* (Oct. 12, 2018), https://tinyurl.com/chx49csm (emphasis added).

2001 collapse of the notorious Oregon corporation Enron, when the Attorney General had to watch from the sidelines while other states' prosecutors investigated and remediated Enron's accounting and securities fraud. Oregon's Department of Justice sought authority to fill this gap — to pursue what it termed the "Enron type of situation," where securities fraud and related violations harm Oregonian investors in large, publicly traded companies. The Department of Justice emphasized to the Oregon Legislature that it needed "very narrow" authority with respect to only "those securities that are listed on the three national exchanges." And the Legislature obliged, granting the Attorney General the limited power to sue for violations that harm Oregonian investors in companies listed on the New York Stock Exchange, the American Stock Exchange, and the NASDAQ exchange. *See* O.R.S. § 59.331(2)(a).

In nearly two decades since, the Department of Justice did not pursue a single securities suit under that statute, respecting the strict constraints on its enforcement power. Until now. In this action, the Attorney General — represented by private lawyers whose firm gave generously to his political campaign and whose contingent pay depends entirely on procuring penalties — seeks to bootstrap his "very narrow" mandate into sweeping authority over the nation's largest digital-asset marketplace. But when the Legislature authorized the Attorney General to pursue Enron-like frauds, it was not anointing him czar of crypto or of registration requirements under state securities law. The statutory text, context, and legislative history make clear that the Attorney General has no authority to bring the claim in this action; alleged registration violations are the province of the DCBS. The Complaint should be dismissed for this fatal lack of authority.

2.      Even if the Attorney General had the power to bring his claim against Defendants, he could not do so in an Oregon court, because he has failed to carry his burden of pleading personal jurisdiction over Coinbase, Inc. or its corporate parent, Coinbase Global, Inc. in this state.

To allege jurisdiction consistent with federal due process, the Attorney General must show that each defendant purposely established "minimum contacts" with Oregon. The Complaint does not plead sufficient contacts as to either. With respect to Coinbase, Inc., the Attorney General merely alleges that the company operates and markets a nationwide digital-asset platform that has been accessed by users in Oregon and across the country. Those allegations are insufficient as a matter of Ninth Circuit law. And the pleadings are even more threadbare as to Coinbase Global, Inc., a holding company that is not alleged to have *any* activity in Oregon. Because the Attorney General has not shown that jurisdiction is proper in this Court, the Complaint should be dismissed.

3.      Finally, the Attorney General's claim is subject to the three-year statute of limitations that governs Oregon's blue sky laws. If the case is not dismissed in its entirety, and it should be, the claim should be limited to transactions occurring on or after January 3, 2022 (three years before Coinbase and the Attorney General entered into a tolling agreement).

*      *      *

This case should never have been brought. It defies the constructive federal efforts underway to provide uniform and customized rules for crypto, rules that will allow consumers around the country to benefit from one of the fastest-growing and most innovative technologies in the world. And this action reflects a meritless attack on Coinbase, unmoored from foundational limits to the state's securities laws and the jurisdictional protections of the federal Constitution. Most fundamentally, though, the Attorney General has overstepped his statutory authority, and the case should accordingly be dismissed.

## **BACKGROUND**

Coinbase Inc. ("Coinbase") is a Delaware company that operates a platform for the secondary trading of digital assets, sometimes called "cryptocurrencies." Compl. ¶¶ 2, 17, 34. Launched in 2012, Coinbase's platform is the country's largest digital-asset market, servicing

millions of customers and accounting for billions of dollars in daily trading volume across hundreds of assets. Compl. ¶ 5. In April 2014, Coinbase became a wholly-owned subsidiary of Coinbase Global, Inc. ("CGI"), a NASDAQ-listed Delaware holding company. Compl. ¶¶ 17-18. CGI also owns other crypto-related subsidiaries, in addition to Coinbase. *See* Compl. ¶ 43.

Coinbase's platform has been accessible nationwide, including in Oregon, since inception. Compl. ¶¶ 5, 34. In late 2018, as digital assets became increasingly popular throughout the country, Oregon began providing public guidance on their legal status, with the DCBS explaining that "[c]ryptocurrencies are *unregulated digital assets* . . . [that] are typically purchased, used, stored, and traded electronically through a digital currency exchange."[2] This public notice made clear to prospective market participants that "cryptocurrency is not regulated . . . by the State of Oregon."

Years passed, without Oregon's securities regulator ever suggesting that the sale of digital assets through Coinbase's secondary-market platform violated Oregon law. Then, on April 18, 2025, two private firms acting on behalf of the Attorney General commenced this action in Oregon state court, naming Coinbase and CGI as defendants. As the Attorney General has since publicly conceded, the same lead counsel also ran the pre-suit investigation of the matter, operating under a retention agreement that awarded them compensation only if their investigation furnished an enforcement action. *See* Ex. 7 (April 2023 Retention Agreement) at § 3.1. That arrangement has since been superseded by updated agreements, under which the firms are likewise pursuing this action on a contingency basis. Ex. 8 (April 2025 Retention Agreement) at §§ 3.1, 3.2, 3.3.

The Attorney General pleads that transactions in 31 digital assets traded on the Coinbase platform are "investment contracts" and thus securities under Oregon law, Compl. ¶ 71 — largely

---

[2]    Or. Dep't of Consumer & Bus. Svcs., Div. of Fin. Reg., *Cryptocurrency* (Oct. 12, 2018), https://tinyurl.com/chx49csm (emphasis added).

parroting the allegations in now-dismissed federal lawsuits against Coinbase and other crypto companies. On the basis of those allegations, the Attorney General claims that Coinbase and CGI "sold or successfully solicited sales of . . . unregistered Crypto Securities to Oregon residents in violation of ORS 59.055 and ORS 59.115(1)(a)," and "further participated or materially aided in the unlawful sale of unregistered securities through its trading platform in violation of ORS 59.115(3)." Compl. ¶ 505. The Attorney General seeks a $20,000 fine per violation, disgorgement of profits, restitution, and an injunction against any future sales of the targeted assets in Oregon. Compl. ¶¶ 506, 508-10. The Attorney General announced this action as a bid to "fill" a supposed "enforcement vacuum being left by federal regulators."[3]

On June 2, 2025, Coinbase timely removed the action to this Court. Dkt. No. 1. Seeking to avoid federal jurisdiction, the Attorney General amended his pleadings on July 2, 2025 and moved to remand. Dkt. Nos. 18, 19. That motion remains pending.

## **ARGUMENT**

### I.    **THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE ATTORNEY GENERAL LACKS STATUTORY AUTHORITY TO PURSUE HIS CLAIMS ON BEHALF OF OREGON.**

Under Oregon law, only the DCBS has plenary authority to enforce the state's securities statute. O.R.S. § 59.235. In the fallout of the Enron scandal, however, Oregon's state prosecutors realized that they lacked statutory power to participate in nationwide investigations of large, public-company securities frauds.[4] To address this gap, in 2005 the Department of Justice sought

---

[3]    Or. Dep't of Just., *Oregon Attorney General Rayfield Sues Coinbase for Promoting and Selling High-Risk Investments* (Apr. 18, 2025), https://tinyurl.com/5fmerby4.

[4]    *See* Ex. 3 (Memorandum of Frederick M. Boss on Senate Bill 211 (Mar. 10, 2005)) at 1 ("The Oregon Department of Justice has found in its review of [the] Enron and Worldcom securities crashes that the ability of the Department of Justice to investigate and punish companies registered on the National Stock Exchange for the violation of the securities laws is limited.").

authority to pursue what it called the "Enron type of situation," where securities violations harm Oregonian investors in the shares of companies "listed on the major exchanges" — not other unlisted or over-the-counter securities.[5] The Oregon Legislature acceded to that cabined request, granting the Attorney General limited power to sue "only in connection with":

> Alleged violations involving companies whose securities are listed on the New York Stock Exchange, the American Stock Exchange or the [NASDAQ] National Market System.

O.R.S. § 59.331(2)(a) (the "AG Authority Provision").[6]

The Attorney General has never before brought a case under this narrow charge. But now he asserts summary authority under the statute to regulate digital-asset transactions on Coinbase's nationwide platform. *See* Compl. ¶ 11 (claiming authority under O.R.S. § 59.331 "to enforce compliance with, and to enjoin acts that violate, the Oregon Securities Law," without qualification). Neither the plain language of the statute nor its legislative history supports this power-grab. The action should therefore be dismissed for failure to state a claim. *See Minden Pictures, Inc.* v. *John Wiley & Sons, Inc.*, 795 F.3d 997, 1001 (9th Cir. 2015) (affirming dismissal under Fed. R. Civ. P. 12(b)(6) for lack of statutory authority to sue).

1.    ***Text, context, and legislative history confirm the narrow authority at issue.*** It is well settled under Oregon law that courts must "consider the disputed statutory text in context, together with any available legislative history [it] find[s] helpful," *State* v. *Azar*, 372 Or. 163, 170 (2024) — indeed, that is so "even if the court does not perceive an ambiguity in the statute's text," *State* v. *Gaines*, 346 Or. 160, 172 (2009); *see Powell's Books, Inc.* v. *Kroger*, 622 F.3d 1202, 1209

---

[5]    *See* Ex. 1 (Oral Testimony of Frederick M. Boss before Sen. Bus. Dev. Comm. (Mar. 15, 2005)) at 5:11-18.

[6]    The same bill also permitted the Attorney General to sue in three other situations, all plainly irrelevant to this case. *See* O.R.S. § 59.331(2)(b) (authorizing suit in cases that involve allegations of racketeering); § 59.331(2)(c) (unfair trade practices); § 59.331(2)(d) (anticompetitive conduct).

(9th Cir. 2010) (federal court's role is to "interpret the law as would the [Oregon] Supreme Court" (internal quotation omitted)). Further, even "facially broad" statutory language must be read narrowly where the record shows that "the legislature did not intend [a] provision to apply as expansively as its plain terms could possibly reach." *Azar*, 372 Or. at 171; *see also State* v. *Eggers*, 372 Or. 789, 799-800 (2024) (a statute's context "include[s] essentially anything of which the legislature could have been aware at the time of a given enactment" (internal quotation omitted)).

The AG Authority Provision confers enforcement power only for securities-law violations "involving" companies whose securities are listed on three major stock exchanges. While the term "involve" can take many definitions, Oregon courts have held that it commonly means "'to have an effect on[;] concern directly[;] affect.'" *State* v. *Schriner*, 336 Or. App. 873, 879 (2024) (quoting *Webster's Third New Int'l Dictionary* at 1191 (unabridged ed. 2002)), *review allowed*, 373 Or. 712 (2025). Applying that definition, the AG Authority Provision permits the Attorney General to pursue securities-law violations that "have an effect on" or "affect" exchange-listed companies, such as the misleading accounting and securities filings that Enron executives used to defraud Oregonian investors in their stock. This reading heeds the text of the statute while also honoring its broader context, in which the Legislature appointed the DCBS to set securities policy for the State by endowing it with "general supervision and control over all issuers [and] registrants of securities . . . doing business in [Oregon] and engaged in any activity with respect to securities or any aspect of the securities business." O.R.S. § 59.235; *see Unger* v. *Rosenblum*, 362 Or. 210, 221 (2017) (courts must "consider all relevant statutes together, so that they may be interpreted as a coherent, workable whole"). The plain language thus empowers the Attorney General to act on behalf of the State where securities violations harm Oregonians who have invested in the shares of prominent public companies, without unduly trenching on the DCBS's authority to direct the regulatory interpretation and enforcement of state securities law.

The legislative history of the AG Provision leaves no doubt about the limits of this mandate. As set out in the Senate testimony of Frederick Boss — who led the Department of Justice's Civil Enforcement Division and was the statute's primary drafter — the AG Authority Provision was tailored to address the "Enron type of situation," without disturbing the DCBS's role as the "securities regulator in the State of Oregon."[7] *Cf. State* v. *Harrison*, 365 Or. 584, 591 (2019) (relying on "legislative purpose" for guidance in construing statutory text). Speaking for the Department of Justice, Mr. Boss assured the Senate that the new law would supply only "very narrow" enforcement authority:

> We are primarily [going] to focus on activities where we are already investigating the scam, and the large collapses that may perhaps have a State of Oregon loss such as Enron or WorldCom. Those are the ones that we're primarily concerned [with]. The other portion of that is probably left to the regulation of DCBS and with the regulatory authority.[8]

Reinforcing the statute's limited ambition, Mr. Boss was unable to identify *any* other fact pattern that also would implicate the Attorney General's new power.[9]

The statute's cabined scope is also apparent from its drafting history. As initially proposed, the law would have authorized the Attorney General to target only "[a]lleged violations involving *federal covered securities*"[10] — a defined term that captures, among other securities, stock that trades on the national exchanges.[11] This would have authorized the Attorney General to pursue

---

[7]    Ex. 1 (Oral Testimony of Frederick M. Boss before Sen. Bus. Dev. Comm. (Mar. 15, 2005)) at 5:20-7:7

[8]    Ex. 1 (Oral Testimony of Frederick M. Boss before Sen. Bus. Dev. Comm. (Mar. 15, 2005)) at 5:20-6:4.

[9]    Ex. 1 (Oral Testimony of Frederick M. Boss before Sen. Bus. Dev. Comm. (Mar. 15, 2005)) at 7:11-8:3 (citing the Enron-like collapse of WorldCom and a bid-rigging scandal involving the Oregon-based brokerage Marsh).

[10]    Ex. 4 (Proposed Amendments to Senate Bill 211 (Mar. 15, 2005)) at 1:6-8.

[11]    *See* O.R.S. § 59.015(5) (incorporating federal definition codified at 15 U.S.C. § 77r).

Enron-style securities fraud, consistent with the goal of the reform. It would not, however, have permitted the Attorney General to bring *registration*-related claims under those provisions of Oregon law that bar the offer, solicitation, and sale of unregistered securities, all of which categorically excluded (and still exclude) "federal covered securities" from their ambit. *See* O.R.S. § 59.055 (excluding "federal covered securities"); § 59.115(1)(a) (same). Thus, the original formulation of the AG Authority Provision conferred *no authority* on the Attorney General to pursue the claim he now asserts against Coinbase and CGI, a claim that arises out of transactions in alleged unregistered securities. Compl. ¶ 505 (suing under O.R.S. §§ 59.055, 59.115(1)(a)).

Critically, the authority ultimately granted to the Attorney General was understood to be *even narrower* than that original proposal. When the draft legislation was amended to its current form — at the Department of Justice's request[12] — Mr. Boss emphasized that the change was intended to "further *narrow*[] the scope of the Attorney General's authority to prosecute the Oregon securities laws, [from] federally covered securities *to those securities that are listed on the three national exchanges*."[13] When pressed by senators to describe the scope of the Attorney General's requested new power, Mr. Boss specifically confirmed that the statute as enacted would only authorize enforcement with respect to securities "listed on the major exchanges," not "pink sheet securities and others."[14]

---

[12]    *See* Ex. 5 (Proposed Amendments to Senate Bill 211 (Apr. 7, 2005)) at 1:5-10 (proposing that the Attorney General be permitted to take action in connection with "[a]lleged violations involving companies whose securities are listed on the New York Stock Exchange, the American Stock Exchange or the Nasdaq National Market System").

[13]    Ex. 2 (Oral Testimony of Frederick M. Boss before Sen. Bus. Dev. Comm. (Apr. 7, 2005)) at 3:19-23 (emphasis added).

[14]    Ex. 1 (Oral Testimony of Frederick M. Boss before Sen. Bus. Dev. Comm. (Mar. 15, 2005)) at 5:11-18. "Pink sheet" stocks are equities that trade on an over-the-counter market rather than on a major stock exchange. *See Pink Market: Listings for Stocks that Trade Over-the-Counter*, Investopedia (July 21, 2024), https://www.investopedia.com/terms/p/pinksheets.asp.

2.    ***The AG Authority Provision does not extend to this action.*** The claim asserted against Defendants bears no resemblance to the "Enron type of situation" covered by the AG Authority Provision, as confirmed by its text, context, and legislative history. The Attorney General alleges no securities violation — let alone fraud — directed to an exchange-traded company. While CGI lists on the NASDAQ exchange, the Attorney General's case in no way concerns trading in the company's stock, nor does he make disclosure-related allegations of some fraud or accounting practice purportedly harming investors in that stock. Indeed, the Complaint alleges next to nothing about CGI. *See infra* pp. 16-19. Instead, the Attorney General has brought a strict-liability claim directed to the registration status of third-party digital assets available on the platform of Coinbase, Inc. That entity is not publicly listed, and none of those digital assets trade on any of the major stock exchanges specified by the Legislature.[15] And even if transactions in the assets on Coinbase's platform could be shown to implicate "investment contracts" (which they cannot), the claim here would present a matter of technical registration compliance that falls squarely within the province of the DCBS as Oregon's securities regulator. This action thus strays far afield of the narrow category of claims addressed in the AG Authority Provision.

To sustain this action, the Attorney General would need a far broader interpretation of the text, one that reaches, for example, *any* securities violation touching the activities of a publicly listed company, including alleged wrongdoing unrelated to the company's publicly traded shares. But that would allow the cabined exception to swallow the rule, as every prominent player in the

---

[15]    In fact, none even *could* trade on any of the designated exchanges. While the Attorney General alleges (wrongly) that those digital assets trade as securities, not even he claims that they qualify as the type of "stock" that lists on those markets. *See, e.g.*, NYSE Listed Company Manual § 303A (articulating corporate governance requirements necessary for listing on the NYSE); Nasdaq Rulebook § 5600 (similar); NYSE American Company Guide § 101 (specifying equity thresholds necessary for listing eligibility).

securities industry — from Bank of America to Wells Fargo, Citigroup to Goldman Sachs — trades on the major domestic exchanges. That construction would vest the Attorney General with carte blanche to regulate the overwhelming majority of corporate securities transactions — including over-the-counter trading of stocks and derivatives, or private equity transactions involving the nation's leading banks — that potentially intersect with Oregon's securities law, upending the DCBS's "general supervision and control" and defying the Oregon Supreme Court's directive to interpret the statute "as a coherent, workable whole." *Unger*, 362 Or. at 221.

Such a broad interpretation would also ineluctably collide with the statute's legislative history. As discussed above, the Attorney General indisputably lacked authority to pursue securities-registration violations — like those alleged here — under the original version of the AG Authority Provision. *See supra* pp. 8-9. He thus plainly lacks authority to bring such claims under the concededly "narrower" language that became law. *See supra* p. 9. As this legislative record confirms, the Legislature gave the Department of Justice only what it sought — the authority to prosecute the "Enron type of situation," where a securities-law violation harms Oregonian investors in a large, publicly traded company through its impact on the company's listed shares. The Attorney General cannot plausibly stretch that narrow license to justify this action, which seeks to regulate the sale of digital assets that trade on no stock exchange whatsoever.

In like circumstances, the Oregon Supreme Court has similarly endorsed common-sense constructions of superficially broad statutes. In *Lake Oswego Preservation Society* v. *City of Lake Oswego Hanson*, 360 Or. 115 (2016), for example, the court was confronted with whether a statute conferring rights on "a property owner" of a historic home also extended to the owner's successors — individuals who were, after all, "property owners" as well under a broad reading of the text. *Id.* at 117. After examining the stated purpose of the law and the drafting history of the disputed

provision, the court rejected that broad interpretation, reiterating that simply because "a statutory provision describes something in relatively broad terms does not always mean that the legislature intended the most expansive meaning possible." *Id.* at 129. The same logic applies squarely here.

Remarkably, although the Department of Justice secured passage of O.R.S. § 59.331 by emphasizing its narrow ambit, the Complaint nowhere reckons with the strict limits on the Attorney General's authority. Instead, the Attorney General now advances the sweeping, ahistorical assertion that the statute endows him with general "enforcement authority of the Oregon Securities Law." Compl. ¶ 16 (citing O.R.S. § 59.331); ¶ 11 (claiming "ORS 59.331 empowers the Attorney General to bring this suit to enforce compliance with, and to enjoin acts that violate the Oregon Securities Law"); *see also* Dkt. No. 31 ("Remand Reply Br.") at 6 (claiming a generic interest in "enforcing Oregon's state-specific regulatory scheme"). But the Attorney General nowhere justifies that claim, nor does he even feign compliance with the statutory framework — failing, for example, to plead that he abided by his statutory obligation to provide the DCBS's director with pre-suit "notice and the opportunity to participate" in any enforcement action, O.R.S. § 59.331, and citing remedy provisions that are solely applicable to actions brought by the DCBS, *see*, *e.g.*, Compl. ¶ 504 (invoking O.R.S. § 59.255(1), which empowers "the Director of the [DCBS]" to seek injunctive relief).

The Court should reject the Attorney General's effort to commandeer authority that the Legislature properly reserved to the DCBS and dismiss this action in its entirety.

## II.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS.

Even if the Attorney General had authority to bring this action, it would still be due for dismissal because the Complaint fails to adequately plead that this Court has jurisdiction over Defendants. *See* Fed. R. Civ. P. 12(b)(2). The Attorney General bears the burden to establish

personal jurisdiction over each of Coinbase and CGI. *Domaine Serene Vineyards Winery, Inc.* v. *Jacob Rieger & Co., LLC*, 2019 WL 1522881, at *3 (D. Or. Mar. 20, 2019), *adopted*, 2019 WL 1522877 (D. Or. Apr. 8, 2019); *see* Compl. ¶ 13 (claiming jurisdiction under Oregon Rules of Civil Procedure 4J(1) and 4J(2)). To do so, the Attorney General must allege facts showing that "the exercise of personal jurisdiction would comply with [federal] due process." *Mann* v. *St. Laurent*, 2002 WL 31972161, at *2 (D. Or. Dec. 16, 2002). The "touchstone" of this constitutional inquiry is "whether [each] defendant purposefully established 'minimum contacts' in the forum State." *Asahi Metal Indus. Co.* v. *Superior Ct.,* 480 U.S. 102, 108-09 (1987).

Because the Complaint does not allege such minimum contacts with Oregon as to either Coinbase or CGI, the Complaint should be dismissed for lack of jurisdiction.

### A. The Complaint fails to allege sufficient contacts with Oregon to establish personal jurisdiction over Coinbase.

To meet the minimum-contacts test, the Attorney General must allege, among other things, that both Defendants "purposefully direct[ed] [their] activities" at Oregon or "purposefully avail[ed] [themselves] of the privilege of conducting activities in [Oregon]." *Domaine Serene*, 2019 WL 1522881, at *5 (quoting *Schwarzenegger* v. *Fred Martin Motor Co.*, 374 F.3d 797, 803 (9th Cir. 2004)). Where, as here, a claim is not based on the existence of a contract, the Ninth Circuit generally employs the "purposeful direction" test — requiring a plaintiff to adequately allege that each defendant committed an intentional act that was "expressly aimed at the forum state." *See id; Briskin* v. *Shopify, Inc.*, 135 F.4th 739, 751 (9th Cir. 2025). The Complaint fails this threshold test.

The "operation of an interactive website does not, by itself, establish express aiming." *Herbal Brands, Inc.* v. *Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023). "[S]omething more" is required. *Id.* at 1092. But the Complaint alleges nothing more — no facts suggesting Coinbase

directs its activities to the Oregon market, nor that it cultivates an Oregon-specific audience, nor that it operates any part of its platform in Oregon. While the Complaint alleges that Coinbase markets its platform and services in various generalized ways, Compl. ¶¶ 46-54, it does not identify any Oregon-specific marketing, or even any general advertisements directed to Oregon. C*f. Rio Properties, Inc.* v. *Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002) (holding that an online company directly targeted the forum when it ran radio and print advertisements in the forum state). Nor does the Attorney General allege that Coinbase offers Oregon-specific products or services, or tailors its services in any way to the Oregon market.[16]

To be sure, the Complaint alleges that Oregonians use Coinbase's platform to trade digital assets, generating revenue for Coinbase. But the Attorney General's claims do not concern Coinbase affirmatively delivering products to Oregon residents in Oregon, *see Herbal Brands*, 72 F.4th at 1092-96, or reaching into Oregonians' devices to obtain and use personal data for its commercial gain, *see Briskin*, 135 F.4th at 755-56; *Shah* v. *Hilton Worldwide Holdings Inc.*, 2025 WL 1683577, at *2 (N.D. Cal. June 11, 2025) (distinguishing *Briskin* and dismissing for lack of personal jurisdiction absent allegations that website targeted California consumers). This case involves Oregonians choosing to use a secondary-market platform operated by a non-Oregon-based company to trade digital assets custodied by Coinbase outside of Oregon. That is not enough to hale Coinbase into an Oregon court for "purposeful direction."

And even if the "purposeful availment" test were applicable, personal jurisdiction still would not lie. That standard is satisfied when a defendant's dealings in a state create a "quid pro

---

[16]    This is also not a situation where Coinbase's application and website focus on a subject matter — trading in digital assets — with a particular connection to or locus in Oregon. *Cf. Mavrix Photo, Inc.* v. *Brand Techs., Inc.*, 647 F.3d 1218, 1229-31 (9th Cir. 2011) (holding that the defendant expressly aimed its website, "celebrity-gossip.net," at California because the site had a specific focus on the California-centric entertainment industry).

quo," whereby the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, and in return submit[ted] to the burdens of litigation in the State." *Davis* v. *Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1163 (9th Cir. 2023) (internal quotation omitted). In assessing purposeful availment, courts "examine whether the defendant deliberately reached out beyond its home — by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Id.* (internal quotation and alteration omitted). "The 'unilateral activity' of another party does not meet this standard." *Id.*

The Complaint does not allege facts establishing purposeful availment. The Attorney General does not allege that Coinbase specifically "sought out" crypto traders in Oregon "or benefitted from [their] residence in" Oregon. *Id.* To the contrary, users provide the same liquidity benefits to the Coinbase platform whether they are in Oregon or Maine. Nor does Oregon plead any relevant business conduct undertaken by Coinbase in Oregon,[17] or that Coinbase's platform obtains special benefits from Oregon's laws. That is not surprising, as its platform and custodial digital assets exist on servers thousands of miles from the state. *Cf. Yamashita* v. *LG Chem, Ltd.*, 62 F.4th 496, 504 (9th Cir. 2023) (defendants who sent products through Hawaii port "relied on the laws of Hawaii to protect their property while it was located within its jurisdiction"). And while Coinbase's relationship with its customers is governed by a user agreement, that agreement is the same for all users across the country; is governed by California — not Oregon — law; and requires no performance in Oregon.[18] Put simply, "nothing" in that agreement "contemplate[s]

---

[17]    The Complaint alleges that "Coinbase, Inc. opened an office in Portland, Oregon in 2018 and maintains offices in Oregon," Compl. ¶ 17, but does not identify what activities or operations allegedly took place.

[18]    *Coinbase User Agreements*, https://tinyurl.com/3hmb5da6 (cited at Compl. ¶ 507).

consequences suggest[ing] that [Coinbase] sought to benefit from [Oregon's] laws." *Davis*, 71 F.4th at 1164.

The Attorney General's "'bare bones' assertions of minimum contacts with [Oregon] . . . [do] not satisfy [his] pleading burden." *Swartz* v. *KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007). The Complaint must therefore be dismissed as against Coinbase.

**B.     Even were personal jurisdiction adequately pleaded as to Coinbase, it has not been alleged as to CGI.**

In any event, the Complaint alleges no plausible basis for the Court to exercise jurisdiction over CGI. All of the jurisdictional allegations concern Oregon residents' use of the Coinbase platform. *See supra* p. 14. The Attorney General concedes, however, that the platform is operated by Coinbase, *not* CGI. Compl. ¶ 17. He does not identify any operational activity whatsoever by CGI, much less any activity with a nexus to Oregon (let alone any activity arising out of the claims asserted in the Complaint). *See Est. of Osborn-Vincent* v. *Ameriprise Fin., Inc.*, 2018 WL 1724948, at *3 (D. Or. Feb. 13, 2018) ("[N]one of the documents in the record supports the inference that AFI — as opposed to AFI subsidiaries — conducted business in Oregon."), *adopted as modified*, 2018 WL 1585763 (D. Or. Mar. 30, 2018). At bottom, as the Attorney General also acknowledges, CGI is just a "holding company" that owns equity in Coinbase. Compl. ¶ 18. But it is blackletter law that owning a company — even 100% of a company — "is insufficient, on its own, to justify imputing [that] entity's contacts with a forum state . . . for the purpose of establishing personal jurisdiction." *Ranza* v. *Nike, Inc.*, 793 F.3d 1059, 1070 (9th Cir. 2015); *accord CLF 007* v. *CooperSurgical, Inc.*, 2025 WL 975175, at *10 (D. Or. Mar. 31, 2025); *Trama* v. *RELX PLC*, 2025 WL 657911, at *3 (C.D. Cal. Feb. 14, 2025).

Unable to identify any link between CGI and Oregon, the Attorney General suggests that jurisdiction should be imputed on a so-called "alter ego" theory[19] — pleading that Coinbase and CGI share directors and executives,[20] and that CGI's public securities filings define the "Company" to include CGI and its operating subsidiaries, Compl. ¶¶ 42-43. But the law is clear that a parent inherits its subsidiary's jurisdictional contacts only in "narrow" circumstances. *Sundberg* v. *Joint Apprenticeship Training Comm. of Nw. Line Constr. Indus.*, 2018 WL 7108064, at *3 (D. Or. Dec. 4, 2018), *adopted*, 2019 WL 310117 (D. Or. Jan. 23, 2019). The Attorney General would need to show that (1) there exists "'such unity of interest and ownership' between [CGI] and [Coinbase] 'that the separate personalities of the two entities no longer exist'[21] and (2) the 'failure to disregard' the separate entities 'would result in fraud or injustice.'" *Iconlab, Inc.* v. *Bausch Health Cos.*, 828 F. App'x 363, 364 (9th Cir. 2020) (quoting *Ranza*, 793 F.3d at 1073). The Complaint comes nowhere near clearing that bar.

---

[19]    The Complaint itself does not allege that Coinbase is an "alter ego" of CGI, but in subsequent briefing the Attorney General has made clear he is relying on that theory. *See* Reply Remand Br. at 25 n.18.

[20]    The Attorney General alleges that "Coinbase, Inc. and CGI share the same board of directors and the majority of CGI's executive officers hold the same executive positions at Coinbase, Inc., including Brian Armstrong, who acts as CEO for both Coinbase, Inc. and CGI." Compl. ¶ 42. Almost nothing in that allegation is correct. None of CGI's directors is a director of Coinbase. And CGI's executive officers do not hold the same positions at Coinbase. In fact, Mr. Armstrong holds no executive position at Coinbase (much less as CEO). As detailed below, however, the Court need not confront those inaccuracies on this posture given the inadequacy of the pleadings as a matter of law.

[21]    As the Ninth Circuit noted in *Ranza*, 793 F.3d at 1073 (internal quotation omitted):

> The unity of interest and ownership prong of this test requires a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former. This test envisions pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business — from broad policy decisions to routine matters of day-to-day operation. Total ownership and shared management personnel are alone insufficient to establish the requisite level of control.

The Attorney General does not allege that CGI and Coinbase fail to observe corporate formalities, or that Coinbase is not adequately capitalized, or that CGI actually exercises the "pervasive control" over Coinbase's day-to-day operations and governance required by Ninth Circuit law to establish personal jurisdiction.[22] *Ranza*, 793 F.3d at 1073-74 (noting that the Ninth Circuit has rejected the alter-ego theory even where the defendant was "'an active parent corporation involved directly in decision-making about its subsidiaries' holdings,'" because the parent and subsidiary "observe[d] all of the corporate formalities necessary to maintain corporate separateness"); *Iconlab*, 828 F. App'x at 364-65; *Trama*, 2025 WL 657911, at *3-4.

As to what the Attorney General *does* allege, it is common for parents and subsidiaries to share directors and executives, and for corporate websites and SEC filings to group a corporate parent and its subsidiaries for discussion and financial presentation — none of that brings into question the separateness of those entities for personal jurisdiction purposes.[23] If such conduct established an alter-ego relationship, every publicly traded holding company would be subject to jurisdiction in every state where its subsidiaries could be sued. That is not remotely the law.

---

[22]    For this same reason, the Complaint fails to allege that Coinbase's contacts could be imputed to CGI under an agency theory. *See CLF 007*, 2025 WL 975175, at *11 (finding no agency relationship "[b]ecause Plaintiffs have not alleged with specificity how [the parent] exercises substantial control over [the subsidiary]").

[23]    *See United States* v. *Bestfoods*, 524 U.S. 51, 69 (1998) ("'[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.'"); *Ranza*, 793 F.3d at 1074 ("Some employees and management personnel move between the entities, but that does not undermine the entities' formal separation."); *Iconlab*, 828 F. App'x at 364-65 (allegations that a parent and subsidiary "issued collective media releases" and "submitted consolidated earnings reports" were insufficient to establish an alter ego relationship); *see also Trama*, 2025 WL 657911, at *3 (rejecting alter ego theory even where complaint alleged that "(1) the [parent and subsidiary] define themselves as a cohesive entity, the RELX Group, even in official press releases and investor reports; (2) the RELX Group has shared places of business and operates multiple offices in California; (3) the RELX Group shares personnel, directors, officers, financials, and decision-making operations; and (4) RELX PLC exerts control and dominion over its subsidiaries, including RELX Inc." (internal quotation omitted)).

The Attorney General similarly alleges no facts showing "'that failure to disregard [the entities' separate identities] would result in fraud or injustice.'" *Ranza*, 793 F.3d at 1073. This prong "requires a plaintiff to demonstrate that the alleged injustice 'relate[s] to the *forming of the corporation or abuse of the corporation*, not a fraud or injustice generally.'" *Brown* v. *Serv. Grp. of Am., Inc.*, 2022 WL 43880, at *6 (D. Or. Jan. 5, 2022) (emphasis added), *aff'd*, 2022 WL 16958933 (9th Cir. Nov. 16, 2022). The Complaint does not even attempt to allege some fraud or injustice regarding the corporate forms of CGI and Coinbase — nor could it. *See Iconlab*, 828 F. App'x at 364-65.

Accordingly, CGI should also be dismissed from this case for lack of personal jurisdiction.

### III.    IN THE ALTERNATIVE, THE COURT SHOULD DISMISS ANY CLAIMS THAT PRE-DATE JANUARY 3, 2022 BECAUSE THEY ARE TIME-BARRED.

Beyond the threshold defects detailed above, the Attorney General's claim is subject to a three-year statute of limitations. *See* O.R.S. § 59.115(6) ("no action or suit may be commenced . . . more than three years after the sale" of an alleged security); *see also Ciuffitelli* v. *Deloitte & Touche LLP*, 2018 WL 4568737, at *10 (D. Or. Aug. 1, 2018) ("The statute of limitations for Plaintiffs' non-registration claims under O.R.S. §§ 59.055 and 59.115(1)(a) is three years."), *adopted*, 2018 WL 4568586 (D. Or. Sept. 21, 2018); *Anderson* v. *Carden*, 146 Or. App. 675, 679 (1997) ("ORS 59.115(6) . . . generally describes the statute of limitations for civil actions for damages based on violations of the Oregon securities laws.").

"'A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations . . . when "the running of the statute is apparent on the face of the complaint."'" *Kruesi* v. *Or. Dep't of Corr.*, 2025 WL 1897872, at *1 (D. Or. July 9, 2025) (quoting *Von Saher* v. *Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010)). Before this action was filed, the Attorney General and Coinbase entered into an agreement which provided

that all "time-related defenses . . . are tolled" as of January 3, 2025. *See* Ex. 6 (Tolling Agreement) at ¶¶ 1-2. Under O.R.S. 59.115(6), therefore, any claims based on offers or sales of digital assets that occurred before January 3, 2022 are time barred.

The Attorney General, however, does not limit his claim to transactions on or after that date. To the contrary, he expressly targets transactions from years earlier. For example, the Complaint seeks to hold Coinbase liable on the theory that it "made available for trading in Oregon" the digital asset XRP, which "was first listed for trading on the Coinbase Platform in February 2019." Compl. ¶¶ 71, 465. The Attorney General similarly alleges time-barred transactions for 24 of the 31 digital assets targeted in his pleadings.[24] If the Court otherwise allows this action to proceed — which it should not — then it should dismiss the claim as to any transactions that occurred before January 3, 2022.

---

[24]    *See* Compl. ¶ 83 (AAVE available for trading on the Coinbase platform "since approximately December 14, 2020"); ¶ 91 (ADA available "since approximately March 2021"); ¶ 101 (ALGO available "in or around July 2020"); ¶ 124 (AMP available "since approximately June 8, 2021"); ¶ 151 (ATOM available "since approximately February 14, 2021"); ¶ 163 (AVAX available "since approximately September 30, 2021"); ¶ 172 (AXS available "since approximately August 2021"); ¶ 182 (CHZ available "since approximately June 2021"); ¶ 198 (COMP available "since approximately June 23, 2020"); ¶ 221 (DASH available "since approximately September 2019"); ¶ 240 (EOS available "since approximately May 30, 2019"); ¶ 249 (FIL available "since approximately December 2020"); ¶ 286 (ICP available "since approximately May 2021"); ¶ 302 (LCX available "since approximately October 27, 2021"); ¶ 312 (LINK available "since approximately June 26, 2019"); ¶ 324 (MATIC available "since March 2021"); ¶ 341 (MIR available "beginning in approximately May 2021"); ¶ 354 (MKR available "since approximately June 11, 2020"); ¶ 374 (POWR available "since approximately November 16, 2021"); ¶ 387 (RLY "first became available to trade on the Coinbase platform on July 15, 2021"); ¶ 426 (UNI available "since approximately September 17, 2020"); ¶ 434 (VGX available "starting in November 2021"); ¶ 448 (wLUNA available "on or around August 21, 2021"); ¶ 489 (XYO available "since approximately September 8, 2021").

## <u>CONCLUSION</u>

For the reasons stated above, the Court should dismiss the Complaint for failure to state a claim and for failure to plead personal jurisdiction. In the alternative, the Court should dismiss as time-barred the Attorney General's claim as to transactions that pre-date January 3, 2022.

DATED: August 1, 2025        STOEL RIVES LLP


/s/ Timothy W. Snider
TIMOTHY W. SNIDER, OSB No. 034577
timothy.snider@stoel.com
JAMES A. KILCUP, OSB No. 173891
james.kilcup@stoel.com
KATE S. SHEPHERD, OSB No. 224891
kate.shepherd@stoel.com

AND

KEVIN S. SCHWARTZ, appearing *pro hac vice*
kschwartz@wlrk.com
NOAH B. YAVITZ, appearing *pro hac vice*
nbyavitz@wlrk.com
ADAM M. GOGOLAK, appearing *pro hac vice*
amgogolak@wlrk.com
SIJIN CHOI, appearing *pro hac vice*
schoi@wlrk.com
JULIA M. BRUCE, appearing *pro hac vice*
jmbruce@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: 212.403.1000

*Attorneys for Defendants Coinbase, Inc. and
Coinbase Global, Inc.*