IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| THE STATE OF OREGON, EX REL. DAN RAYFIELD, ATTORNEY GENERAL FOR THE STATE OF OREGON, | Case No. 3:25-cv-00952-JR |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| COINBASE, INC. and COINBASE GLOBAL, INC., | |
| Defendants. | |

_____

RUSSO, Magistrate Judge:

Plaintiff the State of Oregon moves to remand this case, and for associated attorney fees, pursuant to 28 U.S.C. § 1447(c). For the reasons set forth below, plaintiff's motion to remand should be granted and request for attorney fees denied.

Page 1 – FINDINGS AND RECOMMENDATION

**DISCUSSION**

In April 2025, plaintiff filed a lawsuit in Multnomah County Circuit Court, alleging violations of the Oregon Securities Law ("OSL"), Or. Rev. Stat. § 59.005 *et seq.*, against defendants Coinbase, Inc. and Coinbase Global, Inc. Specifically, plaintiff asserts "Coinbase has for years operated an illegal securities business in Oregon through its cryptocurrency trading platform and its practice of selling high-risk and unregistered securities to Oregonians."[1] First Am. Compl. ("FAC") ¶¶ 1, 71, 504-11 (doc. 18). The FAC ultimately targets 31 cryptocurrencies.

Defendants timely removed plaintiff's lawsuit to this Court on the basis of original jurisdiction:

> The Oregon Attorney General's lawsuit rests on whether certain crypto transactions are "investment contracts" and therefore securities under Oregon law. But to answer that question, Oregon looks to federal law, analyzing whether the transactions meet a test established by the U.S. Supreme Court [in *U.S. Sec. & Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293 (1946)]. That issue is necessarily raised by Oregon's complaint, substantial, and disputed between the parties. And far from "disturbing a congressionally approved balance of federal and state judicial responsibilities," *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 309 (2005), allowing this lawsuit to be heard in federal court is the only way to serve that balance.

Notice of Removal ¶¶ 14, 19-21 (doc. 1). As an alternate basis, defendants assert "the action is subject to federal-officer removal under 28 U.S.C. § 1442(a)(1) [because the] U.S. Marshals Service has hired Coinbase as its agent to trade digital assets seized by the federal government."[2] *Id.* at ¶¶ 15, 22-26.

---

[1] Section 59.055 makes it unlawful to sell any unregistered security in Oregon, subject to enumerated exceptions not relevant here. A security is defined, in part, as an "investment contract." Or. Rev. Stat. § 59.015(19)(a).

[2] On July 21, 2025, Blockchain Association sought leave to file an amicus brief opposing remand under 28 U.S.C. § 1331. "The district court has broad discretion to appoint amicus curiae." *Greater Hells Canyon Council v. Wilkes*, 2023 WL 6443562, *5 (D. Or. Apr. 20, 2023) (citation and internal quotations omitted). "An amicus brief should normally be allowed . . . when the amicus

## STANDARD OF REVIEW

Subject to strict time constraints, defendants in a state court action may remove that action to federal court when the case could have originally been brought in federal court. 28 U.S.C. §§ 1441, 1446(b). Courts strictly construe the removal statute against federal jurisdiction, "and any doubt about the right of removal requires resolution in favor of remand." *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (9th Cir. 2009) (citation omitted).

"Unlike removal under § 1441, which is construed narrowly, federal officer removal must be liberally construed" in favor of removal. *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 913 (9th Cir. 2024) (citations and internal quotations omitted); *DeFiore v. SOC LLC*, 85 F.4th 546, 553 (9th Cir. 2023). Although removal rights under the federal officer removal statute "are much broader than those under section 1441, the statute's broad language is not limitless." *Doe*, 106 F.4th at 913. The court "may not interpret the federal officer removal statute considerably beyond its reach, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id.*

---

has an interest in some other case that may be affected by the decision in the present case, or when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Cmty. Ass'n for Restoration of Env't (CARE) v. DeRuyter Bros. Dairy*, 54 F.Supp.2d 974, 975 (E.D. Wash. 1999) (internal citation omitted). "This is a low threshold." *Greater Hells Canyon Council*, 2023 WL 6443562 at *5. Blockchain Association is a "nonprofit membership organization representing more than 130 companies in the digital asset and blockchain technology sector." Mot. Appear Amicus Curiae 1 (doc. 28). It purports to "offer a broader industry and policy perspective [and present] legal history and public interest relevant to the Court's review." *Id.* at 2. Mainly, Blockchain Association asserts that granting plaintiff's motion would create a "fragmented, state-by-state approach to defining what constitutes a 'security' [and] generate legal uncertainty and impede the development of digital financial infrastructure." *Id.* at 3. At this stage of the litigation, the Court finds that Blockchain Association has unique information and grants its motion. *See, e.g.*, *Sec. & Exch. Comm'n v. Coinbase, Inc.*, 761 F.Supp.3d 702, 720 n.6 (S.D. N.Y. 2025).

Upon a motion by the plaintiff, a federal court may remand the action to state court for lack of subject matter jurisdiction. 28 U.S.C. § 1447(c); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 885 (9th Cir. 2010). The party opposing the motion for remand bears the burden of establishing jurisdiction exists. *See, e.g.*, *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921); *see also Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 746 (9th Cir. 2022) ("[t]he defendant has the burden of proving by a preponderance of the evidence that the requirements for removal jurisdiction have been met").

**DISCUSSION**

Plaintiff argues that this Court lacks subject matter jurisdiction. In particular, plaintiff contends the Supreme Court of Oregon "broke stride with *Howey* in its interpretation of an 'investment contract' under the OSL, deciding the term should be 'modified' to encompass a broader range of investment schemes." Pl.'s Mot. Remand 4 (doc. 19) (quoting *Pratt v. Kross*, 276 Or. 483, 497, 555 P.2d 765 (1976)). Plaintiff also argues "Coinbase ignores other important differences between the OSL and the federal 1933 Act as well as Oregon's strong interests in maintaining this action in its courts, all of which further undercut Coinbase's argument for federal question jurisdiction." *Id.* Separately, plaintiff maintains the 2022 contract "between Coinbase and the U.S. Marshals Service ('USMS') does not demonstrate the close direction and control of Coinbase's actions necessary for federal officer removal[,] a causal connection between its fulfillment of its obligations to USMS and the State's claims [is lacking], and it fails to assert a colorable federal defense arising from its purported official duties." *Id.* As a result, plaintiff contends that defendants' removal was "no[t] objectively reasonable" such that attorney fees should be awarded. *Id.* at 26.

I.       **Federal Question Jurisdiction**

Original jurisdiction exists in "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Claims can meet this definition in one of two ways. "Most directly, a case arises under federal law when federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (citations omitted). Where, as here, "a claim finds its origins in state rather than federal law," courts "have identified a special and small category of cases in which arising under jurisdiction still lies." *Id.* at 258 (citation and internal quotations omitted). As such, federal jurisdiction exists in the present context "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* (citing *Grable*, 545 U.S. at 314).

Defendants maintain that "the first and second factors of *Grable* [are satisfied because] whether exchange-based trading in [cryptoassets] forms 'investment contracts' turns on federal law, as Oregon evaluates 'investment contracts' under the standard applied [in *Howey*] and its progeny in the context of the Exchange Act." Notice of Removal ¶ 20 (doc. 1) (citing *Computer Concepts, Inc. v. Brandt*, 310 Or. 706, 714 n.7, 808 P.2d 800 (1990)). Defendants also argue:

> The federal question at issue is substantial not just because it sits at the fulcrum of this litigation, but also because it implicates the regulation of a multi-trillion-dollar global industry. Here, the Attorney General would ask an Oregon state court to resolve foundational questions—when do cryptoasset transactions on crypto platforms involve securities—that are presently being weighed by Congress, the CFTC, a dedicated SEC task force, and federal courts around the country. And because the Attorney General's action implicates the federal government's strong interest in national regulation of—including uniform rules for—interstate digital-asset transactions, the balance of state-federal enforcement authority favors removal as well. That interest confirms that the issues raised here belong in federal court.

*Id.* at ¶ 21 (citations and internal quotations omitted).

Initially, the central question posed by the FAC is whether the transactions at issue are "investment contracts" under the OSL. While "[t]he definition of 'security' under federal law is substantially the same as Oregon's," such that "federal cases [may provide] guidance in interpreting the meaning of 'investment contract,'" the OSL neither refers to nor incorporates federal law. *Computer Concepts, Inc.*, 310 Or. at 714 n.7. As a result, the precedent on which defendants rely – i.e., *New York v. Arm or Ally, LLC*, 644 F.Supp.3d 70 (S.D.N.Y. 2022) – is distinguishable. *Cf. Roskind v. Morgan Stanley Dean Witter & Co.*, 165 F.Supp.2d 1059, 1067 (N.D. Cal. 2001) (no federal jurisdiction over state securities claims where the plaintiff "need not establish a violation of" federal law "to establish liability").

Turning to the first factor, "a federal issue is necessarily raised when the issue is pivotal to the case." *Ranck v. Mt. Hood Cable Regul. Comm'n*, 2017 WL 1752954, *2 (D. Or. May 2, 2017) (citation and internal quotations omitted). And a "federal issue is actually disputed when it is the primary focus of the complaint, and not merely a peripheral issue." *Id.* at *3 (citation and internal quotations omitted).

It is beyond dispute that Oregon courts have not strictly followed the *Howey* test in determining what constitutes an "investment contract" under the OSL. Rather, via *Pratt*, the Oregon Supreme Court revised this test. *Pratt*, 276 Or. at 497. *Pratt* involved an investment by a passive investor in a limited partnership interest. *Id.* at 485. The defendant served as the general partner of the company, with full control over its management. *Id.* The case hinged on whether the plaintiff's interest qualified as an "investment contract." *Id.* The Oregon Supreme Court began by acknowledging the *Howey* test and its limitations: "This definition has gradually come under pressure from 30 years' use. In some jurisdictions it has been modified, and in others it has not been used in limited circumstances." *Id.* at 489. *Pratt* ultimately concluded that, consistent with

the broadly protective statutory purposes and design of the OSL, *Howey*'s definition was overly restrictive and adopted a "modified" version before holding that the underlying arrangement embodied an "investment contract." *Id.* at 495.

Numerous courts have recognized this departure and applied *Pratt* in the intervening decades. *See, e.g.*, *Computer Concepts, Inc.*, 310 Or. at 713-14; *Almaden Plaza Assocs. v. United Tr. Fund Ltd. P'ship*, 123 Or.App. 372, 377, 860 P.2d 289 (1993), *rev. denied*, 318 Or. 458, 871 P.2d 122 (1994); *State v. Nistler*, 268 Or.App. 470, 481, 342 P.3d 1035 (2015). Given the distinction between the Oregon and federal tests, a financial product can be an investment contract under *Pratt* but not under *Howey*.

The major takeaway from this line of cases is that Oregon is not bound by *Howey* or any other federal standard in determining the existence of a regulated security under the OSL. Instead, Oregon has leeway to depart from federal authority in effectuating the broad "remedial purposes of Oregon's Blue Sky laws." *See Jost v. Locke*, 65 Or.App. 704, 716, 673 P.2d 545 (1983), *rev. denied*, 296 Or. 712, 678 P.2d 740 (1984) (*Pratt* "recognized that *Howey* is unduly restrictive" but acknowledged "that [its] formulation of an 'investment contract,' like *Howey*'s, may not be applicable to all situations"); *State v. Consumer Bus. Sys.*, 5 Or.App. 19, 29, 482 P.2d 549 (1971) ("[w]e hold that the *Howey* test is not exclusive and that the 'risk capital' test is also to be used in determining whether a particular financial activity constitutes an offer of an 'investment contract' which must be registered").

The Court cannot conclude that, because Oregon has taken guidance from certain federal sources of law in defining an investment contract under the OSL, plaintiff's claims necessarily raise a federal question. *Cf. Badger v. Paulson Inv. Co.*, 311 Or. 14, 21, 803 P.2d 1178 (1991) ("[i]n situations involving Oregon laws in large measure drawn from a federal counterpart, it is

appropriate to look for guidance to federal court decisions interpreting similar federal laws, even though those decisions do not bind us"). Indeed, as the aforementioned authority makes clear, the test for a security in this context does not turn on federal law, because Oregon can independently determine what constitutes an investment contract pursuant to the OSL without deference to or the presumption of primacy of *Howey* or its progeny.

The fact that Oregon's test for an investment contract under the OSL might furnish the same outcome as the federal test is therefore not dispositive. *See Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 675-76 (9th Cir. 2012) (in an action brought by the state attorney general "in state court to enforce its own state consumer protection laws" and that alleged "only state law causes of action, brought to protect [state] residents," the fact that the complaint referenced federal standards and made passing references to federal statutory violations did not confer federal question jurisdiction under *Grable*); *see also St. Mary's Reg'l Med. Ctr. v. Renown Health*, 35 F.Supp.3d 1275, 1282-84 (D. Nev. 2014) (finding no necessary federal issue where the plaintiffs' state law "claims can be decided independently of any federal question").

The third and fourth *Grable* factors also counsel against removal under 28 U.S.C. § 1331. Defendants' Notice of Removal and briefing largely focus on the national import of the cryptocurrency market and the corresponding "wide-ranging consequences for the regulation of Coinbase and other nationwide digital-asset platforms" implicated by plaintiff's action. *See, e.g.*, Defs.' Resp. to Mot. Remand 15-16 (doc. 25). But, plaintiff observes, "the substantiality inquiry for purposes of removal is not about the breadth of the defendant's business ventures; it is about the overriding interests at stake." Pl.'s Reply to Mot. Remand 6 (doc. 31); *see also Ranck*, 2017 WL 1752954 at *3 ("[a] federal issue is substantial when it presents a serious federal interest in claiming the advantages thought to be inherent in a federal forum . . . This factor concerns not the

significance of the issue to the particular parties in the immediate suit but the importance of the issue to the federal system as a whole") (citations and internal quotations omitted); *In re Standard & Poor's Rating Agency Litig.*, 23 F.Supp.3d 378, 413 (S.D. N.Y. 2014) ("with few exceptions, the doors to federal court [do] not swing open merely because a party has a national presence") (citation and internal brackets and quotations omitted).

Here, the interest at stake is state-based, not federal – i.e., the Oregon Attorney General's interest in enforcing a state-specific regulatory scheme and in protecting state residents. That Congress is examining cryptocurrency legislation does not alter the Court's conclusion as to this issue. In fact, as both parties acknowledge, Congress has been considering such legislation for years but has yet to take any concrete action that could alter the federal-state regulatory balance.

In any event, "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 383 (1996); *see also Ciuffitelli for Tr. of Ciuffitelli Revocable Tr. v. Deloitte & Touche LLP*, 2017 WL 2927481, *18 (D. Or. Apr. 10), *adopted by* 2017 WL 2927150 (D. Or. July 5, 2017) (federal law exempting certain "covered securities" from state securities regulation did not preempt state regulation of other securities). Had Congress wanted to "preclude the operation of state laws" and place "supervision" of securities regulation exclusively "in the hands of" the U.S. Securities and Exchange Commission and federal courts, it could have. *Hornish v. King Cnty.*, 899 F.3d 680, 691 (9th Cir. 2018). Given these circumstances, there is no "serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable*, 545 U.S. at 313. Defendants failed to carry their burden in establishing that plaintiff's claim arises under federal law.

## II.     Federal Officer Removal Statute Jurisdiction

The federal officer removal statute creates federal jurisdiction over actions brought in state court against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). To satisfy this requirement, the removing party "must establish: (a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims; and (c) it can assert a colorable federal defense." *San Mateo*, 32 F.4th at 755 (citation and internal quotations omitted). The absence of any one factor forecloses removal under § 1442(a)(1).

The parties do not dispute that defendants are "persons" but they disagree as to the latter two elements. Defendants first argue that a causal nexus exists "because Coinbase acts as an agent of the federal government with respect to the sale of billions of dollars' worth of cryptoassets throughout the United States" pursuant to the 2022 Prime Broker Agreement and Master Trading Agreement (collectively the "2022 Agreement"). Notice of Removal ¶ 23 (doc. 1).

Specifically,

Coinbase entered into [the 2022 Agreement] under which . . . Coinbase must open an account for the USMS on Coinbase Prime's execution platform [that provides the USMS] "with access to trade execution and automated trade routing services and Coinbase Execution Services . . . to enable [the USMS] to purchase and sell specified Digital Case Assets." The [2002] Agreement further provides that "[n]either Coinbase nor any Coinbase Entity will sell, transfer, loan, rehypothecate or otherwise alienate Client's Assets credited to Client's Trading Balance unless instructed by Client pursuant to an agreement between Client and a Coinbase Entity." Coinbase operates a nationwide platform that includes consumers in Oregon and beyond, and its duty under the agreement is to sell the seized assets for the U.S. government at the best price available through this nationwide platform. Under its agreement with the USMS, Coinbase has conducted more than half a million sales of federal cryptoassets, including sales of more than half of the cryptoassets targeted by the Attorney General in this action. These sales were each tightly controlled by the terms of Coinbase's agreement with the federal government . . . Prior to entering into the agreement with Coinbase in 2022, the

> USMS directly managed the federal government's seized cryptoassets, consistent
> with its regulatory mandate to administer the federal asset seizure and forfeiture
> programs. The services provided by Coinbase under its agreement are thus essential
> to the USMS's fulfillment of its core regulatory responsibilities . . . If the Attorney
> General prevails in this action, Coinbase would be liable for and barred from selling
> digital assets in Oregon on behalf of the United States government.

*Id.* at ¶¶ 23-25 (internal citations omitted; quoting Notice of Removal Ex. 3, at 16, 18 (doc. 1-3)).

In their opposition, defendants assert for the first time that their "new agreement with the USMS"

– i.e., the 2024 "RFP Contract" – confers federal officer removal jurisdiction. Defs.' Resp. to Mot.

Remand 8-9, 25-26 (doc. 25).

Defendants also rely on the following "substantial federal defenses" in asserting that

federal jurisdiction is proper:

> • The Attorney General has failed to establish that either Coinbase, Inc. or Coinbase
> Global, Inc. has sufficient contacts with Oregon to subject it to the jurisdiction of
> the Oregon courts consistent with the federal Constitution.
>
> • The Attorney General cannot show that any of the digital-asset transactions
> identified in the Complaint qualify as "investment contracts" under the Exchange
> Act's framework, including because the transactions on Coinbase's platform do not
> grant the purchaser a contractual claim related to the future income, profits, or
> assets of a business enterprise.
>
> • The Attorney General's enforcement action violates the fair notice requirements
> of the federal Due Process Clause . . . For years, Oregon issued public guidance
> making plain its conclusion that the digital assets traded on platforms like Coinbase
> were "not regulated . . . by the State of Oregon" and never once suggested that
> Coinbase participated in unregistered securities transactions.
>
> • The Attorney General's action violates the Supremacy Clause. As discussed
> above, through this action, the Attorney General seeks to dictate how Coinbase
> performs services under a trading agreement entered into with the USMS in
> accordance with the Asset Forfeiture Program, which the USMS is required to
> administer by federal statute and regulations.

Notice of Removal ¶ 26 (doc. 1).

Turning to the first disputed element, to demonstrate a "causal nexus" the defendant "must

show: (1) [it] was acting under a federal officer in performing some act under color of federal

office, and (2) that such action is causally connected with the plaintiff's claims against it." *San Mateo*, 32 F.4th at 755 (citation and internal quotations omitted).

The first requirement is met when the defendant is "involved in an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Goncalves ex rel. Goncalves v. Rady Childs. Hosp. San Diego*, 865 F.3d 1237, 1244-45 (9th Cir. 2017) (citation and internal quotations omitted; emphasis in original). The mere "fact that a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail" does not mean the company acts under a federal officer for removal purposes. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 145-50 (2007). Rather, "[s]omething more must be present, like the delegation of legal authority, which might include evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement." *Doe*, 106 F.4th at 913 (citation and internal quotations omitted).

Accordingly, a removing party "acts under" a federal officer when it is working under an officer in a manner "akin to an agency relationship," subject to the officer's "subjection, guidance, or control," and "help[ing] fulfill basic governmental tasks" that implicate "a 'significant risk of state-court prejudice,' just as a government employee would in similar circumstances." *DeFiore*, 85 F.4th at 554 (citation and internal quotations omitted); *San Mateo*, 32 F.4th at 757 (quoting *Watson*, 551 U.S. at 152).

The 2022 Agreement set "forth the terms and conditions for clients to trade Digital Assets through the Coinbase prime broker execution platform," and expressly delineated that "Coinbase is not registered with the U.S. Securities and Exchange Commission as a broker-dealer or an investment adviser or licensed under any state securities laws [and] is not acting as a fiduciary in respect of [the USMS]." Notice of Removal Ex. 3, at 16, 21 (doc. 1-3); *see also DeFiore*, 85 F.4th

at 554 (fiduciary relationship is a hallmark of the common-law agency principles relevant to whether a government contractor acts under a federal officer).

Defendants, in turn, retained significant discretion under the 2022 Agreement over the type of orders they accepted from the USMS and whether, or how, to execute those orders. *See* Notice of Removal Ex. 3, at 19 (doc. 1-3) ("Coinbase may, in its sole discretion, . . . halt or suspend Trading Services [or] impose limits on the amount or size of [the USMS] Orders"; "Coinbase reserves the right to modify the terms of any Order Type and the Coinbase Trading Rules at any time and without prior notice to [the USMS]"; "Coinbase has sole and absolute discretion to accept or reject any Order"); *id.* at 21 ("Coinbase may, in its sole discretion, suspend, restrict or terminate the [the USMS'] Trading Services"); *see also id.* at 1 ("Coinbase may act in a principal capacity with respect to certain Orders [and] may have an incentive to favor their own interests and the interests of their affiliates over a particular Client's interests").

Thus, unlike *DeFiore*, on which defendants rely, the 2022 Agreement does not create a common-law agency relationship or otherwise require defendants to follow all orders issued by the USMS. *DeFiore*, 85 F.4th at 556; *see also City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1108 (9th Cir. 2022) ("payment under a commercial contract—in kind or otherwise—does not involve close supervision or control and does not equal 'acting under' a federal officer"); *Cabalce v. Thomas E. Blanchard & Assocs.*, 797 F.3d 720, 728 (9th Cir. 2015) (contractor hired by the government to store and dispose of seized fireworks did not act under a federal officer due to "the lack of any evidence of the requisite federal control or supervision over the handling of the seized fireworks") (citation and internal quotations omitted).

The RFP Contract poses a closer question. It is undisputed that the RFP Contract "took effect weeks after Coinbase removed this case to federal court." Pl.'s Reply to Mot. Remand 11

Page 13 – FINDINGS AND RECOMMENDATION

(doc. 31); Defs.' Resp. to Mot. Remand 9 (doc. 25). Stated differently, it did not form the basis of defendants' Notice of Removal, but neither party meaningfully addresses the timing of these events and their potential impact. *Cf. Andrews v. Cunningham*, 2003 WL 21088535, *2 (D. Or. Feb. 25, 2005) (statutory time limit for filing a notice of removal "is mandatory and a timely objection within 30 days to a late petition will defeat removal") (citation and internal quotations omitted).

Nevertheless, as defendants point out, the "current contract is a bespoke agreement calibrated to the federal government's unique specifications, replete with detailed auditing and reporting requirements, through which Coinbase offers services that are not available to the general public." Defs.' Resp. to Mot. Remand 8-9, 25 (doc. 25). Importantly, the RFP Contract stipulates that the USMS retains "ultimate decision making" authority surrounding investment and disposal of the underlying cryptoassets, and that defendants operate at all times under its direction and control. *See, e.g.*, Foster Decl. Ex. 2A, at 1 (doc. 26-2); Foster Decl. Ex. 2B, at 1-3 (doc. 26-2); Foster Decl. Ex. 2C, at 1-6, 9 (doc. 26-2). Relatedly, the RFP Contract delineates "[t]he USMS expects [defendants to act] as its agent" pursuant to "a bailment relationship." Foster Decl. Ex. 2C, at 4, 8 (doc. 26-2).

Further, defendants' contracts with the USMS help fulfill a basic governmental task. *See* Foster Decl. ¶ 5 (doc. 26) (in 2022, USMS sought "to retain a private company to assist it with managing and disposing of the billions of dollars' worth of digital assets seized by or forfeited to the federal government . . . Until that time, the agency had been carrying out these duties itself"); Foster Decl. Ex. 2C, at 3 (doc. 26-2) ("[t]he USMS has been self-managing cryptocurrency assets seized and forfeited by the DOJ and TEOAF forfeiture programs since 2014"); *see also Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (defendant was performing a basic

governmental task where, in "the absence of a contract with a private firm, the Government itself would have had to perform" that job).

The RFP Contract thus represents a shift and defendants no longer appear to be providing trade execution services to the USMS identical to those rendered to other, non-government customers. Regardless, presuming the "acting under" prong is met, defendants fail to identify any provision of either the 2022 Agreement or RFP Contract that meets the "causal connection" requirement insofar as they do not demonstrate they sold allegedly unregistered cryptoassets to Oregon residents in violation of the OSL at the USMS' direction. *See Goncalves*, 865 F.3d at 1245 (to establish a causal connection, a defendant must show "that the challenged acts occurred because of what [it was] asked to do by the Government") (citation, internal quotations, and emphasis omitted).

Critically, the FAC makes clear that plaintiff's claims do not emanate from the sale of any cryptosecurities by or on behalf of the USMS. FAC ¶ 503 (doc. 18). In fact, any claims related to defendants' contractual relationship with the USMS are "expressly exclude[d]," "disclaim[ed]," and "expressly release[d]." *Id.*; *see also San Mateo*, 32 F.4th at 746 ("the plaintiff is the master of the claim and can generally avoid federal jurisdiction if a federal question does not appear on the face of the complaint") (citation and internal quotations omitted); *Marcher v. Air & Liquid Sys. Corp.*, 2022 WL 562268, *2 (C.D. Cal. Feb. 24, 2022) ("many courts in the Ninth Circuit have recognized that when the federal officer removal statute is at issue, a plaintiff may expressly waive claims that would give rise to potential federal defenses [and such] waiver is sufficient to eviscerate a defendant's grounds for removal") (citations and internal quotations omitted); *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 187 (1st Cir. 2024) (waivers "that clearly carve out certain factual bases, whether by time span or location, such that any alleged injury could not have

happened under the direction of a federal officer will prevent removal") (citation and internal quotations omitted).

In other words, although the FAC alleges that defendants violated the OSL, it does not assert that defendants did so in connection with any of the services they provided to the USMS, and defendants otherwise do not cite to any portion the 2022 Agreement/RFP Contract suggesting the presence of the requisite "causal connection." Instead, defendants contend removal was appropriate because "Coinbase has pleaded that the operation of its trading platform on a nationwide basis, without restriction of Oregonians, is a key component of its performance under its agreements with the federal government." Defs.' Resp. to Mot. Remand 27-28 (doc. 25). Essentially, defendants argue they have an obligation to maintain their platform and deliver a national, liquid market for the USMS, which plaintiff's "post-amendment claims" would "dry up."[3] *Id.* at 21-22.

But defendants' actions involve distinct transactions and assets, executed for individual clients. *Cf.* Foster Decl. Ex. 2C, at 7-8 (doc. 26-2) (defendants "shall maintain a complete and accurate accounting of the Government's cryptocurrency inventory at all times [and report the] type and amount of cryptocurrency, custody receipt dates, cryptocurrency wallet addresses and transaction hashes, cryptocurrency airdrop amounts, valuation records of cryptocurrency, etc";

---

[3] In so arguing, defendants assert that plaintiff's "disclaimer [can] not defeat removal [because the Court must credit their] theory of the case." Defs.' Resp. to Mot. Remand 22-23, 28 (doc. 25). While this is generally true, defendants' "theory of the case" is simply not viable to the extent it contradicts the express terms of the contract invoked under § 1442(a)(1). *See Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999) (explaining that the defendants' theory of the case should be credited for purposes of the jurisdictional inquiry where the parties' respective positions required the court "to decide the merits of this case [which] would defeat the purpose of the removal statute"); *see also Plaquemines Par. v. BP Am. Prod. Co.*, 103 F.4th 324, 339 (5th Cir. 2024) ("in cases involving private federal contractors, courts look to the contents of the relevant federal contracts in determining whether the challenged conduct was connected or associated with acts taken under color of federal office").

"each Government cryptocurrency asset is segregated by its wallet address [and] the Government's cryptocurrency inventory is never comingled with any other wallets or addresses belonging to different owners"). And defendants do not cite to any provision of the RFP Contract suggesting the USMS hired them specifically to maintain a certain amount of nationwide liquidity (or, by extension, that would be breached by reducing liquidity from Oregon users). *See, e.g.*, *id.* at 9. Moreover, there is no dispute that defendants, alone, decide which cryptoassets are available to trade on their platform or to Oregon residents.

Separately, as both parties acknowledge, the FAC only "targets 31 out of the millions of cryptocurrencies that exist, and does not allege that Bitcoin, which comprises the majority of the crypto market's value, is a security." Pl.'s Mot. Remand 9 n.6 (doc. 19); Defs.' Resp. to Mot. Remand 11 (doc. 25). The Court also notes that "[a]ny transaction by . . . a marshal" is "exempt from [Or. Rev. Stat. §] 59.055." Or. Rev. Stat. § 59.035(1).[4]

Therefore, as plaintiff denotes, "Coinbase may continue to meet its obligations to USMS [by executing] orders submitted by USMS to sell the many crypto assets that are not at issue in the State's Complaint [especially because] USMS represents that it is and shall remain in full compliance with all applicable laws including U.S. securities laws and regulations, as well as any applicable state and federal laws." Pl.'s Mot. Remand 17 n.13 (doc. 19) (internal citation, quotations, ellipses, and brackets omitted); Notice of Removal Ex. 3, at 2 (doc. 1-3); Foster Decl.

---

[4] Defendants rely on the legislative history to imply that this "exemption is narrower [and] only [reaches] transactions by a marshal in the judicial context." Defs.' Resp. to Mot. Remand 21 n.19 (doc. 25) (citation and internal quotations omitted). Yet "[w]hen the text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different." *State v. Gaines*, 346 Or. 160, 173, 206 P.2d 1042 (2009); *see also Preble v. Centennial Sch. Dist. No. 287*, 298 Or.App. 357, 367, 447 P.3d 42 (2019) ("courts assume that the legislature's use of the word 'any' indicates [a] deliberately comprehensive application") (collecting cases).

Ex. 2, at 9 (doc. 26-2); Foster Decl. Ex. 2C, at 23 (doc. 26-2). Stated differently, the FAC does not

challenge defendants' broader operation of its trading platform. As such, plaintiff's particular

claim – which targets solely the sale of cryptosecurities to Oregon residents through defendants'

platform by or on behalf of customers other than USMS – is separate from the services furnished

under the 2022 Agreement/RFP Contract.

In sum, the Court finds no causal nexus between defendants' actions pursuant to the 2022

Agreement/RFP Contract and plaintiff's claims, such that jurisdiction under 28 U.S.C. §

1442(a)(1) is lacking.[5]

## III.    Attorney Fees

"An order remanding the case may require payment of just costs and any actual expenses,

including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The decision

whether to award such fees lies within the district court's discretion. *Martin v. Franklin Cap.

Corp.*, 546 U.S. 132, 139 (2005). Nevertheless, absent unusual circumstances, attorney fees are

---

[5] Although not dispositive, the Court also notes that three of the four defenses asserted by
defendants – i.e., lack of personal jurisdiction, failure to state a claim, and violation of the Due
Process Clause – do not support removal because they do not depend on whether defendants
were acting under the direction of the USMS. Notice of Removal ¶ 26 (doc. 1); *see also Honolulu*, 39
F.4th at 1110 (a defense is colorable if it "arise[s] out of [the defendant's] official duties" and is
plausible) (citation and internal quotations omitted). In other words, even if plausible, these are
general defenses that do not flow from defendants' purported official duties and exist irrespective
of the 2022 Agreement/RFP Contract. Concerning the remaining defense – i.e., violation of the
Supremacy Clause – the Court reiterates that USMS transactions are exempted from Or. Rev. Stat.
§ 59.055. And, as observed in Section I, state and federal securities regulation may co-exist, and
nothing in the Asset Forfeiture Program evinces an intent to override state laws regulating the sale
of certain property seized by the federal government. Finally, the fact that the underlying action
may indirectly increase the federal government's costs by "impair[ing] the liquidity and scale . . .
that is key to [defendants'] performance" does not appear sufficient to invoke the Supremacy
Clause. Defs.' Resp. to Mot. Remand 3-4 (doc. 25); *see also Geo Grp., Inc. v. Newsom*, 50 F.4th
745, 760 (9th Cir. 2022) ("numerous cases distinguish for purposes of intergovernmental immunity
between regulations of federal contractors that merely increase the federal government's costs, like
taxes, and regulations that would control federal operations").

appropriate "under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Id.* at 141.

Plaintiff's sole argument simply restates the applicable standard and its previous arguments: "As shown by the discussion above, not only do Coinbase's arguments lack merit, clear law demonstrates that Coinbase had no objectively reasonable basis for seeking removal either based on federal question jurisdiction or under the federal officer removal statute." Pl.'s Mot. Remand 26 (doc. 19).

Although, as discussed herein, the Court finds that remand is warranted, there is little clear guidance surrounding the application of at least some surrounding legal principles in the present context. Indeed, cryptocurrency litigation, especially as it relates to Blue Sky Laws, is an emerging area of law that few courts have had the opportunity to address. Additionally, the Court finds the issue of waiver central and the FAC was filed after defendants removed the case. Given these circumstances, attorney fees are not warranted. *See Lussier v. Dollar Tree Stores, Inc.*, 518 F.3d 1062, 1065 (9th Cir. 2008) ("removal is not objectively unreasonable solely because the removing party's arguments lack merit, or else attorney's fees would always be awarded whenever remand is granted").

## RECOMMENDATION

Plaintiff's Motion to Remand (doc. 19) and Blockchain Association's Motion to Appear Amicus Curiae (doc. 28) should be granted. Plaintiff's request for attorney fees is denied. Likewise, plaintiff's request for oral argument is denied as unnecessary. Judgment should be prepared remanding this case to state court and all other pending motions should be denied as moot.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 12th day of September, 2025.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge