TIMOTHY W. SNIDER, OSB No. 034577
timothy.snider@stoel.com
JAMES A. KILCUP, OSB No. 173891
james.kilcup@stoel.com
KATE S. SHEPHERD, OSB No. 224891
kate.shepherd@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380

KEVIN S. SCHWARTZ, appearing *pro hac vice*
kschwartz@wlrk.com
NOAH B. YAVITZ, appearing *pro hac vice*
nbyavitz@wlrk.com
ADAM M. GOGOLAK, appearing *pro hac vice*
amgogolak@wlrk.com
SIJIN CHOI, appearing *pro hac vice*
schoi@wlrk.com
JULIA M. BRUCE, appearing *pro hac vice*
jmbruce@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: 212.403.1000

*Attorneys for Defendants Coinbase, Inc. and
Coinbase Global, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| THE STATE OF OREGON, ex rel, DAN RAYFIELD, Attorney General for the STATE OF OREGON,<br><br>            Plaintiff,<br><br>v.<br><br>COINBASE, INC. and COINBASE GLOBAL, INC.,<br><br>            Defendants. | Case No.: 3:25-cv-00952-JR<br><br>**DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**<br><br>Request for Oral Argument |

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................3

ARGUMENT ....................................................................................................11

I.     THE COURT SHOULD NOT ADOPT THE F&R BECAUSE THIS
ACTION WAS PROPERLY REMOVED UNDER *GRABLE*..........................................11

     A.     Contrary to the F&R, Oregon's action necessarily raises a
federal issue that is actually disputed between the parties.....................................12

     B.     The F&R misconstrues the substantial federal interests at stake. ..........................15

II.     THE COURT SHOULD NOT ADOPT THE F&R BECAUSE
REMOVAL WAS INDEPENDENTLY PROPER UNDER THE
FEDERAL-OFFICER REMOVAL STATUTE. ...............................................................18

     A.     Contrary to the F&R, there is sufficient nexus between
Oregon's claims and Coinbase's federal conduct to deny
remand to state court. .............................................................................20

          1.     Coinbase "acts under" the USMS by operating its
trading platform nationwide.......................................................................20

          2.     Contrary to the F&R, this lawsuit bears on Coinbase's
operation of its nationwide trading platform on behalf
of the USMS. .......................................................................................23

     B.     Contrary to the F&R, Coinbase has identified colorable federal
defenses that warrant denial of remand. ..........................................................28

CONCLUSION....................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amerivest Fin., LLC* v. *Malouf*,
    263 Or. App. 327 (Or. App. 2014).........................................................................13

*Butcher* v. *Knudsen*,
    38 F.4th 1163 (9th Cir. 2022) .......................................................................30, 31

*Cal. by & through Harrison* v. *Express Scripts, Inc.*,
    2025 WL 2586648 (9th Cir. Sept. 8, 2025) ................................................26 n. 18

*Cal. ex rel. Lockyer* v. *Dynegy, Inc.*,
    375 F.3d 831 (9th Cir. 2004) .......................................................................17

*Casablanca Prods., Inc.* v. *Pace Int'l Rsch., Inc.*,
    697 F. Supp. 1563 (D. Or. 1988) .........................................................................13

*Cnty. of San Mateo* v. *Chevron Corp.*,
    32 F.4th 733 (9th Cir. 2022) ...............................................................................22

*Cnty. of Santa Clara* v. *Astra USA, Inc.*,
    401 F. Supp. 2d 1022 (N.D. Cal. 2005) .........................................................18

*Coinbase, Inc.* v. *SEC*,
    126 F.4th 175 (3d Cir. 2025) .......................................................................31

*Cohen* v. *Apple Inc.*,
    46 F.4th 1012 (9th Cir. 2022) .............................................................................30

*Computer Concepts Profit Sharing Plan* v. *Brandt*,
    98 Or. App. 618 (Or. App. 1989),
    *aff'd* 310 Or. 706 (1990) .........................................................................13, 14

*Dart Cherokee Basin Operating Co.* v. *Owens*,
    574 U.S. 81 (2014).............................................................................................20

*DeFiore* v. *SOC LLC*,
    85 F.4th 546 (9th Cir. 2023) ....................................................... *passim*

*Durham* v. *Lockheed Martin Corp.*,
    445 F.3d 1247 (9th Cir. 2006) .......................................................................27

*FCC* v. *Fox Television Stations, Inc.*,
    567 U.S. 239 (2012).........................................................................................30

*Flam* v. *Flam*,
788 F.3d 1043 (9th Cir. 2015) ..................................................................11

*Geo Grp., Inc.* v. *Newsom*,
50 F.4th 745 (9th Cir. 2022) (*en banc*) ....................................................29

*Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*,
545 U.S. 308 (2005)...................................................................... *passim*

*Gunn* v. *Minton*,
568 U.S. 251 (2013)....................................................................................15

*Herbal Brands, Inc.* v. *Photoplaza, Inc.*,
72 F.4th 1085 (9th Cir. 2023) ...................................................................32

*In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def.*
*Ass'n of Phila.*,
790 F.3d 457 (3d Cir. 2015)......................................................................25

*Jefferson Cnty., Ala.* v. *Acker*,
527 U.S. 423 (1999)..............................................................................23, 26

*Jost* v. *Locke*,
65 Or. App. 704 (Or. App. 1983)........................................................13, 15

*Leite* v. *Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ..............................................................24, 28

*L.A. Police Protective League* v. *City of Los Angeles*,
2008 WL 11454760 (C.D. Cal. June 20, 2008),
*aff'd*, 314 F. App'x 72 (9th Cir. 2009)....................................................1, 16, 17

*Matsushita Elec. Indus. Co.* v. *Epstein*,
516 U.S. 367 (1996)....................................................................................15

*Merrell Dow Pharms. Inc.* v. *Thompson*,
478 U.S. 804 (1986)....................................................................................17

*Morales* v. *Trans World Airlines*,
504 U.S. 374 (1992)....................................................................................23

*NASDAQ OMX Grp., Inc.* v. *UBS Secs., LLC*,
770 F.3d 1010 (2d Cir. 2014)......................................................................16

*Nevada* v. *Bank of America Corp.*,
672 F.3d 661 (9th Cir. 2012) ......................................................................18

*New York* v. *Arm or Ally, LLC,*
  644 F. Supp. 3d 70 (S.D.N.Y. 2022).................................................2, 14, 15, 18

*Oregon Prescription Drug Monitoring Program* v. *U.S. Drug Enf't Admin.,*
  860 F.3d 1228 (9th Cir. 2017) .....................................................................30

*Oregon* v. *Gen. Nutrition Corp.,*
  2016 WL 3382137 (D. Or. Mar. 30, 2016),
  *adopted by,* 2016 WL 3381247 (D. Or. June 14, 2016)...............................15

*People of State of Cal.* v. *H & H Ship Serv. Co.,*
  68 F.3d 481 (9th Cir. 1995) ..........................................................................32

*Plaquemines Par.* v. *BP Am. Prod. Co.,*
  103 F.4th 324 (5th Cir. 2024),
  *cert. granted,* 145 S. Ct. 2792 (2025) .....................................................19, 25

*Pratt* v. *Kross,*
  276 Or. 483 (1976)................................................................................ *passim*

*Ranck* v. *Mt. Hood Cable Regul. Comm'n,*
  2017 WL 1752954 (D. Or. May 2, 2017) ................................................11, 16

*Sauk-Suiattle Indian Tribe* v. *City of Seattle,*
  56 F.4th 1179 (9th Cir. 2022) .......................................................................15

*Sawyer* v. *Foster Wheeler LLC,*
  860 F.3d 249 (4th Cir. 2017) ...................................................................25, 26

*SEC* v. *Binance Holdings Ltd.,*
  738 F. Supp. 3d 20 (D.D.C. 2024) ................................................................31

*SEC* v. *Coinbase, Inc.,*
  761 F. Supp. 3d 702 (S.D.N.Y. 2025)...........................................................31

*SEC* v. *Glenn W. Turner Enters.,*
  474 F.2d 476 (9th Cir. 1973) ...................................................................12, 13

*SEC* v. *Ripple Labs, Inc.,*
  682 F. Supp. 3d 308 (S.D.N.Y. 2023).............................................................31

*SEC* v. *W.J. Howey Co.,*
  328 U.S. 293 (1946).............................................................................. *passim*

*Smith* v. *Mylan Inc.,*
  761 F.3d 1042 (9th Cir. 2014) ..................................................................21 n.16

*Stirling* v. *Minasian*,
     955 F.3d 795 (9th Cir. 2020) ...................................................................32

*United Hous. Found., Inc.* v. *Forman*,
     421 U.S. 837 (1975)...................................................................................12

*Watson* v. *Phillip Morris Cos., Inc.*,
     551 U.S. 142 (2007)...........................................................................20, 23

*Willingham* v. *Morgan*,
     395 U.S. 402 (1969).......................................................................... *passim*

**Statutes and Rules**

21 U.S.C. § 881(e)(1)(B) ...................................................................................30

21 U.S.C. § 903 ..................................................................................................30

28 C.F.R. § 0.111(i) ...........................................................................................22

28 U.S.C. § 1331 ................................................................................................11

28 U.S.C. § 1441(a) ...........................................................................................11

28 U.S.C. § 1442(a)(1)..............................................................................2, 18, 28

28 U.S.C. § 1653 ........................................................................................ 21 n.16

Fed. R. Civ. P. 72(b)(3)...................................................................................... 11

New York General Business Law § 898-b ......................................................... 14

**Other Authorities**

Removal Clarification Act of 2011, Pub. L. No. 112–51, § 2(b)(1)(A),
     125 Stat. 545 ..................................................................................... 23 n. 17

Restatement (Third) of Agency § 1.01 (2006)...................................................21

U.S. Dep't of Just., Just. Manual § 9-115.100 (2020) ......................................22

## <u>INTRODUCTION</u>

This is a case about regulatory overreach and the ambition of a state attorney general to dictate the future of nationwide digital-asset markets — an intrusion on the province of federal law and federal interests that must be resolved by a federal court.

Dissatisfied with the federal government's recent approach to crypto policymaking and regulation, Oregon's Attorney General brought this action in state court against Coinbase, the nation's largest digital-asset market, in an express bid to "fill" a supposed "enforcement vacuum being left by federal regulators."[1] Parroting allegations previously made by the SEC in a suit since dismissed with prejudice, the Oregon Attorney General contends, for the first time in the decade-plus history since Coinbase's trading platform has been available to Oregonians, that the company participates in the sale of unregistered securities in the state by operating that platform, which is relied upon by customers across the country — and also the U.S. Marshals Service ("USMS"). Coinbase removed the action to this Court because it implicates the company's obligations to the federal government and "issues of potential national importance [that] are the kinds of issues most properly resolved in a federal forum." *L.A. Police Protective League* v. *City of Los Angeles*, 2008 WL 11454760, at *10 (C.D. Cal. June 20, 2008), *aff'd*, 314 F. App'x 72 (9th Cir. 2009).

Oregon moved to remand, and Judge Russo recommended the motion be granted. Dkt. No. 46 ("F&R"). The Court should decline to adopt the F&R, as removal was proper on two grounds:

1.      This Court has jurisdiction because Oregon's claim necessarily raises a substantial issue of federal law that warrants resolution in a federal forum. In concluding otherwise, the magistrate judge erroneously found daylight between Oregon and federal law on the core legal question at issue and ignored the nationwide impact and federal character of this lawsuit.

---

[1]      Or. Dep't of Just., *Oregon Attorney General Rayfield Sues Coinbase for Promoting and Selling High-Risk Investments* (Apr. 18, 2025), https://tinyurl.com/5fmerby4.

This lawsuit hinges on whether certain digital-asset transactions on Coinbase's nationwide platform are "investment contracts" and therefore securities under state law. To answer that question, for 50 years Oregon has adopted *federal* law — the standard set by the U.S. Supreme Court's decision in *SEC* v. *W.J. Howey Company*, 328 U.S. 293 (1946) and applied by its progeny. And whether digital-asset transactions on nationwide platforms meet this standard is a novel and important legal issue, one that urgently calls for "the experience, solicitude, and hope of uniformity that a federal forum offers." *Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Transactions on nationwide exchanges implicate uniquely federal issues, properly heard in federal court. And "although the State brings only state-law claims, the State itself made the decision to incorporate a federal definition into the relevant state law and, thus, took the risk that suits to enforce the law would be removed to federal court." *New York* v. *Arm or Ally, LLC*, 644 F. Supp. 3d 70, 82 (S.D.N.Y. 2022). Having looked to federal law for decades to determine what is, and what is not, an investment contract, Oregon should not now be permitted to escape a federal court deciding that issue in this case.

2.      This action is also subject to removal under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), which permits parties acting on behalf of the federal government to remove suits relating to that work. In applying that statute, the F&R uses the wrong legal standard and ignores binding authority requiring that the allegations of *Coinbase* be credited, instead disregarding the substantial impact of this action on Coinbase's obligations to the USMS.

For years, the USMS has engaged Coinbase as its chosen platform for sales of the digital assets seized by or forfeited to the federal government — including more than half of the digital assets targeted in this action. The USMS retained Coinbase to supply a market where the government can attain the "maximum value" and efficiency for its asset sales — performance

achieved by leveraging the liquidity and scale of Coinbase's nationwide platform. To fulfill that contractual mandate, Coinbase must operate its trading platform on a nationwide basis, without restriction of Oregonians, as part of its performance on behalf of the USMS.

The Attorney General now seeks to drive Oregonians away from Coinbase, prohibiting them from buying scores of popular digital assets from anyone other than the USMS, and prohibiting them from reselling assets acquired from the USMS. The result will be no market in Oregon whatsoever. That the Attorney General purports to allow Oregonians to purchase tokens from the USMS solves nothing. As well-pleaded by Coinbase, that would create a liquidity vacuum that shutters the market for those assets in the state and precludes any sales by the USMS. Moreover, no consumer could participate in a market that results in them holding an asset they cannot subsequently sell without supposedly violating Oregon law. The Attorney General's supposed fix would thus result in the same repercussions for the federal government — effectively halting USMS sales to customers in the state and, more broadly, impairing the nationwide market that Coinbase supplies to the USMS. The impact of the Attorney General's claims on Coinbase's activities for the USMS easily clears the requisite "nexus" threshold and justifies removal.

Applying *de novo* review, the magistrate judge's findings and recommendation should be rejected and remand denied, to ensure that the Oregon Attorney General's invasion of federal interests is litigated in federal court, where it belongs.

## **BACKGROUND**

### A.     **Coinbase's business.**

Founded in 2012, Coinbase offers the nation's largest platform for trading digital assets. First Amended Complaint ("Am. Compl."), Dkt. No. 18 at ¶ 5. Every second of every day, a fully automated matching engine brings together and executes transactions for users around the country

from a central order book. *Id.* ¶¶ 61, 62; Decl. ¶ 3.[2] Coinbase's platform thus supports an integrated and highly liquid national market. Decl. ¶¶ 3, 9.

From inception, Coinbase has invested heavily in efforts to comply with applicable regulatory guidance, including by developing procedures to identify and exclude from listing on its platform any digital assets that might be deemed securities. Notice of Removal ("NOR"), Dkt. No. 1 at ¶ 3. This investment in compliance was validated in April 2021, when the SEC allowed Coinbase's parent to become a publicly traded company — a determination that followed a thorough review of the company's business, including its trading platform. *Id.*

Not once during this period did the SEC, the CFTC, or any other regulator suggest that Coinbase's core business — its trading platform — runs afoul of laws that regulate the offer and sale of unregistered securities. *Id.* Nor did Oregon. To the contrary, Oregon expressly declared that digital assets were "*not* regulated" by the State, and were "similar to . . . gold." NOR ¶ 4.

**B.    The federal government taps Coinbase's trading platform to sell seized and forfeited assets on its behalf.**

Under federal law, the USMS has primary responsibility for managing and selling assets seized by and forfeited to the federal government. For years, the USMS itself managed the custody and sale of the billions in digital assets seized by federal law enforcement. NOR ¶ 24. As this market grew in complexity, however, the USMS decided to retain an outside specialist to perform that work. In December 2022, the agency hired Coinbase to act as its agent in future sales on terms set out in a pair of agreements: the Prime Broker Agreement ("PBA") and the accompanying Master Trading Agreement ("MTA"). *Id.* ¶ 23.

---

[2]    Coinbase incorporates by reference the Declaration of Brian Foster (Dkt. No. 26, "Decl."), which was filed in support of its Opposition to Plaintiff's Motion to Remand (Dkt. No. 25). "Ex. __" refers to the exhibits attached to the declaration.

Coinbase's obligation under these agreements was to sell the seized and forfeited assets for the federal government at the best price then available, per the USMS's direction. *Id.* ¶ 24. Specifically, Coinbase was required to "provide Client [*i.e.*, the USMS] with access to trade execution and automated trade routing services and Coinbase Execution Services . . . to enable Client[] to submit orders . . . to purchase and sell specified Digital Assets . . . ." Ex. 1 (MTA) at 16. The MTA further provided that "[n]either Coinbase nor any Coinbase Entity [would] sell, transfer, loan, rehypothecate or otherwise alienate Client's Assets credited to Client's Trading Balance *unless instructed by Client* pursuant to an agreement between Client and a Coinbase Entity." *Id.* § 2.7 (emphasis added).

At the USMS's direction, Coinbase performed under the agreements by providing the federal government with access to the liquidity and price performance of its nationwide trading platform and services. NOR ¶¶ 23-24; Decl. ¶¶ 3, 5, 7, 9, 15. The central purpose of the agreements was to allow the federal government to tap into the liquidity and price performance of the nationwide private market that Coinbase built — the largest in the country. Decl. ¶¶ 3, 5, 9. To satisfy its obligations to the USMS, Coinbase had to "continuously operate that platform and make it broadly accessible to the national market of purchasers and sellers of digital assets, including purchasers in and outside of Oregon, in order to maintain a highly liquid marketplace for the disposal of the digital assets controlled by the USMS." *Id.* ¶ 15.

To date, Coinbase has sold more than half a million digital assets for the USMS, including transactions in more than half of the specific digital assets targeted by the Attorney General in this action. NOR ¶ 24. Each of these transactions was performed at the specific direction of the USMS, with Coinbase operating as its agent. In each instance, the USMS directed Coinbase to sell specific quantities of specific digital assets at the highest price then-achievable, implementing execution

strategies authorized by federal officials. *Id.* ¶¶ 23, 24; Decl. ¶¶ 7, 16-18. Throughout the life of the agreements, the USMS has applied pervasive oversight to Coinbase's operations — including by regular security audits and demands for detailed reporting. Decl. ¶ 20.

### C. The SEC launches a regulation-by-enforcement campaign, while the USMS enters into a new agreement with Coinbase.

In 2023, the SEC abruptly pivoted its regulatory stance, launching an enforcement sweep against the digital-asset industry. This included an action in June 2023 accusing Coinbase of failing to register as a national securities exchange under the Securities Exchange Act of 1934 ("Exchange Act"). NOR ¶ 5.

While the SEC was suing Coinbase's platform, the USMS continued to rely on the same platform to sell hundreds of millions of dollars in government assets. In March 2024, seeking to expand its use of private companies for the management and disposition of seized digital assets, the USMS posted a "Request for Proposal" that sought bids to fulfill its requirement for managing and disposing of large quantities of popular cryptocurrency assets. Decl. ¶ 8. Following an open solicitation process, on June 28, 2024 the USMS entered into a multi-year services contract with Coinbase, Inc., pursuant to which the company would custody, manage, and dispose of digital assets seized by and forfeited to federal agencies with law-enforcement missions, including many of the digital assets targeted by the Attorney General in this action. *Id.* ¶ 9.

Under the terms of the new agreement (the "RFP Contract"), Coinbase agreed to "remain capable of taking custody of *all* types and quantities of virtual currency *without limitation*" and to "dispose of forfeited virtual currency" upon the request of a designated USMS officer with responsibility for "overall project management and oversight" and "coordinat[ing] the technical aspects" of Coinbase's services. Ex. 2A § 2; Ex. 2B § 9(b)(a) (emphasis added). The RFP Contract further provided that "[o]nce a Government cryptocurrency asset has been approved for disposal,

the USMS will notify [Coinbase] and indicate which asset(s) under custody will be disposed, via exchange or return, through written documentation," with "the ultimate decision regarding the disposal method rest[ing] solely with the USMS." Ex. 2C §§ 2.4, 2.4.1.

As with its prior USMS agreements, Coinbase's ability to provide a highly liquid, efficient national market remained critical. To discharge its responsibilities under the RFP Contract, Coinbase must "provide [the USMS with] a platform that allows for the quick and efficient disposal of cryptocurrency assets," permitting "[d]irect exchange from cryptocurrency into fiat currency where markets exist." *Id.* § 2.4. To service the USMS under the RFP Contract, as under the prior agreement, "it has been and will be necessary for Coinbase to continuously operate that platform and make it broadly accessible to the national market of purchasers and sellers of digital assets, including purchasers in and outside of Oregon, in order to maintain a highly liquid marketplace for the disposal of the digital assets controlled by the USMS." Decl. ¶ 19.

In connection with its performance under the contract, Coinbase expressly agreed that it would serve as an agent of the USMS and a bailee of the federal government. Ex. 2C §§ 1.3, 2.3.5. At all times, Coinbase must operate at the USMS's direction and subject to its guidance, supervision, and control. Decl. ¶ 13. And significantly, Coinbase is duty-bound to "ensure all services in the contract provide *maximum value* while minimizing expenses to the USMS." Ex. 2C § 1.3 (emphasis added).

Although the new agreement was executed in June 2024, it did not take immediate effect due to a series of bid protests filed by one of Coinbase's competitors, which prompted the USMS to issue a stop-work order. Decl. ¶ 10. Pending the final resolution of those protests, Coinbase continued to perform under its existing agreements with the USMS including by and through the operation of its trading platform nationwide. *Id.* ¶¶ 10, 15.

Page 7 – DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION

### D.    The SEC drops its enforcement action and the federal government pursues comprehensive, uniform policymaking.

In early 2025, the SEC dismissed its action against Coinbase, with prejudice. Acknowledging that its enforcement dragnet had created "confusion about what is legal,"[3] and had "evaded sound regulatory practice,"[4] the agency launched a Crypto Task Force charged with developing a comprehensive, clear federal regulatory framework for digital assets. The SEC Chair has since "directed Commission staff across [its] policy Divisions to begin drafting rule proposals related to crypto,"[5] and staff have already issued a series of guidance statements addressing questions about digital assets under federal law.[6] The CFTC has partnered in this initiative.[7]

Congress, too, has redoubled its efforts to develop a tailored framework to govern digital assets. In 2024, the U.S. House of Representatives adopted legislation proposing functional federal requirements for digital-asset markets. In May 2025, the House released an updated, bipartisan draft digital-asset market structure bill.[8] The draft legislation reaffirms that digital assets trading

---

[3]    NOR ¶ 7 (quoting SEC, *SEC Crypto 2.0: Acting Chairman Uyeda Announces Formation of New Crypto Task Force* (Jan. 21, 2025), https://tinyurl.com/e5fekk55, and citing SEC Comm'r Hester M. Peirce, *The Journey Begins* (Feb. 4, 2025) ("[T]he Commission's handling of crypto has been marked by legal imprecision and commercial impracticality."), https://tinyurl.com/36vd3ykx).

[4]    NOR ¶ 7 (quoting SEC Comm'r Hester M. Peirce, *New Paradigm: Remarks at SEC Speaks* (May 19, 2025), https://tinyurl.com/yj8nkm3v).

[5]    NOR ¶ 7 (quoting SEC Chair Paul S. Atkins, *Prepared Remarks Before SEC Speaks* (May 19, 2025), https://tinyurl.com/ywrkctnv).

[6]    NOR ¶ 7 (citing SEC, Div. of Corp. Fin., *Statement on Stablecoins* (Apr. 4, 2025), https://tinyurl.com/bdh3uskt; SEC, Div. of Corp. Fin., *Statement on Certain Protocol Staking Activities* (May 29, 2025), https://tinyurl.com/33jj4t5n).

[7]    NOR ¶ 7 (citing CFTC, *Acting Chairman Pham Lauds DOJ Policy Ending Regulation by Prosecution of Digital Assets Industry and Directs CFTC Staff to Comply with Executive Orders*, Release No. 9063-25 (Apr. 8, 2025), https://tinyurl.com/bdcmcsjf).

[8]    NOR ¶ 8 (citing Digital Asset Market Clarity Act of 2025, H.R. 3633, 119th Cong. (2025), https://tinyurl.com/8v3hw9jn).

on secondary markets like Coinbase's are not securities, and that digital-asset platforms like Coinbase's are to be principally regulated by the CFTC. And three weeks ago, the Senate Banking Committee published a draft for similar legislation.[9]

### E.    Oregon brings a copycat action against Coinbase, purporting to "fill" an "enforcement vacuum being left by federal regulators."

Dissatisfied with federal developments, Oregon's Attorney General sued on April 18, 2025, naming Coinbase, Inc. and its corporate parent Coinbase Global, Inc. as defendants. NOR ¶ 10. The Complaint alleges that transactions in 31 digital assets (the "Digital Assets") are "investment contracts" and that Coinbase offers and sells, or aids and abets the offer and sale of, unregistered securities, because it "created and operated an exchange" where these assets can trade. Am. Compl. ¶¶ 2, 8, 71, 82. The Complaint seeks a $20,000 fine per violation, disgorgement of profits, and an injunction against any future sales of the targeted assets in Oregon. *Id.* at p.162.

The Attorney General's allegations largely parrot those made in the now-dismissed SEC complaints. Indeed, the Complaint cites an SEC report for the proposition that Coinbase has "satisfied the criteria for being an exchange under the Exchange Act." *Id.* ¶ 33 (cleaned up). In announcing this action, the Attorney General touted it as a bid to "fill" a supposed "enforcement vacuum being left by federal regulators who are giving up under the new administration and abandoning [] important cases."[10]

### F.    Coinbase removes the action, the Attorney General moves to remand, and the RFP Contract takes effect.

On June 2, 2025, Coinbase timely removed the action to this Court on the basis that (1) the

---

[9]    *See* Discussion Draft of Responsible Financial Innovation Act of 2025, 119th Cong. (Sept. 5, 2025), https://tinyurl.com/5dwu2vk2.

[10]    NOR ¶ 11 (quoting Or. Dep't of Just., *Oregon Attorney General Rayfield Sues Coinbase for Promoting and Selling High-Risk Investments* (Apr. 18, 2025), https://tinyurl.com/5fmerby4).

case presents a federal question, and (2) the claims target Coinbase's work for the USMS. *See generally* NOR. Either ground independently supports removal.

Seeking to avoid federal jurisdiction, the Attorney General amended his complaint on July 2, 2025 and moved to remand. Dkt. Nos. 18, 19 ("Mot."). The amended complaint sought to exclude claims and relief for "any sale of [digital assets], or any successful solicitation of, or any participation in or material aid of, any sale of [digital assets] by or on behalf of the [USMS]." Am. Compl. ¶ 503.

On June 24, 2025, in the midst of remand briefing, the USMS informed Coinbase that the existing challenge to the RFP Contract had been resolved, and that the government was prepared to proceed under this new agreement. Accordingly, Coinbase ceased performance under the PBA and MTA and commenced performance under the RFP Contract. Decl. ¶ 10.

Because Coinbase provided services to the USMS solely under the RFP Contract as of June, this new operative agreement would be implicated by the injunction sought by the Attorney General. Accordingly, on July 16, 2025, Coinbase described these developments in its Opposition to Plaintiff's Motion to Remand, Dkt. No. 25 ("Opp."), which it filed together with a declaration from a knowledgeable employee that described Coinbase's relationship with the USMS and the company's performance under its federal contracts, *see generally* Decl.

On July 30, the Attorney General filed his Reply in Support of Plaintiff's Motion to Remand. Dkt. No. 31. The Attorney General did not introduce any declaration, affidavit, or other evidence seeking to rebut Coinbase's sworn written testimony. *See id.*

### G.    Judge Russo recommends remand.

On September 12, 2025, Magistrate Judge Jolie A. Russo issued her Findings and Recommendation in favor of remand, without hearing oral argument. *See generally* F&R. The F&R concludes the Attorney General's claims do not present a federal question, reasoning that

Page 10 – DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION

state and federal securities law differ, *id.* at 6-7, and that "the interest at stake is state-based, not federal – i.e., the Oregon Attorney General's interest in enforcing a state-specific regulatory scheme and in protecting state residents," *id.* at 9. Judge Russo also recommends that the Court reject an application of the federal-officer removal statute, concluding that Coinbase failed to show that its challenged conduct was mandated by the terms of its federal contracts. *Id.* at 15.

## ARGUMENT

In reviewing the F&R, this Court "must determine *de novo* any part of [Judge Russo's] disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see Flam* v. *Flam*, 788 F.3d 1043, 1047 (9th Cir. 2015) (remand recommendation to be reviewed *de novo*). Here, the F&R should be rejected and remand denied.

## I. THE COURT SHOULD NOT ADOPT THE F&R BECAUSE THIS ACTION WAS PROPERLY REMOVED UNDER *GRABLE*.

A civil action commenced in state court may be removed to federal court if it "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see* 28 U.S.C. § 1441(a). Federal-question removal applies not only in cases where the complaint asserts a federal claim, but also where asserted state-law claims raise substantial federal issues that "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312.

Under *Grable*, a state-law claim is properly removed where it "contains a federal issue that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance." *Ranck* v. *Mt. Hood Cable Regul. Comm'n*, 2017 WL 1752954, at *2 (D. Or. May 2, 2017). The F&R concludes that Oregon's action does not satisfy the first, third, and fourth requirements of this test. Those findings were in error and should not be adopted. This Court should instead find this suit properly removed under *Grable*.

A.     **Contrary to the F&R, Oregon's action necessarily raises a federal issue that is actually disputed between the parties.**

As the F&R acknowledges, the Attorney General's claims are all predicated on the theory that transactions in the Digital Assets qualify as "investment contracts," and thus securities, under Oregon law. F&R at 6. In analyzing this "central question," the F&R finds that the Attorney General's action does not necessarily raise a federal issue because Oregon's definition of investment contract "neither refers to nor incorporates federal law." *Id.* According to the F&R, the Oregon Supreme Court in *Pratt* v. *Kross*, 276 Or. 483 (1976), "revised" the federal standard for the determination of an investment contract established by the U.S. Supreme Court in *SEC* v. *W.J. Howey Company*, 328 U.S. 293 (1946) and, as a result, "Oregon courts have not strictly followed the *Howey* test in determining what constitutes an 'investment contract' under the OSL." *Id.* So, the F&R concludes, the "major takeaway from this line of cases is that Oregon is not bound by *Howey* or any other federal standard in determining the existence of a regulated security under the OSL." *Id.* at 7. This Court should reject those findings because they misstate Oregon law.[11]

Contrary to the F&R, the *Pratt* Court did not "revise" or invent out of whole cloth a "modification" of *Howey*, nor did the test stated in *Pratt* mark any departure from federal law. To the contrary, the *Pratt* Court's application of *Howey* simply reflected, and adopted, how the *Howey* standard had been applied over time by the federal courts — most notably, by the U.S. Supreme Court in *United Housing Foundation* v. *Forman*, 421 U.S. 837, 852 (1975), and the Ninth Circuit in *SEC* v. *Glenn W. Turner Enterprises*, 474 F.2d 476, 481-82 (9th Cir. 1973). *See, e.g.*, *Pratt*, 276

---

[11]    The U.S. Supreme Court held in *Howey* that an investment contract "means a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298-99. Thirty years later, the Oregon Supreme Court in *Pratt* expressly adopted *Howey* as the proper test for determining an "investment contract" under Oregon law, framing the final *Howey* element as focused on the "management and control of others." 276 Or. at 497.

Or. at 496-97 (discussing *Forman* and *Glenn W. Turner*'s modification of *Howey*); *Computer Concepts, Inc. Profit Sharing Plan* v. *Brandt*, 98 Or. App. 618, 624 n.7 (Or. App. 1989) ("In *Pratt* v. *Kross*, the Supreme Court followed *Forman*, in modifying the *Howey* test, using the analysis in *Glenn W. Turner*." (cleaned up)), *aff'd*, 310 Or. 706 (1990). Indeed, only a few years after *Pratt* was decided, the Oregon Court of Appeals observed that "the Oregon Supreme Court, in *Pratt* v. *Kross*, recognized that *Howey* is unduly restrictive and therefore **adopted** Forman's **restatement of the** Howey **test**." *Jost* v. *Locke*, 65 Or. App. 704, 716 (Or. App. 1983) (cleaned up; emphasis added). *Pratt* thus was not, as the F&R frames it, a "departure" from *Howey*, F&R at 7; it was a wholesale embrace of *Howey*, as it was then being applied by the federal courts.

It is therefore error to find that "Oregon can independently determine what constitutes an investment contract pursuant to the OSL without deference to or the presumption of primacy of *Howey* or its progeny." F&R at 8. Oregon courts have consistently deferred to, and indeed "adopted," the federal courts' application of this federal standard, and by consequence incorporated federal law into their own jurisprudence regarding the definition of "investment contract" under Oregon law. *Jost*, 65 Or. App. at 716; *see Amerivest Fin., LLC* v. *Malouf*, 263 Or. App. 327, 336-37 & n.8 (Or. App. 2014) (citing *Computer Concepts*, 310 Or. at 714 & n.7) (noting that "Oregon's modification of the *Howey* test" runs in "parallel [with the] modification of the test in federal courts"). That is why, for nearly half a century since *Pratt*, there has been no daylight between Oregon and federal law in determining whether a transaction forms an investment contract. *See, e.g.*, *Casablanca Prods., Inc.* v. *Pace Int'l Rsch., Inc.*, 697 F. Supp. 1563, 1566 & nn.1-2 (D. Or. 1988) (applying *Glenn W. Turner* to resolve whether general partnership was a "security" under both federal and Oregon law, and noting it was unnecessary to conduct a separate analysis under *Pratt* because both cases would furnish the same outcome).

And while the F&R states that "[g]iven the distinction between the Oregon and federal tests, a financial product can be an investment contract under *Pratt* but not under *Howey*," it cites nothing for that proposition. F&R at 7. That is not surprising. Oregon's so-called "modified" test *is* the federal standard, as *Pratt* and its progeny have acknowledged.

Similarly flawed is the F&R's fleeting reliance on the so-called "risk capital" test. F&R at 7. That test has been dead letter in Oregon for decades, and the Attorney General does not seriously contend that it applies in this action.[12] This is why the Amended Complaint borrows wholesale the allegations from the SEC's complaint (despite its dismissal with prejudice) in alleging that the Digital Assets are "investment contracts" — because the Attorney General seeks to satisfy the same federal standard. As the Oregon Court of Appeals observed *36 years ago*: *Pratt* "reduced the need for the alternative [risk capital] test, and no Oregon appellate court has since relied on the risk capital test." *Computer Concepts*, 98 Or. App. at 624 n.7.

For these reasons, the F&R's attempt to distinguish *New York* v. *Arm or Ally, LLC*, 644 F. Supp. 3d 70 (S.D.N.Y. 2022) is unavailing. In *Arm or Ally*, the New York Attorney General filed suit against certain gun manufacturers and sellers for the sale of "ghost guns," alleging a violation of New York General Business Law § 898-b, which applied to "gun industry member[s]" who sell a "qualified product." *Id.* at 75, 78. The statute in turn adopted the federal definition of "qualified product." *Id.* at 78. On those facts, the court found that the action "necessarily raised" a federal question, because "to prevail on its claim that Defendants' conduct falls under General Business Law § 898-b(1), . . . the State must demonstrate that the products at issue . . . were 'firearms' or 'component parts' thereof within the meaning of federal law." *Id.* at 78-79.

---

[12]    The "risk capital" test applies when an investor contributes capital to finance an enterprise. *See Pratt*, 276 Or. at 490. There is no claim here — nor could there be — that any person trading on Coinbase's secondary market platform contributes capital to any enterprise.

Page 14 – DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION

The same result obtains here. The Oregon Securities Law under which the Attorney General's claims arise applies to "investment contracts," which the Oregon Supreme Court has held has the same meaning as under federal law, *i.e.*, in accordance with "*Forman*'s restatement of the *Howey* test." *Jost*, 65 Or. App. at 716. In other words, the Oregon Supreme Court in *Pratt* bound Oregon courts to apply the federal standard when it adopted the federal courts' modified *Howey* test as its own, just as the state legislature had in *Arm or Ally*. *See Pratt*, 276 Or. at 496-97. So to prevail on the theory that Coinbase's conduct falls within the Oregon Securities Law, the Attorney General must establish that the digital-asset transactions alleged in the Complaint involve investment contracts "within the meaning of federal law." The action thus necessarily raises a federal issue, satisfying *Grable*'s first prong. *See Oregon* v. *Gen. Nutrition Corp.*, 2016 WL 3382137, at *5 (D. Or. Mar. 30, 2016) (finding federal issue necessarily raised where Oregon "relies on the federal definition to establish the 'unlawfulness' element of its UTPA claims"), *adopted by*, 2016 WL 3381247 (D. Or. June 14, 2016).

## B.    The F&R misconstrues the substantial federal interests at stake.

Under *Grable*'s third and fourth prongs, courts look to the "importance of the issue to the federal system as a whole," *Gunn* v. *Minton*, 568 U.S. 251, 260 (2013), and whether denying remand would disrupt the "congressionally approved balance of federal and state judicial responsibilities," *Sauk-Suiattle Indian Tribe* v. *City of Seattle*, 56 F.4th 1179, 1185 (9th Cir. 2022) (quoting *Grable*, 545 U.S. at 314). The F&R states that these factors "counsel against removal" based on two findings: *first*, that the "interest at stake is state-based, not federal – i.e., the Oregon Attorney General's interest in enforcing a state-specific regulatory scheme and in protecting state residents"; and *second*, that "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions." F&R at 8-9 (quoting *Matsushita Elec. Indus. Co.* v. *Epstein*, 516 U.S. 367, 383 (1996)). Neither ground withstands scrutiny.

At the outset, in describing this case as "state-based," the F&R ignores that all of the transactions at issue take place on Coinbase's *nationwide* platform. Each and every transaction the Attorney General seeks to regulate involves not just an Oregonian buyer but also a seller, who could be resident in any number of other U.S. jurisdictions. And the necessary predicate of the Attorney General's claims is that all of those sellers, all around the country, have likewise violated Oregon law by selling unregistered securities on Coinbase's platform. The interests implicated by the action thus reach far beyond Oregon's borders.

The F&R also ignores that if the Attorney General were successful in establishing that the transactions at issue are "investment contracts," that would mean that Coinbase is a national securities exchange subject to the Exchange Act. The regulation of such exchanges is indisputably the province of the *federal* government, *see NASDAQ OMX Grp., Inc.* v. *UBS Secs., LLC*, 770 F.3d 1010, 1024-25 (2d Cir. 2014) (discussing national importance of regulation of securities exchanges) — the Attorney General's action therefore threatens wide-ranging consequences for the regulation of all nationwide digital-asset platforms. *See, e.g.*, *L.A. Police Protective League*, 2008 WL 11454760, at *10 (removal warranted because action implicated "issues of potential national importance" "most properly resolved in a federal forum").

Ensuring that nationwide platforms like Coinbase's are subject to a uniform set of rules is critical to the efficient operation of those markets. The F&R's blinkered portrait of the interests at stake as "state-based, not federal" would allow "disparate state courts to establish different standards" for digital-asset transactions under federal law, hobbling digital-asset platforms with a patchwork of state-based rules and regulations. *See Ranck*, 2017 WL 1752954, at *3 (noting Congress intended the Cable Communications Policy Act to establish uniform national standards for cable companies and franchises and that allowing state courts to establish different fee

standards could undermine that uniformity). Contrary to the F&R, the need for uniformity underscores the "importance of the issue to the federal system as a whole." *Id.*

In recognition of the substantial federal interests at stake, Congress, the SEC, and the CFTC have been actively working to develop uniform rules for crypto transactions.[13] *See supra* pp. 8-9. The Attorney General's decision to act in contravention of these efforts, with the unabashed objective to "fill the enforcement vacuum [] left by federal regulators," plainly implicates "issues of potential national importance," "the kinds of issues most properly resolved in a federal forum." *L.A. Police Protective Leagues*, 2008 WL 11454760, at *10; *see also Cal. ex rel. Lockyer* v. *Dynegy, Inc.*, 375 F.3d 831, 843 (9th Cir. 2004) (finding removal jurisdiction where "California's state claim represented a naked attempt to enforce . . . federal obligations").

Finally, the F&R applies the wrong standard under the fourth *Grable* factor. The magistrate judge weighs that factor to counsel against removal on the ground that "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions," F&R at 9 — effectively finding removal warranted only where Congress has expressly preempted the action at issue, *id.* (noting that "[h]ad Congress wanted to 'preclude the operation of state laws' and place 'supervision' of securities regulation exclusively 'in the hands of' the U.S. Securities and Exchange Commission and federal courts, it could have."). But as the Supreme Court recognized in *Merrell Dow Pharms. Inc.* v. *Thompson*, 478 U.S. 804 (1986), there is no "bar [to] federal jurisdiction over state claims in the absence of preemption," and thus a state-law action that is not preempted under the federal securities laws may still be properly removed to

---

[13]    The F&R tries to brush aside that "Congress is examining cryptocurrency legislation," arguing "Congress has been considering such legislation for years but has yet to take any concrete action that could alter the federal-state regulatory balance." F&R at 9. But Congress's continued focus on the issue confirms that regulation of digital assets implicates substantial federal interests.

federal court if it satisfies *Grable*. *Cnty. of Santa Clara* v. *Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1030 (N.D. Cal. 2005) (discussing *Merrell Dow*).

In contrast to the situation in *Nevada* v. *Bank of America Corporation*, 672 F.3d 661 (9th Cir. 2012), the Attorney General here seeks to regulate transactions involving individuals located around the country through state laws that have adopted the federal test for "investment contract." *Cf. Nevada*, 672 F.3d at 674-76 (state-law action alleging violations of state consumer protection laws involving only Nevada residents was properly remanded). Since "the State itself made the decision to incorporate a federal definition into the relevant state law and, thus, took the risk that suits to enforce the law would be removed to federal court," the Attorney General should not be allowed to deprive Coinbase of its right to defend this action in federal court. *Arm or Ally*, 644 F. Supp. 3d at 82. The Court should therefore decline to adopt the F&R and instead find that the action was properly removed under *Grable*.

## II.    THE COURT SHOULD NOT ADOPT THE F&R BECAUSE REMOVAL WAS INDEPENDENTLY PROPER UNDER THE FEDERAL-OFFICER REMOVAL STATUTE.

The Court should also retain jurisdiction under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), which permits removal of civil actions brought against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." *Id.* That law's protection extends to companies, like Coinbase, that act on behalf of the federal government. *See DeFiore* v. *SOC LLC*, 85 F.4th 546, 553, 555 (9th Cir. 2023). Because "the statute vindicates the interests of government itself in preserving its own existence," it must be interpreted "broadly in favor of removal." *Id.* at 553 (cleaned up). Under this "generous and liberal construction," removal is proper where (1) "there is a causal nexus between [the defendant's] actions, taken pursuant to a federal officer's directions, and plaintiff's claims" and (2) the defendant "can assert a colorable federal defense." *Id.*

Coinbase satisfies both elements of this test, notwithstanding the Attorney General's post-removal effort to disclaim relief arising out of the sale of USMS Digital Assets to Oregon residents. As Coinbase has alleged, its work for the federal government is not limited to those direct sales, because it contracted not just to sell digital assets for the federal government but also to supply a *market* for their sale — a contractual obligation that necessitates the operation of Coinbase's trading platform on a nationwide basis, without restriction of Oregonians. In this action, the Attorney General seeks to shutter that platform in Oregon, eliminate any private market for the re-sale of the Digital Assets in the state, and thereby directly target Coinbase's past and future performance under its federal contracts.

In recommending remand, the F&R improperly disregards these well-pleaded facts and instead focuses narrowly on whether Coinbase's USMS contracts themselves specifically direct the company to operate a market in Oregon for the sale of Digital Assets. This was error, for several reasons: *First*, the F&R's "contract-directive" test is contrary to Ninth Circuit law. Indeed, the F&R's sole support for that inquiry is an outlier opinion issued by a divided panel of the Fifth Circuit — an opinion which the Supreme Court already has granted *certiorari* to review this Term in an appeal that will also weigh the continued vitality of "causal" nexus as a condition to removal. *See Plaquemines Par.* v. *BP Am. Prod. Co.,* 103 F.4th 324 (5th Cir. 2024), *cert. granted*, 145 S. Ct. 2792 (2025).[14] *Second*, contrary to binding authority, the magistrate judge's analysis fails to credit Coinbase's theory of nexus, relying instead on a misreading of the USMS contracts and on the artful pleading of the Attorney General. *Finally*, due in part to that crabbed reading of

---

[14] While Coinbase recognizes that Ninth Circuit authority requires a "causal nexus," it reserves argument on this point pending decision by the Supreme Court in *Plaquemines*. In the likely event that the Supreme Court clarifies its federal-officer-removal jurisprudence in that decision, Coinbase respectfully requests permission to supplement this briefing.

Coinbase's federal conduct, the F&R misconstrues Coinbase's federal defenses and fails to properly assess that they are colorable.

For these reasons, and as further set out below, remand should be denied so that Coinbase may present its federal defenses in the federal forum.

**A.  Contrary to the F&R, there is sufficient nexus between Oregon's claims and Coinbase's federal conduct to deny remand to state court.**

Courts in this Circuit evaluate nexus in two steps. First, a removing party must plead that it was "acting under a federal officer in performing some act under color of federal office." *DeFiore*, 85 F.4th at 554 (internal quotation omitted). Next, the removing party must allege that its activities on behalf of the federal government are "connected or associated with" the conduct charged in the plaintiff's complaint. *Id.* at 557 n. 6. This statutory hurdle is "quite low," *id.* at 557 (internal quotation omitted) — both because the requisite showing is slight and because, at both stages of the analysis, the Court must credit *Coinbase's* "version of the facts," *Willingham* v. *Morgan*, 395 U.S. 402, 409 (1969), under the federal notice-pleading standard, *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81, 87 (2014). Coinbase easily clears that low hurdle.

**1.  Coinbase "acts under" the USMS by operating its trading platform nationwide.**

A person "act[s] under" a federal officer when engaged in "an effort to assist, or to help carry out, the duties or tasks of" that officer. *Watson* v. *Phillip Morris Cos., Inc.*, 551 U.S. 142, 152 (2007) (emphasis omitted). Where a company contracts with the federal government, this standard is met through allegations that *either* (a) the company's "assistance . . . goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks," *id.* at 153, *or* (b) it serves as an "agent" of the federal government "under common-law agency principles." *DeFiore*, 85 F.4th at 556. While the F&R does not resolve the "acting under" question, the magistrate judge's findings and the pleaded facts make clear that Coinbase's work on behalf

Page 20 – DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION

of the USMS meets both conditions, with each independently sufficient.[15]

As the F&R recognizes, Coinbase's current contract with the USMS — the RFP Contract — is a "bespoke agreement calibrated to the federal government's unique specifications, replete with detailed auditing and reporting requirements, through which Coinbase offers services that are not available to the general public." F&R at 14 (internal quotation omitted).[16] Under the plain terms of that agreement, the USMS requires Coinbase, "as its *agent*, to take prudent action and good faith on the USMS's behalf." Ex. 2C § 1.3 (emphasis added). In addition, Coinbase is obligated to "operate at all times under [the] direction and control" of the USMS, with the federal government "retain[ing] 'ultimate decision making' authority surrounding investment and disposal of the underlying cryptoassets." F&R at 14 (citing Ex. 2A at 1, Ex. 2B at 1-3, Ex. 2C at 1-6, 9). Accordingly, as acknowledged by the F&R, Coinbase serves as an agent of the USMS, by "act[ing] on the [USMS's] behalf and subject to [its] control" in connection with its performance under that contract. *DeFiore*, 85 F.4th at 556 (quoting Restatement (Third) of Agency § 1.01).

---

[15]    The F&R asserts that a removing party must show conduct "akin to an agency relationship . . . *and* helping fulfill basic governmental tasks that implicate a significant risk of state-court prejudice." F&R at 12 (internal quotation omitted; emphasis added). That was error; removal is proper upon a showing of either. *See DeFiore*, 85 F.4th at 556 (holding that "serving as the government's common-law agent satisfies the statute's 'acting under' requirement"); *id.* at 569 (Collins, J., dissenting) (criticizing the majority's conclusion that the "basic governmental task" requirement "only appl[ies] if the defendant is not an agent of the Government").

[16]    The RFP Contract took effect weeks after removal in this case, at which point Coinbase properly raised it in further opposition to remand. The F&R notes this timing and the absence of briefing on its "potential impact." F&R at 13-14. The Attorney General has waived any argument on the point by failing to assert it. *See Smith* v. *Mylan Inc.*, 761 F.3d 1042, 1044-45 (9th Cir. 2014). And in any event, the Ninth Circuit has consistently approved of efforts by defendants to update the record concerning their federal relationships following removal. *See, e.g.*, *DeFiore*, 85 F.4th at 559 n.10 (taking judicial notice of a declaration filed after appeal, noting that defendants can freely amend at any point to "clarif[y] the factual underpinnings of [a] previously asserted basis for removal" (internal quotation omitted)). Nevertheless, in the alternative, Coinbase also requested leave from Judge Russo to amend its Notice of Removal pursuant to 28 U.S.C. § 1653, and renews that request here if necessary. *See* Opp. at 4-5 n.3.

Moreover, as Judge Russo correctly found, Coinbase's "contracts with the USMS help fulfill a basic governmental task," F&R at 14, because its role is one "that the Government itself would have had to perform if it had not contracted with a private firm." *Cnty. of San Mateo* v. *Chevron*, 32 F.4th 733, 756-57 (9th Cir. 2022) (internal quotation omitted). There is no dispute that prior to retaining Coinbase, the USMS both sold and supplied a market for the digital assets seized by and forfeited to the federal government. *See supra* p. 4. Nor can it plausibly be denied that this activity is one of the USMS's core regulatory responsibilities. *See* 28 C.F.R. § 0.111(i); U.S. Dep't of Just., Just. Manual § 9-115.100 (2020).

Significantly, Coinbase's work for the USMS extends far beyond the direct sale of federal Digital Assets, which is the only activity excluded by the Amended Complaint's disclaimer. Among its other contractual undertakings to the federal government, Coinbase must "provide a platform that allows for the quick and efficient disposal of cryptocurrency assets," including by supplying the USMS with "direct access to a cryptocurrency exchange that converts cryptocurrency into fiat currency," Ex. 2C §§ 2.4; 2.4.1; *see also id.* § 2.4.1.2 (requiring the use of a USMS "pre-approved, U.S. based" exchange). As with all other services provided under that contract, Coinbase must "ensure" that this platform "provide[s] maximum value while minimizing expenses to the USMS," *id.* § 1.3. And "[i]n order to provide this service, it has been and will be necessary" — as a matter of undisputed fact — "for Coinbase to continuously operate [its nationwide trading] platform and make it broadly accessible to the national market of purchasers and sellers of digital assets, including purchasers in and outside of Oregon, in order to maintain a highly liquid marketplace for the disposal of the digital assets controlled by the USMS." Decl. ¶ 19. Coinbase's operation of its pre-approved trading platform, in Oregon and elsewhere, is thus

a central and necessary element of its effort to "assist" the USMS in fulfilling its statutory obligation to sell the federal government's Digital Assets. *Watson*, 551 U.S. at 152.

### 2. Contrary to the F&R, this lawsuit bears on Coinbase's operation of its nationwide trading platform on behalf of the USMS.

Coinbase has also shown that its work for the USMS is implicated by this lawsuit. In evaluating that nexus, the Court must look "'not just' [to] the specific challenged acts" of the removing party, but more broadly to the "'circumstances that gave rise to the' claim against" it. *DeFiore*, 85 F.4th at 557 (quoting *Jefferson Cnty.* v. *Acker*, 527 U.S. 423, 433 (1999)). And to support removal, the relationship between these circumstances and a defendant's conduct *need not* be "causal," *id.* at 557 n.6 — removal is proper where a defendants' federal conduct merely "stand[s] in some relation," "ha[s] bearing or concern," or "pertain[s]," to the "circumstances that gave rise to the claim[s] against [it]," *id.* at 557 & n.6 (quoting *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) and *Jefferson Cnty.*, 527 U.S. at 431).[17]

Here, Oregon seeks to hold Coinbase liable for "creat[ing] and operat[ing] an exchange for the purchase and sale of crypto assets" and thus allegedly "solicit[ing], participat[ing] in, and materially aid[ing] the sale of unregistered securities to Oregonians." Am. Compl. ¶ 2. As discussed above, Coinbase's performance of its agreements with the USMS *necessitates* the operation of that same nationwide platform to supply the pre-approved market that the government hired Coinbase to deliver — a market that reaches purchasers throughout the United States, with the scale to attain the best price available for the federal government's Digital Assets. *See supra*

---

[17]     The "causal" descriptor in this Circuit's case law is an artifact of an earlier version of the statute, which allowed removal of suits only "for any act under color of [federal] office." The law was broadened to its current form in 2011, however, permitting removal of suits "for *or relating to* any act under color of [federal] office." *See* Removal Clarification Act of 2011, Pub. L. No. 112–51, § 2(b)(1)(A), 125 Stat. 545 (emphasis added). While the Ninth Circuit continues to use the "causal nexus" label, the Court has recognized that the term now "incorporates the 'connected or associated with' standard." *DeFiore*, 85 F.4th at 557.

pp. 5, 7. And the Attorney General's disclaimer changes nothing about the federal interests at stake. The Attorney General argues that Oregonians could supposedly purchase USMS tokens on the Coinbase platform. But as well-pleaded by Coinbase (to be credited as a matter of law at this stage), precluding Oregon residents from buying Digital Assets from anyone but the USMS would create a liquidity vacuum that would shutter the market for those assets in the state and preclude any sales by the USMS as well. Decl. ¶¶ 15, 19. What's more, it's unclear *why* Oregonians would purchase a token from the USMS when the Attorney General precludes them from reselling such tokens. In other words, the Attorney General's fix is predicated on: (1) a market that doesn't exist (a USMS-only exchange), and (2) Oregonians willingly purchasing tokens they can never resell. That's not a fix; it's a fiction — and critically, one belied by Coinbase's pleadings. For all these reasons, the Attorney General's suit would affect the nationwide scale and liquidity of the market the USMS engaged Coinbase to supply, and therefore bears a direct and unavoidable relationship to Coinbase's activity on behalf of the federal government, regardless of the disclaimer.

The F&R nevertheless counsels remand for failure to plead nexus. It does not, however, ground that guidance in the law of this Circuit — which would permit such remand only upon finding that even crediting *Coinbase's* theory of nexus, the Attorney General's claims have *zero* bearing upon and *no* relationship to Coinbase's performance under its USMS contracts. Far from that required inquiry, the F&R discards Coinbase's allegations and erects novel legal hurdles that cannot be reconciled with binding precedent. The Court should not adopt this analysis:

1.    In this Circuit, it is well-settled that "whether the challenged act was outside the scope of [a defendants'] official duties, or whether it was specifically directed by the federal Government, is one for the federal — not state — courts to answer." *Leite* v. *Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014). For that reason, the Court of Appeals has expressly rejected a "separate

nexus requirement that a defendant's challenged actions must have been under color of a federal officer's office." *DeFiore*, 85 F.4th at 558 n.7 (holding that security contractor did not need to identify provisions in federal contract that compelled conduct at issue). And this rule is rooted in clear authority from the Supreme Court, which has explained that when "the question raised is whether [defendants asserting federal-officer removal] were engaged in some kind of 'frolic of their own' in relation to [a plaintiff]" — as the Attorney General claims here, with respect to the operation of Coinbase's trading platform in Oregon — "then they should have the opportunity to present their version of the facts to a *federal*, not a *state* court." *Willingham*, 395 U.S. at 409 (emphasis added) (permitting federal warden to remove prisoners' claims of assault, without any showing that the warden was directed or duty-bound to commit assault).

The F&R flouts this foundational principle, finding removal appropriate only where Coinbase can "identify [a] provision" in its federal contracts "demonstrat[ing]" that it "sold allegedly unregistered [securities] . . . *at the USMS' direction*." F&R at 15 (emphasis added); *see also id.* at 17 ("[D]efendants do not cite to any provision of the RFP Contract suggesting the USMS hired them specifically to maintain a certain amount of nationwide liquidity (or, by extension, that would be breached by reducing liquidity from Oregon users).").

The F&R offers just one precedent for this novel precondition to removal — a recent opinion from a divided panel of the Fifth Circuit in *Plaquemines Parish* v. *BP Am. Prod. Co.*, 103 F.4th 324 (5th Cir. 2024). But that case is an outlier that lacks force here; the Fifth Circuit stands alone in adopting the "contractual-directive" test, which has been rejected not just by the Ninth Circuit, but by every other appellate court to have considered it. *See In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 470-72 (3d Cir. 2015) (nexus requirement satisfied despite lack of any explicit federal direction); *Sawyer* v. *Foster*

*Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (statute does not "demand[] a showing of a specific government direction," because it is enough "that the charged conduct *relate* to an act under color of federal office"). And to make matters worse, the Supreme Court has granted *certiorari* to review *Plaquemines*, in an appeal that will decide not only the validity of the Fifth Circuit test the F&R would adopt but also what degree of nexus is required under the federal-officer removal statute. *Chevron USA Inc.* v. *Plaquemines Par., La.*, 145 S. Ct. 2792 (2025); *see also id.*, Brief for the United States as Amicus Curiae Supporting Petitioners at 28, https://tinyurl.com/4cs72jd2 (collecting cases and urging reversal of *Plaquemines*).

The F&R's reliance on *Plaquemines* cannot be justified. Absent guidance from the Supreme Court, the majority rule continues to govern removal here. And under that rule, the nexus determination turns not on whether Coinbase's challenged conduct was specifically directed by a federal contract, but instead on whether that conduct was in some manner "*connected* or *associated*" with Coinbase's work for the USMS. That low bar is met here.[18]

2.    In addition to applying the wrong standard, the F&R also misconstrues the well-pleaded factual record. As set out above, binding authority compels this Court to credit Coinbase's theory of nexus in assessing Oregon's remand motion. *See Willingham*, 395 U.S. at 409; *Jefferson Cnty.*, 527 U.S. at 431 ("Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint."). This rule is intended to ensure a

---

[18]    The Ninth Circuit's recent decision in *California by & through Harrison* v. *Express Scripts, Inc.*, 2025 WL 2586648 (9th Cir. Sept. 8, 2025) is not to the contrary. In that case, unlike here, the Ninth Circuit rejected defendants' theory of federal-officer removal because it rested on a mistaken interpretation of the state law that supported the plaintiff's claims and a bare assertion that the defendants "provided the same type of services for federal and non-federal clients." *Id.* at *4, 12. Coinbase's theory of nexus, meanwhile, is that the operation of its nationwide platform is a necessary part of its performance under its federal contract, as a factual matter, and therefore that the federal and non-federal work are not just similar or parallel but rather part and parcel of the same essential nationwide marketplace.

federal forum even where the federal relationship is latent or subtle, consistent with the protective purpose of the removal statute. *See Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006) (statute is interpreted broadly to capture circumstances where "[f]ederal government officers and their agents [] get into trouble when they act within the States").

The F&R advises the Court to take a different tack, by *rejecting* Coinbase's detailed allegations concerning its federal conduct and instead emphasizing that the Attorney General's pleadings do not assert that Coinbase "violated the OSL . . . in connection with any of the services [it] provided to the USMS." F&R at 16. To justify that backwards approach, the F&R asserts that Coinbase's allegations of nexus are "contradict[ed by] the express terms of" the USMS contracts. *Id.* at 16 n.3. But the F&R nowhere identifies these "contradictory" contract terms,[19] because it cannot. In fact, as explained above, Coinbase's current agreement with the USMS expressly requires it to provide access to a "pre-approved" cryptocurrency exchange, and Coinbase complies with this obligation by operating and maintaining the nationwide trading platform that the Attorney General now targets. *See supra* pp. 5, 7, 22.

And even if the USMS contracts lacked that requirement, removal would still have been appropriate. Opposing remand, Coinbase explained that in order to provide the trading services under those contracts, "it has been and will be necessary for Coinbase to continuously operate that platform and make it broadly accessible to the national market of purchasers and sellers of digital assets, including purchasers in and outside of Oregon." Decl. ¶ 19. This undisputed allegation,

---

[19]    The F&R elsewhere flags provisions of the USMS contracts under which Coinbase agreed to comply with "any applicable state and federal laws" in connection with its performance. F&R at 17-18. But this is simply another reason why removal is warranted, because the Attorney General is seeking to litigate "whether the challenged act[s were] outside the scope of [Coinbase's] official duties," a question that Coinbase is entitled to have resolved by a federal court when it presents its federal defenses. *DeFiore*, 85 F.4th at 558 n.7.

standing alone, is sufficient to establish nexus, because it supplies a direct "connection" between Coinbase's federal conduct and this action.

3.     Finally, the F&R improperly requires a showing that the relief sought by the Attorney General would not only block Coinbase from supplying the USMS with a market for the targeted Digital Assets, but *also* prevent Coinbase from "executing orders submitted by USMS to sell the many crypto assets that are *not* at issue in" the Amended Complaint. F&R at 17 (emphasis added; alternations omitted). The magistrate judge thus concludes that remand is warranted because the Attorney General "does not challenge [Coinbase's] broader operation of its trading platform." *Id.* at 18. Again, this gets it exactly backwards. Under § 1442, removal is justified upon a showing of *any* nexus between the circumstances giving rise to the claim and a defendant's federal conduct, to ensure that the defendant can assert its federal defense — however colorable, however partial — in a federal forum. *See DeFiore*, 85 F.4th at 557 n.6 ("Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office."). If the F&R had it right, then a defendant would be stripped of that protection so long as any aspect of its federal duties remained untouched by state litigation. The F&R cites nothing to support such a rule, which would impermissibly circumscribe application of the statute and upend its protective purposes.

**B.     Contrary to the F&R, Coinbase has identified colorable federal defenses that warrant denial of remand.**

Coinbase has also satisfied its burden of identifying at least one colorable federal defense that "flows from" the performance of its "official duties." "[A] defendant invoking § 1442(a)(1) need not win his case before he can have it removed." *Leite*, 749 F.3d at 1124 (quoting *Willingham*, 395 U.S. at 407). Instead, a federal defense is colorable so long as it is not "immaterial and made solely for the purpose of obtaining jurisdiction or . . . wholly insubstantial and frivolous." *DeFiore*,

85 F.4th at 560 (citation omitted). Coinbase pleads five federal defenses, NOR ¶ 26, all arising out of its work on behalf of the federal government and each more than colorable. In recommending remand, the F&R offers only a cursory footnote that misstates these defenses and fails to apply the "colorability" standard. That reasoning should not be adopted:

1. *Preemption and intergovernmental immunity*. The Attorney General's action violates the federal Supremacy Clause, because it is both preempted and otherwise unsustainable under the intergovernmental immunity doctrine. "Under the doctrine of obstacle preemption [] a state law is preempted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Geo Grp., Inc.* v. *Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) (*en banc*). By seeking to obstruct the USMS and DOJ's execution of their regulatory mandate to administer the Asset Forfeiture Program, the Attorney General's "interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption." *Id.* at 762. The intergovernmental immunity doctrine, meanwhile, "prohibit[s] state laws that . . . regulate the United States directly." *Id.* at 758. Oregon violates this constitutional limit, too, as it seeks to "control" the federal government's law enforcement operations by prohibiting Coinbase from maintaining a nationwide market in connection with its performance under the USMS agreements.

The F&R does not address whether these defenses are colorable, concluding instead that they do not "appear sufficient." F&R at 18 n.5. In all events, nothing in the opinion can sustain a finding that Coinbase's Supremacy Clause defenses are wholly insubstantial and frivolous, as the law requires. To begin, the F&R's analysis rests on a misunderstanding of both Coinbase's work for the federal government and its Supremacy Clause defenses. *See id.* (emphasizing that "USMS transactions are exempted" from Oregon's securities law, without addressing Coinbase's role in supplying the USMS with a market for those transactions); *id.* (suggesting that Coinbase's

Page 29 – DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION

intergovernmental immunity defense is premised on an "indirect[] increase [in] the federal government's costs," without addressing the Attorney General's effort to block Coinbase from operating a market in the state).

And the F&R also misstates federal law, asserting that "nothing in the [federal] Asset Forfeiture Program evinces an intent to override state law[]." *Id.* This is wrong. *See* 21 U.S.C. § 881(e)(1)(B) (authorizing the disposal of forfeited property by public sale or any other commercially feasible means); 21 U.S.C. § 903 (providing that state law is preempted where "there is a positive conflict between" federal law — including 21 U.S.C. § 881 — and state law). In any event, there is no requirement that a federal statute explicitly "evince[] an intent to override state law" in order to assert an obstacle preemption defense. *See Cohen* v. *Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022) ("[T]he intent to pre-empt need not be express . . . . Under the doctrine of implied conflict preemption, [a federal law or regulation] will pre-empt any state or local law that conflicts with such regulations *or frustrates the purposes thereof.*" (cleaned up and emphasis added)); *see also Oregon Prescription Drug Monitoring Program* v. *U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1236 (9th Cir. 2017) (finding that a state law is preempted where it "interferes with the methods by which the federal statute was designed to reach [its] goal").

2.    *Due process*. The Attorney General's enforcement action also violates fair notice principles under the federal Due Process Clause. *See FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). The federal Constitution's fair notice requirement is based on the bedrock principle that "regulated parties should know what is required of them so they may act accordingly" and that "those enforcing the law do not act in an arbitrary or discriminatory way." *Butcher* v. *Knudsen*, 38 F.4th 1163, 1168-

69 (9th Cir. 2022) (cleaned up). Oregon's action fails by either measure. The Attorney General sprang this lawsuit on Coinbase after Oregon had publicly declared that cryptoassets were "not regulated . . . by the State of Oregon," "similar . . . to gold."[20] "That caginess creates a serious constitutional problem; due process guarantees fair notice." *Coinbase, Inc.* v. *SEC*, 126 F.4th 175, 213 (3d Cir. 2025) (Bibas, J., concurring) (criticizing the SEC's action against Coinbase). And this defense directly "flows from" the USMS agreements: Coinbase will rely on the existence of those federal agreements as one reason it lacked fair notice that it might be involved in the sale of unregistered securities.

3.    *Classification of digital assets as "investment contracts."* None of the digital-asset transactions identified in the Complaint qualify as "investment contracts" under the federal standard at issue in Oregon's claims. As the Southern District of New York acknowledged when it granted interlocutory appellate review of the SEC's since-dismissed action against Coinbase, there exists "substantial ground for difference of opinion" on this point, due in part to "conflicting authority [] regarding *Howey*'s application to crypto-assets." *SEC* v. *Coinbase, Inc.*, 761 F. Supp. 3d 702, 716 (S.D.N.Y. 2025); *see also SEC* v. *Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 328-30 (S.D.N.Y. 2023) (holding that sales of XRP on secondary market platforms were not investment contracts); *SEC* v. *Binance Holdings Limited*, 738 F. Supp. 3d 20, 57 (D.D.C. 2024) (dismissing claim that secondary-market transactions of the BNB token were investment contracts). The defense is thus, at minimum, colorable. And again, the challenged conduct "flows from" Coinbase's operation of its digital-asset trading platform, which is a component of its performance of its obligations to the USMS.

---

[20]    NOR ¶ 4 (quoting Or. Div. of Fin. Reg., *Cryptocurrency* (Oct. 12, 2018) (emphasis added), https://tinyurl.com/chx49csm).

4. *Personal jurisdiction*. The Attorney General has failed to plead that Coinbase has "minimum contacts" with Oregon sufficient to establish personal jurisdiction consistent with the federal Constitution. Personal jurisdiction does not lie in Oregon because Oregon does not allege that Coinbase has specifically directed any of its activities toward the state. *Herbal Brands, Inc.* v. *Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023) ("[O]peration of an interactive website does not, by itself, establish express aiming."). In fact, Coinbase Global, Inc., as a holding company, has conducted no activity whatsoever in the state.

The F&R presents no analysis of the merits of Coinbase's Due Process, Exchange Act, and personal jurisdiction defenses. Instead, it opines that none of those defenses "flow[s] from" Coinbase's "official duties" and all would "exist irrespective of" its federal contracts. F&R at 18 n.5. But even were those assertions true, neither is disqualifying. The Ninth Circuit has repeatedly found removal justified even where both were absent. *See, e.g.*, *Stirling* v. *Minasian*, 955 F.3d 795, 801 (9th Cir. 2020) (colorable federal defense based on implied preemption by federal regulatory scheme); *People of State of Cal.* v. *H & H Ship Serv. Co.*, 68 F.3d 481 (9th Cir. 1995) (colorable federal defense based on federal regulation's general preemption provision). As these decisions establish, Coinbase need only show that its defenses generally "flow from" its conduct taken under color of federal authority — including its nationwide operation of the trading platform, as set out above.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should decline to adopt the F&R, deny Oregon's Motion to Remand, and retain jurisdiction.

DATED: September 26, 2025        STOEL RIVES LLP


_s/ Timothy W. Snider_
TIMOTHY W. SNIDER, OSB No. 034577
timothy.snider@stoel.com
JAMES A. KILCUP, OSB No. 173891
james.kilcup@stoel.com
KATE S. SHEPHERD, OSB No. 224891
kate.shepherd@stoel.com

AND

KEVIN S. SCHWARTZ, appearing _pro hac vice_
kschwartz@wlrk.com
NOAH B. YAVITZ, appearing _pro hac vice_
nbyavitz@wlrk.com
ADAM M. GOGOLAK, appearing _pro hac vice_
amgogolak@wlrk.com
SIJIN CHOI, appearing _pro hac vice_
schoi@wlrk.com
JULIA M. BRUCE, appearing _pro hac vice_
jmbruce@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: 212.403.1000

_Attorneys for Defendants Coinbase, Inc. and_
_Coinbase Global, Inc._